No. 22-16020

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

TERESA MACCLELLAND; KAREN UMBERGER; SCOTT WILLITS; VALERIE
REED; JOHN ST. JARRE; LOUISE MONSOUR; VANESSA WEST; TIM FRASCH;
DARLEEN PEREZ; WILLIAM KAUPELIS; KERRY SHOWALTER; BRUCE
SCHRAMM; PATRICIA GAGAN; WILLIAM ERIC LOUGH; MICHAEL CARNEY;
ANNA GUTIERREZ; JANETTE LISNER; MARILYN KAYE; TERESA TOY;
MICHAEL BRANOM; GLORIA STERN; DAVID MASSARO; AUGUSTUS JOHNSON;
EDNA TOY; MOLLY BROWN; LINDA JENKINS; GABRIELLE POZZUOLI,
For Themselves, As Private Attorneys General, And On Behalf Of All
Others Similarly Situated,

*Plaintiffs-Appellees*,

v.

CELLCO PARTNERSHIP, DBA VERIZON WIRELESS; VERIZON
COMMUNICATIONS, INC.,

*Defendants-Appellants*.

On Appeal from the U.S. District Court for the Northern District of
California, No. 3:21-cv-08592 (Hon. Edward M. Chen)

## BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED
## STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF
## DEFENDANTS-APPELLANTS AND REVERSAL

Jennifer B. Dickey
Jordan L. Von Bokern
U.S. CHAMBER LITIGATION
  CENTER
1615 H Street, N.W.
Washington, DC 20062

Andrew J. Pincus
Archis A. Parasharami
Kevin S. Ranlett
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006

*Counsel for* Amicus Curiae *the Chamber of Commerce
of the United States of America*

[additional counsel on signature page]

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The Chamber of Commerce of the United States of America states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

# TABLE OF CONTENTS

**Page**

INTEREST OF THE AMICUS CURIAE ................................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................. 2

ARGUMENT ...................................................................................... 4

I. The Mass-Arbitration Procedures In Verizon's Customer Agreement Are Not Unconscionable ............................................... 4

    A. Verizon Amended Its Mass-Arbitration Clause To Resolve The Court's Central Concern ................................... 5

    B. The District Court Failed To Consider The Benefits Of The Bellwether Approach ........................................................ 7

        1. Consumers and businesses benefit from individual arbitration .................................................. 7

        2. Mass arbitrations have emerged as a vehicle for abuse ............................................................................ 9

        3. Arbitrating bellwether cases ensures merits-based resolutions of mass arbitrations, preserving the benefits of arbitration for all parties .................. 18

    C. The District Court's Other Criticisms Of The Mass-Arbitration Clause Are Without Merit ................................ 21

II. The FAA Preempts California's *McGill* Rule .............................. 24

    A. *Viking River* Abrogates *Sakkab* And Necessarily *Blair* ...... 24

    B. The FAA Preemption Principles Set Forth In *Viking River* Apply In The Context Of Public Injunctions ............ 26

CONCLUSION ................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abernathy v. DoorDash, Inc.*,
    438 F. Supp. 3d 1062 (N.D. Cal. 2020) ............................................... 11

*Allied-Bruce Terminix Cos. v. Dobson*,
    513 U.S. 265 (1995) ..................................................................... 8

*Anders v. Hometown Mortg. Servs. Inc.*,
    346 F.3d 1024 (11th Cir. 2003) ......................................................... 6

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) ....................................................... 8, 27, 28, 29

*Blair v. Rent-a-Center, Inc.*,
    928 F.3d 819 (9th Cir. 2019) .................................................. 4, 25, 27

*Carter v. Countrywide Credit Indus., Inc.*,
    362 F.3d 294 (5th Cir. 2004) ........................................................... 6

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
    2020 WL 3513547 (D. Minn. June 29, 2020) ..................................... 11

*In re Chevron U.S.A., Inc.*,
    109 F.3d 1016 (5th Cir. 1997) ......................................................... 19

*Coneff v. AT&T Corp.*,
    673 F.3d 1155 (9th Cir. 2012) ......................................................... 29

*Cruz v. Cingular Wireless, LLC*,
    648 F.3d 1205 (11th Cir. 2011) ....................................................... 29

*DiCarlo v. MoneyLion, Inc.*,
    988 F.3d 1148 (9th Cir. 2021) ......................................................... 30

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018) ......................................................... 2, 3, 29

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Fishon v. Peloton Interactive, Inc.*,
336 F.R.D. 67 (S.D.N.Y. 2020) ........................................................... 15

*George v. eBay, Inc.*,
71 Cal. App. 5th 620 (2021) ................................................................. 7

*Green Tree Fin. Corp.-Ala. v. Randolph*,
531 U.S. 79 (2000) .............................................................................. 23

*In re Intuit Free File Litig.*,
No. 3:19-cv-2546-CRB (N.D. Cal. Dec.7, 2020) ................................. 11

*Intuit Inc. v. 9,933 Individuals*,
2021 WL 3204816 (Cal. Ct. App. July 29, 2021) ............................... 14

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*,
137 S. Ct. 1421 (2017) ........................................................................ 24

*Lamps Plus, Inc. v. Varela*,
139 S. Ct. 1407 (2019) ................................................................... 2, 26

*Large v. Conseco Fin. Servicing Corp.*,
292 F.3d 49 (1st Cir. 2002) ................................................................... 6

*Livingston v. Assocs. Fin., Inc.*,
339 F.3d 553 (7th Cir. 2003) ................................................................ 6

*McGill v. Citibank, N.A.*,
2 Cal. 5th 945 (2017)..................................................................... 24, 30

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab.
Litig.*,
2007 WL 1791258 (S.D.N.Y. June 15, 2007) .................................... 19

*Mohamed v. Uber Techs., Inc.*,
836 F.3d 1102 (9th Cir. 2016) .............................................................. 6

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Nieves v. City of Cleveland,*
  153 F. App'x 349 (6th Cir. 2005)......................................................... 11

*OTO, L.L.C. v. Kho,*
  8 Cal. 5th 111, 124 (2019).................................................................. 7

*PacifiCare Health Sys., Inc. v. Book,*
  538 U.S. 401 (2003)........................................................................... 23

*Ragone v. Atl. Video at Manhattan Ctr.,*
  595 F.3d 115 (2d Cir. 2010) .............................................................. 6

*S. Leasing Partners, Ltd. v. McMullan,*
  801 F.2d 783 (5th Cir. 1986).............................................................. 11

*Sakkab v. Luxottica Retail N. Am., Inc.,*
  803 F.3d 425 (9th Cir. 2015)...................................................... 4, 24, 25

*Swanson v. H&R Block, Inc.,*
  475 F. Supp. 3d 967 (W.D. Mo. 2020).............................................. 27

*Tompkins v. 23andMe, Inc.,*
  840 F.3d 1016 (9th Cir. 2016)............................................................ 6

*Viking River Cruises, Inc. v. Moriana,*
  142 S. Ct. 1906 (2022).....................................4, 25, 26, 27, 28, 29, 30

*Wallrich v. Samsung Elecs. Am., Inc.,*
  No. 1:22-cv-05506 (N.D. Ill. Oct. 7, 2022)....................................... 13

*Weatherbee v. Va. State Bar ex rel. Fourth
  Dist.-Section I Comm.,*
  689 S.E.2d 753 (Va. 2010)................................................................. 12

## Statutes

Cal. Civ. Code § 1670.5.......................................................................... 7

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Cal. Civ. Proc. Code § 1281.97 ................................................................. 15

Cal. Civ. Proc. Code § 1281.98 ................................................................. 15

Cal. Civ. Proc. Code § 1281.99 ................................................................. 15

**Other Authorities**

AAA, *Consumer Arbitration Rules* (Nov. 1, 2020) .................................. 13

AAA, *Consumer Arbitration Rules: Costs of Arbitration* (Nov.
    1, 2020) ............................................................................... 12, 13, 14

AAA, *Supplementary Rules for Multiple Case Filings* (Aug. 1,
    2021) .................................................................................................. 23

Alison Frankel, *Intuit Defends $40 Million Class Settlement,
    Attacks Mass Arbitration Firm*, Reuters (Dec. 9, 2020) .................... 14

Alison Frankel, *Mass Consumer Arbitration Is On! Ed Tech
    Company Hit With 15,000 Data Breach Claims*, Reuters
    (May 12, 2020) .................................................................................. 18

Am. Bar Ass'n, Model R. of Prof. Conduct 1.4 ........................................ 10

Am. Bar Ass'n, Model R. of Prof. Conduct 3.1 cmt. 2 ............................. 10

Amanda Robert, *Amazon Drops Arbitration Requirement
    After Facing 75,000 Demands*, ABA J. (June 2, 2021) ................ 13, 17

Andrew Wallender, *Uber Settles 'Majority' of Arbitrations for
    at Least $146M*, Bloomberg Law (May 9, 2019) ................................ 13

Christopher Brown, *Samsung Facing Almost 50,000
    Arbitration Claims Over Selfies*, Bloomberg Law (Oct. 11,
    2022) .................................................................................................. 13

Fed. R. App. P. 29 ....................................................................................... 1

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev 1283 (2022)......................................................................... 16, 18

Harry M. Reasoner, *et al.*, *Business & Commercial Litigation in Federal Courts* (5th ed. Supp. 2021) .............................. 10

Henry J. Friendly, *Federal Jurisdiction: A General View* (1973)................................................................................. 16

Hon. Eldon E. Fallon, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323 (2008) ........................... 19

Hon. Stephen R. Bough & Anne E. Case-Halferty, *A Judicial Perspective on Approaches to MDL Settlement*, 89 UMKC L. Rev. 971 (2021) ............................................................... 20

Justin Elliott, *TurboTax Maker Intuit Faces Tens of Millions in Fees in a Groundbreaking Legal Battle Over Consumer Fraud*, ProPublica (Feb. 23, 2022) .................... 18

*Manual for Complex Litigation, Fourth* (2004) ..................... 20

Matthew C. Helland, *Costs of Defense in Mass Individual Wage-and-Hour Arbitrations: A Case Study*, PLI Current Vol. 3, No. 1 (Winter 2019) ............................................. 22

NYU Center on Civil Justice, *What the Data Show: Mapping Trends in Multidistrict Litigation* (Sept. 2015) ................ 20

Nam D. Pham & Mary Donovan, *Fairer, Faster, Better III: An Empirical Assessment of Consumer & Employment Arbitration*, U.S. Chamber of Commerce Institute for Legal Reform (Mar. 2022)...................................................... 8

Skye Witley & Christopher Brown, *Samsung's Biometric Data Clash Opens New Mass Arbitration Front*, Bloomberg Law (Oct. 21, 2022) ......................................... 13

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Stephen J. Ware, *The Centrist Case for Enforcing Adhesive Arbitration Agreements*, 23 Harv. Negotiation L. Rev. 29 (2017).................................................................................9

U.S. Judicial Panel on Multidistrict Litigation, *Statistical Analysis of Multidistrict Litigation Under 28 U.S.C. § 1407 Fiscal Year 2021* (2021)..........................................20

## INTEREST OF THE *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community, such as the enforceability of arbitration agreements and interpretation of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16.

Many of the Chamber's members and affiliates regularly rely on arbitration agreements. Arbitration is speedy, fair, inexpensive, and less adversarial than litigation. The Chamber's members and affiliates have

---

[1] No counsel for a party authored this brief in whole or in part, and no person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties consented to the filing of this brief.

structured millions of contractual relationships around the use of arbitration precisely to achieve those benefits.

The ruling below implicates two serious threats to the availability of such benefits. First, the rise of abusive mass arbitrations and their concomitant blackmail settlements. Confronted with the risks of mass arbitrations, businesses will be discouraged from using arbitration altogether, frustrating the purposes of the FAA and harming both businesses and their customers and employees. Second, California's refusal to enforce agreements for individual arbitration that do not permit an individual to arbitrate claims for public injunctive relief. Accordingly, the Chamber has a strong interest in this case and in reversal of the judgment below.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The FAA directs courts to "enforce arbitration agreements according to their terms—including terms providing for individualized proceedings." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018). Because the Act protects an "individualized form of arbitration," *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019), the Supreme Court has

held that "courts may not allow a contract defense to reshape traditional individualized arbitration," *Epic Sys.*, 138 S. Ct. at 1623.

Despite these mandates, the district court allowed the plaintiffs to circumvent their agreements for individual arbitration of disputes with Verizon. The Chamber agrees with Verizon that the court erred throughout its decision. In this brief, the Chamber focuses on two key errors that have important implications for the broader business community.

*First*, the district court erred in holding that the parties' agreement to address potential mass arbitrations through the use of staged, bellwether-style proceedings is unconscionable. The district court ignored the sound reasons—consistent with the efficiencies of individual arbitration—that support the use of a "bellwether" process for resolving mass arbitrations. Mass arbitrations are ripe for abuse, leading to blackmail settlements. A bellwether process defangs that threat, and it is exactly what happens every day in federal courts in the mass tort and multidistrict litigation ("MDL") contexts.

*Second*, the district court erred in holding that California's rule against waivers of public injunction claims—called the *McGill* rule—

3

precludes enforcement of Verizon's arbitration clause. This Court held in *Blair v. Rent-a-Center, Inc.*, 928 F.3d 819 (9th Cir. 2019), that the FAA does not preempt *McGill*. But *Blair* relied on this Court's decision in *Sakkab v. Luxottica Retail North America, Inc.*, 803 F.3d 425 (9th Cir. 2015), which was recently abrogated by the Supreme Court in *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022). Indeed, the *McGill* rule is fatally undermined by every step of the analysis in *Viking River*.

The district court's order should be reversed.

## ARGUMENT

### I. The Mass-Arbitration Procedures In Verizon's Customer Agreement Are Not Unconscionable.

This Court should reverse the district court's holding that Verizon's mass-arbitration clause is unconscionable. Under that clause, if the same or coordinated counsel bring 25 or more claims, the arbitrations are staged so that 10 cases may be filed in arbitration and resolved at a time, mimicking the familiar bellwether process for MDLs. ER-38. The court focused unduly on an uncharitable interpretation of this clause that Verizon itself waived, and the court failed to consider the many benefits of the bellwether approach. Indeed, this bellwether provision would facilitate the orderly resolution of mass arbitrations through informed

settlements, while preventing some of the abuses that have become prevalent in recent years.

### A. Verizon Amended Its Mass-Arbitration Clause To Resolve The Court's Central Concern.

The key concern that animated the district court's decision was its conclusion that the mass-arbitration clause did not toll the statute of limitations during the bellwether process, which the court worried could result in some claims being "forever barred." ER-23. The court concluded that the clause is unconscionable because "[t]he forfeiture of entire legal rights contravenes public policy." *Id.*

Although Verizon has explained why the clause should have been interpreted to provide for tolling of those claims, Op. Br. 43-45, the district court need not have accepted that interpretation to uphold the clause. Before the district court's ruling, Verizon amended its agreements with all customers to be crystal clear that "the statutes of limitations applicable to a customer's dispute are tolled until the completion of the coordinated arbitration proceeding." D. Ct. Dkt. 44 at 1. Further, Verizon informed the district court that this amendment "would also include all Plaintiffs in the action before this Court to avoid any unconscionable result." *Id.* And Verizon explained that not only the potential mass-

5

arbitration claimants—who were not before the district court—but also all other Verizon customers could take advantage of the amendment as well. *Id.*

This Court has repeatedly refused to consider challenges to contractual terms whose enforceability has been waived. *See Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1212 (9th Cir. 2016) (declining to consider plaintiffs' objection to a fee term in an arbitration agreement because "Uber has committed to paying the full costs of arbitration"); *see also Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1033 (9th Cir. 2016) (Watford, J., concurring) ("I see no need to address whether the fee-shifting clause is substantively unconscionable because 23andMe has waived its right to enforce that clause—a clause that would have been severable in any event.").

Other courts of appeals are in accord. *See Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 124 (2d Cir. 2010); *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 300 & n.4 (5th Cir. 2004); *Livingston v. Assocs. Fin., Inc.*, 339 F.3d 553, 557 (7th Cir. 2003); *Anders v. Hometown Mortg. Servs. Inc.*, 346 F.3d 1024, 1029 (11th Cir. 2003); *Large v. Conseco Fin. Servicing Corp.*, 292 F.3d 49, 56-57 (1st Cir. 2002).

Given Verizon's binding concession, the district court should have followed these decisions and refused to consider plaintiffs' challenge.

### B. The District Court Failed To Consider The Benefits Of The Bellwether Approach.

The district court was separately wrong in refusing to recognize the benefits of Verizon's bellwether clause. Under California law, assessing unconscionability "requires inquiry into the 'commercial setting, purpose, and effect' of the contract or contract provision" in question. *George v. eBay, Inc.*, 71 Cal. App. 5th 620, 630 (2021) (quoting Cal. Civ. Code § 1670.5(b)). A court must "examine the totality of the agreement's substantive terms" and determine the fairness of the parties' "overall bargain." *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 124 (2019). Considered under this standard, the benefits of the bellwether process to all parties are obvious: It preserves individualized arbitration by ensuring that parties can feasibly be heard on the merits while encouraging an orderly settlement process. The district court erred in ignoring these benefits.

#### 1. Consumers and businesses benefit from individual arbitration.

Over a decade ago, the Supreme Court observed that customers "were *better off*" under their agreements for individual arbitration with their cell phone carrier "than they would have been as participants in a

class action, which could take months, if not years, and which may merely yield an opportunity to submit a claim for recovery of a small percentage of a few dollars." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011) (internal quotation marks omitted).

That is because individual arbitration is a faster, simpler, and less expensive method of dispute resolution than a lawsuit in court. Indeed, studies confirm that consumers and employees who arbitrate fare better than ones who litigate.[2] As then-Justice Breyer concluded, arbitration is especially important for individuals with modest claims—abandoning arbitration would "leav[e] the typical consumer who has only a small damages claim (who seeks, say, the value of only a defective refrigerator or television set) without any remedy but a court remedy, the costs and delays of which could eat up the value of an eventual small recovery." *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 281 (1995).

---

[2] *See, e.g.*, Nam D. Pham & Mary Donovan, *Fairer, Faster, Better III: An Empirical Assessment of Consumer & Employment Arbitration*, U.S. Chamber of Commerce Institute for Legal Reform 4 (Mar. 2022), https://bit.ly/3SK7QwA (finding that, on average, arbitration leads to faster resolution of claims than litigation, with consumers and employees enjoying higher win rates and obtaining higher average damages in arbitration than litigation).

Verizon's arbitration clause offers meaningful benefits to consumers: Under that clause, customers arbitrate for free, and if the arbitrator issues an award to the customer that exceeds Verizon's last settlement offer, the customer's minimum recovery is $5,000 and reasonable attorneys' fees and costs. *See* ER-38.

But consumers who have a dispute with a business are not the only beneficiaries of arbitration. Because arbitration reduces the cost of dispute resolution, it also reduces the company's overall cost of doing business. The forces of market competition then cause those savings to be passed along to consumers in the form of lower prices and to employees in the form of higher wages.[3] Without arbitration, those savings dissipate, resulting in higher prices and lower wages. And the ripple effects of these changes are felt throughout the economy.

### 2. Mass arbitrations have emerged as a vehicle for abuse.

Mass arbitrations, like those in this case, are ripe for abuse.

---

[3] Stephen J. Ware, *The Centrist Case for Enforcing Adhesive Arbitration Agreements*, 23 Harv. Negotiation L. Rev. 29, 85, 113 (2017) ("[S]tandard economic analysis suggests that enforcement of adhesive consumer arbitration agreements tends over time to lower the prices of the goods and services consumers buy.").

Unlike class actions, where plaintiffs' lawyers predominantly communicate with a few named plaintiffs to initiate a case, and the subsequent court-supervised class-certification process provides some guarantees about the characteristics of unnamed class members, mass arbitrations require individualized vetting and attention from plaintiffs' lawyers for each arbitration claim that they file. Plaintiffs' lawyers *should* be vetting their clients to ensure that they have a basis for presenting an arbitral claim and communicating with their clients throughout the process—indeed, those steps are mandated by rules of professional conduct.[4]

But recent experience suggests that these requirements are not being met. For example, in a recent mass arbitration filed against Intuit, plaintiffs' counsel had to pull back more than 8,200 claims because, as

---

[4] *See, e.g.*, ABA Model R. of Prof. Conduct 3.1 cmt. 2 ("The filing of an action . . . or similar action taken for a client" requires lawyers to "inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions."); 7 Harry M. Reasoner, *et al.*, *Business & Commercial Litigation in Federal Courts* § 85.14 (5th ed. Supp. 2021) ("Like Fed. R. Civ. P. 11, Model Rule 3.1 and analogous state rules generally impose a duty of investigation on the lawyer."); *see also* ABA Model R. of Prof. Conduct 1.4 (requiring lawyer to communicate and consult with client).

Intuit's counsel explained, it turns out their clients were not in fact customers of Intuit or had never incurred the disputed charge.[5] Other companies targeted by mass arbitrations have had similar experiences.[6] This pattern confirms that lawyers cannot blindly trust the unverified information typed into online forms by strangers recruited to be arbitration claimants.[7]

---

[5]   *See* Decl. of Roger Cole ¶¶ 21-22, Dkt. 192, *In re Intuit Free File Litig.*, No. 3:19-cv-2546-CRB (N.D. Cal. Dec.7, 2020) (noting that out of 42,451 arbitrations filed by the plaintiffs' firm now known as Keller Postman, the firm withdrew 8,282 arbitrations after Intuit demonstrated that the claimants were either not Intuit customers or never paid the disputed fee).

[6]   *See, e.g.*, *In re CenturyLink Sales Pracs. & Sec. Litig.*, 2020 WL 3513547, at *2-3 (D. Minn. June 29, 2020) (reporting that after mass arbitration claimants were selected solely "based on their responses to questionnaires," the defendant found that it "could not identify any potential customer account that could be connected with some" claimants, with some even "claimed to receive services at addresses in states in which [the defendant] does not provide services"); *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1065 (N.D. Cal. 2020) (determining that 869 arbitration claimants had failed to provide sufficient evidence to allow the court to find that they had arbitration agreements with the defendant).

[7]   *See, e.g.*, *Nieves v. City of Cleveland*, 153 F. App'x 349, 353 (6th Cir. 2005) (affirming sanctions imposed on lawyer who "did not do any reasonable investigation to establish the truth of [his client's] claims, but only blindly relied on his client's accusations"); *S. Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir. 1986) ("Blind reliance on the client is seldom a sufficient inquiry" under Rule 11), *overruled in part on*

The arbitration filed against Intuit is a good example of what has become a common phenomenon: plaintiffs' counsel seeking to create coercive settlement leverage based not on the merits of the claims, but based only on the fact that many businesses—like Verizon—agree to pay the costs associated with arbitration. Under the American Arbitration Association consumer fee schedule, if a Verizon customer requests a hearing (even a telephonic or Zoom hearing), Verizon must pay $4,900 in AAA fees per case, win or lose.[8] And the lion's share of these fees—$4,200—must be paid almost immediately after the arbitration is filed.[9]

---

*other grounds by Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866 (5th Cir. 1988) (en banc); *Weatherbee v. Va. State Bar ex rel. Fourth Dist.- Section I Comm.*, 689 S.E.2d 753, 756 (Va. 2010) (lawyer violated Rule 3.1 by filing "form complaints without undertaking a reasonable inquiry into their validity with respect to a particular client").

[8]  *See* AAA, *Consumer Arbitration Rules: Costs of Arbitration* (Nov. 1, 2020), https://bit.ly/3DebCbk. Specifically, the business would pay the consumer's $200 filing fee, the business's $300 filing fee, a $1,400 case-management fee, a $500 hearing fee, and an arbitrator fee of $2,500 per day of hearing. *Id.* at 1.

[9]  The filing fees and arbitrator fees are charged as soon as the case is accepted for administration, and the case-management fee is charged as soon as 14 days later, when the AAA deems the case ready to enter the arbitrator-selection phase. AAA, *Consumer Arbitration Rules: Costs of Arbitration* (Nov. 1, 2020), https://bit.ly/3DebCbk.

In a mass arbitration, the AAA slightly reduces the initial filing fees, gradually lowering the business's cost per case to $4,525.[10]

When aggregated in a mass arbitration, these fees become astronomical. That looming gigantic payment obligation—which lands before a business has even had time to verify that the client was party to an arbitration agreement with it, much less an opportunity to offer any defense to the claims—creates leverage to force blackmail settlements.

Consider a business threatened with 50,000 arbitrations—the number that Samsung is currently facing,[11] and fewer than the number of arbitrations that Uber (60,000),[12] Amazon (75,000),[13] and Intuit

---

[10] *See* AAA, *Consumer Arbitration Rules* 36 (Nov. 1, 2020), https://bit.ly/3FyPYl3; AAA, *Consumer Arbitration Rules: Costs of Arbitration* 3 (Nov. 1, 2020), https://bit.ly/3DebCbk. But the remaining fees (such as arbitrator and case-management fees) are unchanged. *Id.*

[11] Skye Witley & Christopher Brown, *Samsung's Biometric Data Clash Opens New Mass Arbitration Front*, Bloomberg Law (Oct. 21, 2022), https://bit.ly/3ssefBe; Christopher Brown, *Samsung Facing Almost 50,000 Arbitration Claims Over Selfies*, Bloomberg Law (Oct. 11, 2022), https://bit.ly/3gEIgLL; Pet. to Compel Arbitration, *Wallrich v. Samsung Elecs. Am., Inc.*, No. 1:22-cv-05506, Dkt. 1 (N.D. Ill. Oct. 7, 2022).

[12] Andrew Wallender, *Uber Settles 'Majority' of Arbitrations for at Least $146M*, Bloomberg Law (May 9, 2019), https://bit.ly/3z5E0LD.

[13] Amanda Robert, *Amazon Drops Arbitration Requirement After Facing 75,000 Demands*, ABA J. (June 2, 2021), https://bit.ly/3URJuTj.

(125,000)[14] recently faced. Under the AAA's current fee schedule, if the business commits to paying the consumer's filing fee (as often is the case) and the claimants request telephonic or Zoom hearings, the business's immediate upfront cost would be over $201 million.[15] And it would be required to pay this amount even if it wins every case (and even if the claimants were not in fact customers of the company or failed to show up to the hearing).

Nor can businesses simply refuse to pay the fees. The AAA, for example, warns that if a business fails to timely pay an invoice, the AAA "may decline to administer future consumer arbitrations with that business." [16] The nonpayment of fees thus could end the company's

---

[14] Alison Frankel, *Intuit Defends $40 Million Class Settlement, Attacks Mass Arbitration Firm*, Reuters (Dec. 9, 2020), https://reut.rs/3eU2vV0; *see also Intuit Inc. v. 9,933 Individuals*, 2021 WL 3204816, at *2 (Cal. Ct. App. July 29, 2021).

[15] Specifically, the business would pay $4,125,000 in filing fees, the 50,000 consumers' $2,525,000 filing fees, and $195,000,000 in case-management and arbitrator fees. *See* AAA, *Consumer Arbitration Rules: Costs of Arbitration* (Nov. 1, 2020), https://bit.ly/3DebCbk.

[16] AAA, *Consumer Arbitration Rules: Costs of Arbitration* (Nov. 1, 2020), https://bit.ly/3DebCbk.

arbitration program.[17] And in California, Civil Code Sections 1281.97-99 threaten businesses with harsh sanctions if they fail to pay arbitral fees within 30 days.[18]

Plaintiffs' law firms have exploited these dynamics to try to achieve quick and lucrative (at least for plaintiffs' counsel) settlements. After all, a business facing the threat of $200 million in AAA fees may find it difficult to reject a $20 million settlement demand, even if the underlying

---

[17] *See Fishon v. Peloton Interactive, Inc.*, 336 F.R.D. 67, 68 (S.D.N.Y. 2020) (after more than 2,700 Peloton consumers filed individual arbitration demands with the AAA, Peloton failed to pay the required fees and AAA refused to accept any more demands against Peloton).

[18] Under California law, if a "drafting party" to an "employment or consumer arbitration" agreement fails to pay the arbitration fees owed under that agreement "within 30 days" of the invoice, the drafting party is in "default" of the agreement as a matter of law. Cal. Civ. Proc. Code § 1281.97. This default entitles the plaintiff consumer or employee either to (1) "[w]ithdraw the claim from arbitration and proceed in a court of appropriate jurisdiction," in which case "the court shall impose sanctions on the drafting party"; or (2) "[c]ompel arbitration in which [case] the drafting party shall pay reasonable attorney's fees and costs related to the arbitration." *Id.*; *see also id.* §§ 1281.98 & 1281.99.

The U.S. Chamber has elsewhere explained why this rule, which imposes special penalties on arbitration agreements as compared to other contractual agreements, violates the FAA. *See* Amicus Curiae Br. of the Chamber of Commerce of the United States in Supp. of Pls.-Appellants 15-30, *Intuit Inc. v. 9,933 Individuals*, No. B308417 (Cal. Ct. App. Mar. 19, 2021).

claims are meritless. Unsurprisingly given these realities, mass arbitrations have proliferated in recent years.

Nearly a half-century ago, Judge Friendly famously recognized that class actions can lead to "blackmail settlements."[19] Today, for plaintiffs' firms threatening mass arbitrations, blackmail settlements are the entire point. Georgetown Professor J. Maria Glover has stated candidly—after interviewing plaintiffs' lawyers who originated the mass-arbitration strategy—that "[t]he mass-arbitration model operates on its ability to impose significant *in terrorem* settlement pressure" through the imposition of "astounding" fees that "can spell financial catastrophe for a potential defendant."[20] Professor Glover concluded that the settlement pressure imposed by a mass arbitration—even one asserting "more dubious claims"—can be greater than that imposed by a certified class action.[21]

---

[19]  Henry J. Friendly, *Federal Jurisdiction: A General View* 120 (1973).

[20]  Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283, 1345, 1349, 1380 (2022).

[21]  Glover, 74 Stan. L. Rev. at 1350; *see also id*. at 1352 ("Simply put, mass arbitration shows that when it comes to *in terrorem* effects (the bogeyman of the class-action counterrevolution), the leverage of a large number of individual arbitrations can sometimes exceed the leverage created by aggregate proceedings.").

Indeed, during the hearing on Verizon's motion to compel arbitration, plaintiffs' counsel highlighted that the heart of the mass arbitration threat against Verizon was the ability to inflict "potentially millions and millions of dollars" in arbitration fees. D. Ct. Dkt. 40 at 12:10.

Companies dealing with a mass arbitration thus face a Hobson's choice: either pay the overwhelming bill for arbitration fees in order to have an opportunity to investigate and defend against the claims on the merits, or accept under duress a settlement that reflects the AAA fees rather than the merits of the claims. The cost of these blackmail settlements thus amounts to, in effect, a mass-arbitration tax on businesses. Some, like Amazon, which faced more than 75,000 arbitration demands in 2021, were forced to abandon their arbitration clauses and thus the benefits of arbitration for dispute resolution. Amanda Robert, *Amazon Drops Arbitration Requirement After Facing 75,000 Demands*, ABA J. (June 2, 2021), https://bit.ly/3URJuTj.[22] Other

---

[22] Although many threatened or filed mass arbitrations are kept secret, public reports indicate that large mass arbitrations also have been pursued against DoorDash, Postmates, FanDuel, DraftKings, Chegg, Chipotle, CenturyLink, Dollar Tree, and many other companies. *See*, *e.g.*,

businesses have had to pass along the cost of this tax to their customers in the form of higher prices and to employees in the form of lower wages or fewer jobs. None of these results is desirable.

> ### 3. Arbitrating bellwether cases ensures merits-based resolutions of mass arbitrations, preserving the benefits of arbitration for all parties.

The district court gave short shrift to the risks of abuse of mass arbitration and thus failed to appreciate that Verizon's bellwether approach enables parties to resolve mass-arbitration claims in a way that reflects the underlying merits rather than a coerced settlement based on arbitration fees.

Verizon's bellwether approach for administering large numbers of individual arbitrations is modeled after the way that MDL courts resolve large numbers of individual lawsuits—*i.e.*, to provide for bellwether trials designed to inform the parties about whether and how to settle the claims. Although bellwether trials are also not impervious to abuse, one

---

Glover, 74 Stan. L. Rev. at 1387-90; Alison Frankel, *Mass Consumer Arbitration Is On! Ed Tech Company Hit With 15,000 Data Breach Claims*, Reuters (May 12, 2020), https://reut.rs/3z1uwAU; Justin Elliott, *TurboTax Maker Intuit Faces Tens of Millions in Fees in a Groundbreaking Legal Battle Over Consumer Fraud*, ProPublica (Feb. 23, 2022), https://bit.ly/3TLz0Uh.

federal judge has described such trials as "one of the most innovative and useful techniques for the resolution of complex cases." Hon. Eldon E. Fallon, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2323 (2008).

Under the MDL process, a few representative cases are selected from the numerous cases in the MDL and set for trial. *Id.* at 2340-41. The outcome of the bellwether trials then encourages settlement in two ways. First, by preparing for trial, the process forces litigants to take a more realistic assessment of what evidence and arguments they can present. *Id.* at 2341-42. Second, the outcome of the trials provides "real-world evaluations of the litigation by multiple juries." *Id.* at 2325. As the Fifth Circuit has explained, "If a representative group of claimants are tried to verdict, the results of such trials can be beneficial for litigants who desire to settle such claims by providing information on the value of the cases as reflected by the jury verdicts." *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997); *see also In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, MDL No. 1358, 2007 WL 1791258, at *2-3 (S.D.N.Y. June 15, 2007).

MDLs—and the judges overseeing them—have proven to be remarkably effective at achieving settlement. Since 1968, when Congress passed the MDL statute, transferee courts have remanded back to the originating courts fewer than 3% of all cases consolidated into an MDL—which means that transferor courts terminated 97% of cases themselves.[23]

A study by the NYU School of Law Center on Civil Justice determined that between 2000 and 2015, 72% of the MDL case terminations resulted from settlement. NYU Center on Civil Justice, *What the Data Show: Mapping Trends in Multidistrict Litigation* (Sept. 2015), https://bit.ly/3zoDwAp; *see also Manual for Complex Litigation, Fourth* § 20.132 (2004) ("Few cases are remanded for trial; most multidistrict litigation is settled in the transferee court."). As one expert in the MDL process has observed, "nothing encourages global MDL settlement like setting bellwether trials." Hon. Stephen R. Bough & Anne E. Case-Halferty, *A Judicial Perspective on Approaches to MDL*

---

[23] *See* U.S. Judicial Panel on Multidistrict Litigation, *Statistical Analysis of Multidistrict Litigation Under 28 U.S.C. § 1407 Fiscal Year 2021*, 3 (2021), https://bit.ly/3feso28 ("Since the creation of the Panel in 1968, . . . a total of 17,357 actions have been remanded for trial and 647,396 actions have been terminated in the transferee court.").

*Settlement*, 89 UMKC L. Rev. 971, 976 (2021) (quoting Special Master David Cohen).

Verizon's bellwether clause adapts the MDL approach for mass arbitration. After the parties arbitrate 10 test cases to obtain data about the merits and reasonable value of the claims, the parties can use mediation or individual settlement proposals to resolve the remaining cases, or can proceed to arbitrate additional cases. Because all of the cases except for the ones selected as test cases are held outside of arbitration while this process unfolds, the process defers the assessment of arbitration fees until each tranche of cases is actually arbitrated. That fact makes it feasible for defendants to defend against claims on the merits. And some of the money saved in arbitral fees can be used to fund a settlement with real value for claimants, if appropriate. The bellwether process thus promotes resolution based on the merits, rather than based only on the threatened amount of aggregated arbitration fees.

## C.  The District Court's Other Criticisms Of The Mass-Arbitration Clause Are Without Merit.

The district court also criticized Verizon's mass-arbitration clause as non-mutual insofar as it imposed restrictions if claimants retained the same counsel but did not limit Verizon's choice of counsel. ER-24. That

concern is misplaced. There is no requirement of precise mutuality in arbitration agreements. And in any event, the clause's bellwether provisions apply only if a plaintiff wants to proceed through counsel pursuing a mass arbitration, in much the same way that Federal Rule of Civil Procedure 23(g)'s limitations on class counsel apply only to plaintiffs pursuing a class action. No court has held that such asymmetrical restrictions under Federal Rule of Civil Procedure 23(g) are unfair.

The district court's concerns about "delay" from staged bellwether proceedings (ER-23) are likewise misguided. Bellwether proceedings actually encourage resolution of the vast majority of claims in a reasonable time frame—as evidenced by the disposition of cases consolidated into MDLs. Mass arbitrations follow the same pattern. *See, e.g.*, Matthew C. Helland, *Costs of Defense in Mass Individual Wage-and-Hour Arbitrations: A Case Study*, PLI Current Vol. 3, No. 1 at 215-16 (Winter 2019) (reporting that mass arbitration settled following arbitration of five test cases). The district court expressed concern that nothing *forces* the defendant in a mass arbitration to agree to settle (*see* ER-23; D. Ct. Dkt. 40 at 6, 11)—but the same is true in MDLs; an MDL court lacks the power to compel defendants to settle all claims, but over

the 50 years that MDLs have been in place, parties generally have not insisted on trying every single case.

Given the absence of evidence to support the district court's fears, the parties should have been allowed to arbitrate under the procedures in Verizon's clause. In the absence of proof that undue delay is likely, that "'risk' . . . is too speculative to justify the invalidation of an arbitration agreement." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000). Instead, when there is "uncertainty" about how arbitration might unfold, "the proper course is to compel arbitration"—not to deny it "on the basis of 'mere speculation'" about how "an arbitrator might" act. *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 406-07 (2003). *Id.*[24]

Finally, the district court compared Verizon's mass arbitration clause to a different company's provision that allowed users who did not settle their claims to opt out of arbitration and proceed in court. ER-24–25 (citing *McGrath v. DoorDash, Inc.*, 2020 WL 6526129, at *4 (N.D. Cal.

---

[24] In any event, the alternative to a bellwether approach is not the swift simultaneous arbitration of all cases, as the district court assumed. That is because the AAA assigns all cases to a small roster of arbitrators, who then adjudicate each claim individually. *See* AAA, *Supplementary Rules for Multiple Case Filings* 7-8 (Aug. 1, 2021). That means that the cases will be resolved seriatim, just as they would under Verizon's more orderly bellwether process.

Nov. 5, 2020)). But declaring an arbitration provision unconscionable because it doesn't allow a party to refuse to arbitrate would squarely conflict with, and be preempted by, the FAA. *See Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017) (FAA "preempts any state rule discriminating on its face against arbitration").

## II. The FAA Preempts California's *McGill* Rule.

The district court also violated the FAA when it held invalid the clause in Verizon's arbitration provision barring arbitrators from awarding so-called public injunctive relief. ER-18.[25]

In *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017), the California Supreme Court held that a contractual provision that waives the right to seek public injunctive relief is unenforceable. *Id.* at 952. Although this Court held in *Blair* that *McGill* is not preempted by the FAA, that decision has now been effectively abrogated by the Supreme Court.

### A. *Viking River* Abrogates *Sakkab* And Necessarily *Blair*.

*Blair* rested entirely on this Court's decision in *Sakkab*, which the Supreme Court has now overruled. *Sakkab* held that the FAA did not

---

[25] The Chamber agrees with Verizon that the district court also erred in holding that the other challenged terms in Verizon's customer agreement are unconscionable. *See* Op. Br. 47-59.

preempt the California Supreme Court's decision in *Iskanian* that an agreement for individual arbitration that "waive[s] 'representative' PAGA [*i.e.*, California Private Attorney General Act] claims"—"claims seeking penalties for Labor Code violations affecting other employees"— is "unenforceable under California law." 803 F.3d at 431 (citing *Iskanian v. CLS Transp. Los Angeles, LLC*, 327 P.3d 129 (Cal. 2014)). In *Viking River*, the Supreme Court reached the opposite conclusion.

As the Supreme Court explained, *Iskanian* "compels parties to either go along with an arbitration in which the range of issues under consideration is determined by coercion rather than consent, or else forgo arbitration altogether." *Viking River*, 142 S. Ct. at 1924. That result "is incompatible with the FAA" because it "defeat[s] the ability of parties to control which claims are subject to arbitration," "coerc[ing]" them "into giving up a right they enjoy under the FAA"—namely, the right to agree to "traditional individualized arbitration." *Id.* at 1918, 1924.

This Court's decision in *Blair* rose—and now falls—with *Sakkab*. The Court stated in *Blair* that "our decision in *Sakkab* all but decides this case" and is "squarely on point." *Blair*, 928 F.3d at 825, 828. But *Viking River* now all but decides this case, and it requires the parties' agreement to be enforced.

25

### B. The FAA Preemption Principles Set Forth In *Viking River* Apply In The Context Of Public Injunctions.

*Viking River* underscores what should already have been clear: there is no exception to the FAA permitting states to invalidate arbitration agreements that include waivers of public injunctive relief. It does so in two ways.

First, *Viking River* makes clear that neither state law nor court decisions may thwart parties' agreements for individual arbitration by tying together different types of requests for relief into a single cause of action. *Viking River*, for example, requires courts to divide a PAGA action into "individual" and "non-individual claims" for purposes of enforcing arbitration agreements. 142 S. Ct. at 1925.

The same rule must apply to claims under the CLRA, FAL, and UCL for "individual" and "public injunctive" relief, and require that those claims be separated for purposes of applying the FAA. A contrary approach—invalidating agreements to arbitrate only the claim for individualized relief—"unduly circumscribes the freedom of parties to determine 'the issues subject to arbitration' and 'the rules by which they will arbitrate.'" *Id.* at 1923 (quoting *Lamps Plus*, 139 S. Ct. at 1416).

Second, *Viking River* confirms that the FAA protects the ability of parties to agree to traditional arbitration of a claimant's individual

dispute, and to agree not to arbitrate claims providing relief for individuals other than the claimant. *Viking River*, 142 S. Ct. at 1924. As this Court has acknowledged, "arbitration of a public injunction will in some cases be *more complex* than arbitration of a conventional individual action or a *representative PAGA claim*." *Blair*, 928 F.3d at 829 (emphasis added).[26] Indeed, a public injunction has "the same practical effect as a Rule 23(b)(2) class action" and is inconsistent with traditional individualized arbitration. *Swanson v. H&R Block, Inc.*, 475 F. Supp. 3d 967, 977 (W.D. Mo. 2020).

Individualized arbitration, too, is as "poorly suited to the higher stakes of" public injunctions as it is to Rule 23(b)(2) class actions or representative PAGA actions—all three "entail the same 'risk of "in terrorem" settlements.'" *Viking River*, 142 S. Ct. at 1924 (quoting *Concepcion*, 563 U.S. at 350). A public injunction can force a defendant to alter its practices, products, or services for all California customers.

---

[26] The *Blair* Court deemed that complexity irrelevant on the premise that the Supreme Court's FAA preemption principles announced in *Concepcion* were limited to claims that formally resemble class or collective actions. 928 F.3d at 829. But *Viking River* squarely rejects that premise. Regardless of the method, states cannot prevent parties from "agree[ing] to restrict the scope of an arbitration" to the claimant's own dispute. 142 S. Ct. at 1924.

When a court imposes such an injunction, the defendant at least can appeal. But "[t]he absence of 'multilayered review' in arbitral proceedings 'makes it more likely that errors will go uncorrected,'" the risk of which may become unacceptable in view of the greatly increased stakes. *Id.* (quoting *Concepcion*, 563 U.S. at 350).

*Viking River* thus confirms that states cannot put businesses to the choice of having to abandon arbitration altogether to avoid having to arbitrate public injunctions along with the claimant's own dispute and injury. *Id.*

Nor can the *McGill* rule be salvaged by saying that parties have the option of litigating a public injunction claim in court instead. The same alternative was available in *Concepcion*—the *Discover Bank* rule did "not *require* classwide arbitration" because parties could agree instead to litigate class actions in court. 563 U.S. at 346, 351. But the Supreme Court made clear that a regime in which parties must choose between arbitrating public injunction requests and resolving those requests in a separate litigation proceeding is a poor substitute for "arbitration as envisioned by the FAA" and "therefore may not be required by state law." *Id.* at 351. As the Supreme Court reiterated in *Viking River*, the FAA prohibits States from imposing rules "coerc[ing] parties to opt for a

judicial forum" and "giving up a right they enjoy under the FAA." 142 S. Ct. at 1924 (citing *Epic Sys.*, 138 S. Ct. at 1621-24; *Concepcion*, 563 U.S. at 347-51).

Put another way, *Concepcion* and *Epic Systems* hold that an agreement to resolve disputes by individual arbitration precludes class or collective proceedings not just in arbitration, but in court as well—because a rule requiring parties to carve out those proceedings for litigation in court would undermine their arbitration agreement. As this Court has observed, "[e]ven a cursory reading of the opinion reveals that the *Concepcion* Court described the 'fundamental' changes brought about by the shift from bilateral to class arbitration to show that nonconsensual class procedures are inconsistent with the FAA—*not to argue for increased class action litigation*." *Coneff v. AT&T Corp.*, 673 F.3d 1155, 1160 (9th Cir. 2012) (emphasis added) (quoting *Cruz v. Cingular Wireless, LLC*, 648 F.3d 1205, 1213-14 (11th Cir. 2011)). The same principles apply to public injunctions.

Finally, *Viking River* confirms that the answer to the only "remaining question"—whether plaintiffs without individual claims can still pursue *in court* a non-individual public injunction targeting Verizon's disclosures (142 S. Ct. at 1925)—is no. That is because

California law does not permit standalone requests for public injunctions. Although California used to allow such claims, California voters put an end to that practice in 2004 by passing Proposition 64, which requires that a private plaintiff has "lost money or property" as a result of the violation. *McGill*, 2 Cal. 5th at 958. "After Proposition 64, individuals must suffer their own injuries to sue" under the UCL or FAL. *DiCarlo v. MoneyLion, Inc.*, 988 F.3d 1148, 1156 (9th Cir. 2021). The CLRA similarly requires that the consumer have been "damaged." *McGill*, 2 Cal. 5th at 954 (citing Cal. Civ. Code § 1780). Without individual claims to vindicate in court, plaintiffs cannot satisfy this standard. Indeed, in *Viking River*, the Supreme Court held that standalone representative PAGA claims cannot be brought in court for the same reason: "[w]hen an employee's own dispute is pared away from a PAGA action, the employee is no different from a member of the general public, and PAGA does not allow such persons to maintain suit." *Viking River*, 142 S. Ct. at 1925.

## CONCLUSION

The district court's order denying Verizon's motion to compel arbitration should be reversed.

Dated: November 28, 2022

Respectfully submitted,

/s/ *Andrew J. Pincus*

Jennifer B. Dickey
Jordan L. Von Bokern
U.S. CHAMBER LITIGATION
   CENTER
1615 H Street, N.W.
Washington, DC 20062

Andrew J. Pincus
Archis A. Parasharami
Kevin S. Ranlett
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
apincus@mayerbrown.com

Benjamin D. Bright
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020

*Counsel for* Amicus Curiae *the Chamber of Commerce
of the United States of America*

31

## CERTIFICATE OF COMPLIANCE

1.     **9th Cir. Case Number(s)**   No. 22-16020

I am the attorney or self-represented party.

**This brief contains** 6387 **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
      [ ] it is a joint brief submitted by separately represented parties;
      [ ] a party or parties are filing a single brief in response to multiple briefs; or
      [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  /s/ *Andrew J. Pincus*  **Date** November 28, 2022

32

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 28, 2022. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Andrew J. Pincus*
Andrew J. Pincus
*Counsel for* Amicus Curiae