**No. 22-16020**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

TERESA MACCLELLAND; KAREN UMBERGER; SCOTT WILLITS;
VALERIE REED; JOHN ST. JARRE; LOUISE MONSOUR; VANESSA WEST;
TIM FRASCH; DARLEEN PEREZ; WILLIAM KAUPELIS; KERRY
SHOWALTER; BRUCE SCHRAMM; PATRICIA GAGAN; WILLIAM ERIC
LOUGH; MICHAEL CARNEY; ANNA GUTIERREZ; JANETTE LISNER;
MARILYN KAYE; TERESA TOY; MICHAEL BRANOM; GLORIA STERN;
DAVID MASSARO; AUGUSTUS JOHNSON; EDNA TOY; MOLLY BROWN;
LINDA JENKINS; GABRIELLE POZZUOLI, For Themselves, As Private
Attorneys General, And On Behalf Of All Others Similarly Situated,

*Plaintiffs-Appellees*,

v.

CELLCO PARTNERSHIP, DBA Verizon Wireless; VERIZON
COMMUNICATIONS, INC.,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the Northern District of California,
No. 3:21-cv-08592-EMC

———————————

## BRIEF OF *AMICUS CURIAE* CALIFORNIA EMPLOYMENT LAW
## COUNCIL IN SUPPORT OF DEFENDANTS-APPELLANTS

———————————

George W. Abele
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-6000; Facsimile:  (213) 627-0705
georgeabele@paulhastings.com

Attorneys for *Amicus Curiae* California Employment Law Council

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rules of Appellate Procedure Rule 26.1, *Amicus Curiae* California Employment Law Council certifies that it has no corporate parent, and no publicly held corporation owns 10% or more of its stock.

# <u>TABLE OF CONTENTS</u>

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS..........................................................................ii

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION ...............................................................................1

INTERESTS OF *AMICUS CURIAE* .................................................2

CONSENT TO FILE .........................................................................3

DISCUSSION ...................................................................................3

    I.    COURTS ROUTINELY USE BELLWETHER TRIALS TO MANAGE MASS CLAIMS ...............................................4

        A.    Bellwether trials benefit courts. ................................6

        B.    Bellwether trials benefit the parties. .........................7

        C.    Bellwether trials encourage settlements in the remaining cases. .........................................................9

    II.    IT IS LAWFUL, NOT UNCONSCIONABLE, FOR ARBITRATION AGREEMENTS TO IMPORT COURT RULES AND PROCEDURES..........................................11

        A.    Arbitration agreements lawfully impose the equivalent of court filing fees. .................................12

        B.    Arbitration agreements that import the judicial rules of civil procedure are not unconscionable. ..............13

    III.    BELLWETHER PROCEDURES PROTECT AGAINST "IN TERROREM" SETTLEMENTS IN MASS ARBITRATIONS ...............................................................15

IV.    APPELLANTS' USE OF A BELLWETHER PROCESS
HERE PROVIDES THE SAME (OR BETTER) DUE
PROCESS THAN A COURT PROVIDES AND THUS
CANNOT BE UNCONSCIONABLE ................................................19

V.    THE FAA REQUIRES COURTS TO HONOR
REASONABLE PROCEDURES IN ARBITRATION
AGREED TO BY THE PARTIES, SUCH AS A
BELLWETHER PROCESS ...............................................................22

CONCLUSION ....................................................................................................22

CERTIFICATE OF COMPLIANCE......................................................................24

CERTIFICATE OF SERVICE ..............................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Armendariz v. Foundation Health Psychcare Servs., Inc.*,
    24 Cal. 4th 83 (2000) ...................................................................*passim*

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011).....................................................13, 16, 17, 22

*Briggs v. Merck Sharp & Dohme*,
    796 F.3d 1038 (9th Cir. 2015) ..........................................................10

*Canela v. Costco Wholesale Corp.*,
    971 F.3d 845 (9th Cir. 2020) .............................................................2

*Cole v. Burns Int'l Sec. Servs.*,
    105 F.3d 1465 (D.C. Cir. 1997)........................................................12

*Cruise v. Kroger Co.*,
    233 Cal. App. 4th 390 (2015) ....................................................14, 15

*Dodge v. Cotter Corp.*,
    203 F.3d 1190 (10th Cir. 2000) ..........................................................5

*Dunson v. Cordis Corp.*,
    854 F.3d 551 (9th Cir. 2017) ............................................................10

*In Re Ampicillin Antitrust Litig.*,
    88 F.R.D. 174 (D.D.C. 1980)..........................................................4, 5

*In re Chevron U.S.A., Inc.*,
    109 F.3d 1016 (5th Cir. 1997) .......................................................9, 11

*In re C.R. Baird, Inc.*,
    948 F. Supp. 2d 589 (S.D. W.Va. 2013).............................................5

*In re Grice*,
    974 F.3d 950 (9th Cir. 2020) ...........................................................22

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
    No. 1:00-1898, 2007 WL 1791258 (S.D.N.Y. June 15, 2007).......4, 6

*In re Vioxx Prods. Liab. Litig.*,
    239 F.R.D. 450 (E.D. La. 2006) .........................................................7

*In re Welding Fume Prods. Liab. Litig.*,
 245 F.R.D. 279 (N.D. Ohio 2007) ........................................................ 7

*Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*,
 571 F.3d 672 (CA7 2009) ............................................................. 16, 17

*Lamps Plus, Inc. v. Varela*,
 139 S. Ct. 1407 (2019) .................................................................... 20

*Little v. Auto Stiegler, Inc.*,
 29 Cal. 4th 1064 (2003) ............................................................. 13, 14

*MacClelland v. Cellco P'ship*,
 No. 21-CV-08592-EMC, 2022 WL 2390997
 (N.D. Cal. July 1, 2022) .................................................................. 18

*Magadia v. Wal-Mart Assocs., Inc.*,
 999 F.3d 668 (9th Cir. 2021) .............................................................. 2

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
 473 U. S. 614 (1985) ....................................................................... 20

*Morgan v. Ford Motor Co.*,
 No. 06-1080 (JAP), 2007 WL 1456154 (D.N.J. May 17, 2007) ........................ 7

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
 460 U. S. 1 (1983) .......................................................................... 20

*OTO, L.L.C. v. Kho*,
 8 Cal. 5th 111 (2019) ...................................................................... 18

*Phillips v. E.I. Dupont De Nemours & Co. (In re Hanford Nuclear
 Reservation Litig.)*,
 497 F.3d 1005 (9th Cir. 2007) ............................................................. 5

*Silivanch v. Celebrity Cruises, Inc.*,
 333 F.3d 355 (2d Cir. 2003) ............................................................... 5

*St. Paul Fire & Marine Ins. Co. v. AmerisourceBergen Corp.*,
 80 Cal. App. 5th 1 (2022) ................................................................ 11

*Tibble v. Edison Int'l*,
 843 F.3d 1187 (9th Cir. 2016) ............................................................. 3

*TML Recovery, LLC v. Cigna Corp.*,
 No. 820CV00269DOCJDE, 2020 WL 12584276
 (C.D. Cal. Dec. 23, 2020) ................................................................ 10

*Vazquez v. Jan-Pro Franchising Int'l, Inc.*,
   939 F.3d 1045 (9th Cir. 2019) ............................................................3

*Viking River Cruises, Inc. v. Moriana*,
   142 S. Ct. 1906 (2022)......................................................................17

**STATUTES**

9 U.S.C. § 1 (FEDERAL ARBITRATION ACT (FAA)) ...........................13, 22

**RULES**

FED. R. CIV. P. 1 ........................................................................................7

FED. R. CIV. P. 16 ......................................................................................7

FED. R. CIV. P. 23(a)(2) ............................................................................7

FED. R. CIV. P. 42(b).................................................................................4

**TREATISES**

4 Newberg and Rubenstein on Class Actions § 11:12 (6th ed.) ...............8

**OTHER AUTHORITIES**

Catherine R. Borden, Emery G. Lee III & Margaret S. Williams,
   *Centripetal Forces: Multidistrict Litigation and Its Parts*,
   75 La. L. Rev. 425 (2014).................................................................10

Cheryl Wilson, *Mass Arbitration: How The Newest Frontier Of
   Mandatory Arbitration Jurisprudence Has Created A Brand New
   Private Enforcement Regime In The Gig Economy Era*,
   69 UCLA L. Rev. 372 (March 2022) ............................................15, 17

Eldon E. Fallon, et al., *Bellwether Trials in Multidistrict Litigation*,
   82 Tul. L. Rev. 2323 (2008) ...............................................................8

J. Maria Glover, *Mass Arbitration*,
   74 Stan. L. Rev. 1283 (June 2022) ...................................................16

Melissa J. Whitney, *Bellwether Trials In MDL Proceedings*, Federal
   Judiciary Center Pocket Guide Series
   https://www.fjc.gov/sites/default/files/materials/19/Bellwether%20
   Trials%20in%20MDL%20Proceedings.pdf.................................*passim*

R. Joseph Barton, *Utilizing Statistics and Bellwether Trials in Mass Torts: What Do the Constitution and Federal Rules of Civil Procedure Permit?*, 8 Wm. & Mary Bill Rts. J. 199 (1999) ................................................................6

Richard J. Arsenault and J.R. Whaley, *Multidistrict Litigation and Bellwether Trials:  Leading Litigants to Resolution in Complex Litigation*, 39 Brief 60 (Westlaw, Fall 2009) ........................................................8

*Supplementary Rules for Multiple Case Filings*, American Arbitration Association (Aug. 1, 2021) https://www.adr.org/sites/default/files/Supplementary_Rules_MultipleCase_Filings.pdf ........................................................18

*What Is a Bellwether Trial?*, Lieff Cabraser Heimann & Bernstein LLP, https://www.lieffcabraser.com/injury/what-is-a-bellwether [https://perma.cc/8UFB-G425] ........................................................4

## **INTRODUCTION**

Filing mass arbitrations—thousands of individual claims against the same entity by the same (or coordinated) counsel—is a new litigation tactic designed to force defendants to incur initial administrative fees in the millions of dollars long before the merits of any one matter is considered. The prospect of incurring those fees naturally drives defendants to consider a settlement that has no connection to the underlying merits. Arbitration providers, prior to this recent development, typically had no rules or mechanisms to address such mass filings.

But courts for decades have had a process to address such mass filings: bellwether trials. Courts have recognized the many beneficial aspects of such a process: it enables courts to more efficiently manage thousands of individual claims; it enables parties to gauge the strengths and weaknesses of their cases, and better understand the costs and potential outcomes of litigation; and it enables both courts and parties to more quickly guide the thousands of claims to a global settlement.

Arbitration agreements and arbitration providers have begun to borrow that process, in order to recognize the same benefits in arbitration. Arbitration agreements often borrow procedures and processes from the judicial system; doing so is entirely lawful, not unconscionable. The district court here failed to consider this basic point. If bellwether procedures are lawful in court, they also are lawful

in arbitration. Thus, for the same reasons that courts approve arbitration agreements that incorporate other judicial processes, this Court should approve Appellants' adoption of the court-tested bellwether process, and find that the arbitration agreement at issue here is not unconscionable.

## INTERESTS OF *AMICUS CURIAE*

Appellants persuasively explain why the bellwether process contained in the arbitration agreement at issue is not unconscionable, but the issue of bellwether provisions in arbitration agreements has broader implications than the case at bar and the consumer products industry. Specifically, bellwether provisions are used in many arbitration agreements in the employment context. This *Amicus Curiae* brief offers the perspective of a large, state-wide employer organization whose members could be directly impacted by the outcome of this case. The California Employment Law Council ("CELC") is a voluntary, non-profit organization that promotes the common interests of employers and the general public in fostering the development in California of reasonable, equitable, and progressive rules of employment law. CELC's membership includes approximately 70 private sector employers in the State of California who collectively employ hundreds of thousands of Californians. CELC has filed briefs as an *Amicus Curiae* in numerous Ninth Circuit cases involving employment-law issues, including in: *Magadia v. Wal-Mart Associates, Inc.*, 999 F.3d 668 (9th Cir. 2021); *Canela v. Costco Wholesale*

*Corp.*, 971 F.3d 845 (9th Cir. 2020); *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 939 F.3d 1045 (9th Cir. 2019); and *Tibble v. Edison Int'l*, 843 F.3d 1187 (9th Cir. 2016). As an organization actively involved in employment law issues and legislation, CELC has a direct interest in—and offers a unique perspective on—the broad implications of the District Court's analysis of, and conclusions regarding, the use of a bellwether process in the context of mass arbitrations.

This brief was not authored, in whole or in part, by counsel for any of the parties to this appeal. No person other than the *Amicus Curiae*, its members, or its counsel have contributed money intended to fund this brief.

## CONSENT TO FILE

All parties to this appeal have consented to the filing of this brief.

## DISCUSSION

Courts have recognized the many advantages that bellwether procedures provide, not only to the courts, but to the parties themselves. They also have recognized that the bellwether process provides an opportunity to resolve multiple individual claims that otherwise might languish in the court system for years. Importing those bellwether procedures into arbitration presents the same benefits and offers the same opportunity for global settlement. Courts regularly approve arbitration agreements that incorporate judicial procedures and processes; the result here should be no different, but the district court failed to adequately consider the

point. Thus, this Court should find that the use of a bellwether process in the
arbitration agreement presented here is not unconscionable.

## I.  COURTS ROUTINELY USE BELLWETHER TRIALS TO MANAGE MASS CLAIMS

A bellwether proceeding is one that "the court and the parties select to test
their arguments, with the goal of moving the overall litigation towards resolution.
. . . Bellwether cases generally have facts that are typical and representative of
other cases in the wider litigation, and the outcome of a bellwether trial often
informs the parties on whether they will continue to litigate or settle their claims,
and on what terms." *What Is a Bellwether Trial?*, Lieff Cabraser Heimann &
Bernstein LLP, https://www.lieffcabraser.com/injury/what-is-a-bellwether
[https://perma.cc/8UFB-G425].[1]

For several decades, courts have implemented a bellwether process in an
effort to more efficiently manage large numbers of similar claims.[2]  For example,
in *In Re Ampicillin Antitrust Litigation*, 88 F.R.D. 174 (D.D.C. 1980), the trial

---

[1] Lieff Cabraser, according to its website, is "among the largest law firms in the
United States that only represents plaintiffs," and is "committed to achieving
justice" for "consumers [and] employees," among others.  *See*
https://www.lieffcabraser.com/about-us/.

[2] "Rule 42(b) provides, in pertinent part, that a court 'may order a separate trial of
any claim . . . or any separate issue . . . . '  Pursuant to this rule, federal courts have
the authority to conduct a 'bellwether trial.'"  *In re Methyl Tertiary Butyl Ether
(MTBE) Prods. Liab. Litig.*, No. 1:00-1898, 2007 WL 1791258 (S.D.N.Y. June 15,
2007) (ellipses in original) (footnote omitted).

court consolidated several antitrust cases for trial and endorsed the bellwether concept: "As an aid to judicial economy and manageability, the Court endorses the bellwether concept. . . . Indeed, where there is a relatively large number of actions and plaintiffs proceeding on the same theory or claim, . . . the bellwether concept seems particularly useful and appropriate." *Id*. at 178 (citations omitted).

Over the years, bellwether trials have been used in various mass tort actions and multi-district litigation (MDL) proceedings. *See, e.g., Dodge v. Cotter Corp*., 203 F.3d 1190, 1194 (10th Cir. 2000); *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 359 (2d Cir. 2003); *Phillips v. E.I. Dupont De Nemours & Co. (In re Hanford Nuclear Reservation Litig.*), 497 F.3d 1005, 1017 (9th Cir. 2007); *In Re C.R. Baird, Inc.*, 948 F. Supp. 2d 589, 600-01 (S.D. W.Va. 2013). "Bellwether trials are individual trials that are conducted by MDL transferee judges with the goal of producing reliable information about other cases centralized in that MDL proceeding." Melissa J. Whitney, *Bellwether Trials In MDL Proceedings*, Federal Judiciary Center Pocket Guide Series, p. 3.[3]

As explained below, the bellwether approach is useful because it benefits the courts and the parties, and it typically results in a quicker resolution of all the claims than if they had been tried individually.

---

[3] Available at:
https://www.fjc.gov/sites/default/files/materials/19/Bellwether%20Trials%20in%20MDL%20Proceedings.pdf.

## A.     Bellwether trials benefit courts.

When dozens, hundreds, or thousands of claims are filed in close proximity to one another, all of which revolve around a similar set of facts, yet cannot proceed as a class action, courts lack the capacity to try all the claims at once.  The obvious justification for a bellwether trial is that "a consolidation or a multi-district transfer has the potential of overwhelming the resources of a particular court."  R. Joseph Barton, *Utilizing Statistics and Bellwether Trials in Mass Torts: What Do the Constitution and Federal Rules of Civil Procedure Permit?*, 8 Wm. & Mary Bill Rts. J. 199, 202 (1999).  As the court recognized in *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation.*, No. 1:00-1898, 2007 WL 1791258 (S.D.N.Y. 2007), "[I]f plaintiffs file hundreds or thousands of individual actions, the sheer volume of the proceeding may overwhelm a court's ability to provide *any* plaintiff with relief in a timely and efficient manner."  *Id.* at * 2 (emphasis in original).

A bellwether process allows a court to effectively manage the claims, so that resolution of all the claims can be achieved more quickly.  As the Federal Judiciary Center recognized, "[S]cheduling deadlines for the parties to prepare trial-worthy cases may avoid unnecessary delays by counsel and ensure cases move forward with discovery in a timely manner."  Whitney, *Bellwether Trials In MDL Proceedings*, p. 5.  In addition, "[b]ellwether trials can be an efficient vehicle to

decide common legal issues and rule on the admissibility of key evidence in the MDL proceeding. *Id*. at 5; *see also Morgan v. Ford Motor Co.,* No. 06-1080 (JAP), 2007 WL 1456154, at *9 (D.N.J. May 17, 2007) ("[T]he Court finds that the use of bellwether plaintiffs will be helpful to the efficiency and management of this case pursuant to Federal Rules of Civil Procedure 1 and 16.").

In addition, a bellwether process enables a court to have a better understanding of the controversies it is managing. *See, e.g.*, *In re Welding Fume Prods. Liab. Litig.*, 245 F.R.D. 279, 298 n.110 (N.D. Ohio 2007) (discussing Rule 23(a)(2)'s commonality requirement and stating that "the Court has read and heard the medical and statistical expert testimony addressing this fact question several times already, because it has been a common question in the MDL cases previously set for trial"); *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 459 (E.D. La. 2006) ("Having presided over several bellwether trials in this MDL, the Court need not speculate on the issue of commonality, but rather is confident that common questions exist.").

The bellwether process, then, assists courts in managing and resolving mass claims. The process also benefits the parties, as CELC demonstrates next.

## B. <u>Bellwether trials benefit the parties.</u>

Just as a court cannot try every case at once, counsel for the parties cannot focus on every one of thousands of cases all at the same time. The bellwether

process thus enables counsel to focus on particular claims, which in turn assists

counsel in handling other claims later in the process:

> Each side obtains useful information likely applicable to
> the mine run of underlying cases. This includes factual
> information . . . and information about . . . the strengths
> and weaknesses of expert witnesses and their testimony,
> the credibility of fact witnesses, the admissibility of
> particular pieces of evidence, etc.

4 Newberg and Rubenstein on Class Actions § 11:12 (6th ed.) (footnote omitted);

*see also* Eldon E. Fallon, et al., *Bellwether Trials in Multidistrict Litigation*, 82

Tul. L. Rev. 2323, 2325 (2008) (bellwether trials provide an opportunity for

counsel to "evaluate the strengths and weaknesses of their arguments and evidence,

and understand the risks and costs associated with the litigation").

    In addition, "bellwether trials enable the parties to run different theories of

liability and defenses, test different witnesses, and try out different messages and

trial tactics . . . ." 4 Newberg and Rubenstein on Class Actions § 11:12; *see also*

Richard J. Arsenault and J.R. Whaley, *Multidistrict Litigation and Bellwether*

*Trials: Leading Litigants to Resolution in Complex Litigation*, 39 Brief 60, 61

(Westlaw, Fall 2009) (explaining how, in the *Vioxx MDL Litigation*, the bellwether

trials were "instructive" in providing data regarding "how witnesses performed . . .

and how to more effectively tighten the trial presentations and adjust trial

strategies"); Fallon, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. at

2337 ("Another significant benefit of bellwether trials is that they provide a vehicle for putting litigation theories into practice.").

The bellwether process, then, benefits the parties as well as the courts.

**C.     Bellwether trials encourage settlements in the remaining cases.**

Perhaps the greatest benefit of the bellwether process, though, is the opportunity it presents for settlement of all the claims.  As the Fifth Circuit recognized, "The notion that the trial of some members of a large group of claimants may provide a basis for enhancing prospects of settlement or for resolving common issues or claims is a sound one that has achieved general acceptance by both bench and bar."  *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997).

Indeed, the Federal Judiciary Center lists "Promote Settlement" as the first of several goals of bellwether trials:

> *Promote Settlement*.  Bellwether trials can promote global settlement by giving the parties an early understanding of the strengths and weaknesses of each party's position and a sense of the value of individual cases.

Whitney, *Bellwether Trials In MDL Proceedings*, p. 4–5.  The results of bellwether trials "can provide the raw data around which to construct a global settlement . . . ."  *Id.* at 5.

This Circuit also has recognized this critical aspect of a bellwether procedure:

9

> A bellwether trial is a test case that is *typically used to facilitate settlement* in similar cases by demonstrating the likely value of a claim or by aiding in predicting the outcome of tricky questions of causation or liability.

*Briggs v. Merck Sharp & Dohme*, 796 F.3d 1038, 1051 (9th Cir. 2015) (emphasis added); *see also Dunson v. Cordis Corp.*, 854 F.3d 551, 555 (9th Cir. 2017) ("In the second (and far more common) type of bellwether trial, the claims of a representative plaintiff or plaintiffs are tried, but the outcome of the trial is binding only as to the parties involved in the trial itself. The results of the trial are used in the other cases purely for informational purposes as an aid to settlement."); *TML Recovery, LLC v. Cigna Corp.*, No. 820CV00269DOCJDE, 2020 WL 12584276, at * 4 (C.D. Cal. Dec. 23, 2020) (plaintiffs requested bellwether proceeding; "Given the number of patient claims at issue and the relatedness of the claims across the different cases, a bellwether trial remains a sound avenue for conserving party resources, informing settlement discussions, and expediting resolution.").

The practical result is that use of a bellwether process leads to significant global settlements. As the Federal Judiciary Center recognized, "the vast majority of MDL cases are resolved before being remanded for trial." Whitney, *Bellwether Trials In MDL Proceedings*, p. 7 (citing Catherine R. Borden, Emery G. Lee III & Margaret S. Williams, *Centripetal Forces: Multidistrict Litigation and Its Parts*, 75 La. L. Rev. 425, 443 (2014)).

*          *          *

At bottom, bellwether proceedings are a tool for parties and trial courts to expeditiously resolve complex trials. *Chevron*, 109 F.3d at 1019. As the California court of appeal recently recognized:

> Employing a bellwether case in a complex matter like this can serve to winnow and sharpen not only discovery, but claims, defenses, calendaring decisions, motion practice, arguments, hearings or trial, adjudication, indeed every aspect of the litigation process—to the benefit of the parties, the court, and the public alike.

*St. Paul Fire & Marine Insurance Co. v. AmerisourceBergen Corp.*, 80 Cal. App. 5th 1, 16 (2022).

These benefits of the bellwether procedure recognized by the courts apply equally to arbitration.

## II.    IT IS LAWFUL, NOT UNCONSCIONABLE, FOR ARBITRATION AGREEMENTS TO IMPORT COURT RULES AND PROCEDURES

It is entirely lawful—and not at all unconscionable—for arbitration agreements to import rules and procedures from the judicial system into the arbitral system. For example, courts have recognized that arbitration agreements that impose fees akin to court filing fees or that incorporate the judicial rules of civil procedure are fully enforceable. The same principle should apply to bellwether proceedings, which are likewise borrowed directly from judicial procedures.

## A.  <u>Arbitration agreements lawfully impose the equivalent of court filing fees.</u>

Arbitration agreements in the employment context often require that an individual who initiates arbitration against the employer pay a portion of the initial administrative fee that is equivalent to the filing fee that the individual would have had to pay to initiate a lawsuit.  Importing that routine court procedure is entirely lawful, and not unconscionable.

The seminal California case on arbitration agreements in the employment context is *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal. 4th 83 (2000).  The California Supreme Court set forth the "five minimum requirements for the lawful arbitration" of statutory civil rights, relying often on the D.C. Circuit's decision in *Cole v. Burns International Security Services*, 105 F.3d 1465 (D.C. Cir. 1997).  *Id.* at 102.  *Cole* recognized that requiring those initiating arbitration to pay some fee was entirely legitimate:

> There is no doubt that parties appearing in federal court may be required to assume the cost of filing fees and other administrative expenses, so any reasonable costs of this sort that accompany arbitration are not problematic.

*Cole*, 105 F.3d at 1484.

*Armendariz* adopted this rationale, concluding that a lawful arbitration agreement will not "require employees to pay either *unreasonable* costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum."

12

*Armendariz*, 24 Cal. 4th at 102 (emphasis added). *Reasonable* costs, such as a portion of the initial administrative filing fee that equals what the individual would be required to pay in court, are not unconscionable. The court's goal was "to consider whether arbitration served as a reasonable substitute for a judicial forum." *Id*. at 109.

Arbitration procedures that are imported from the judicial process, such as the bellwether procedure here, provide just that reasonable substitute.

### B. Arbitration agreements that import the judicial rules of civil procedure are not unconscionable.

Courts also have recognized the enforceability of arbitration agreements that incorporate rules of civil procedure from the judicial system. In *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), the United States Supreme Court recognized that the parties lawfully could incorporate the rules of litigation that apply in court:

> Parties could agree to arbitrate pursuant to the Federal Rules of Civil Procedure, or pursuant to a discovery process rivaling that in litigation. Arbitration is a matter of contract, and the FAA requires courts to honor parties' expectations.

*Id*. at 351 (emphasis omitted).

California courts are in accord. The California Supreme Court in *Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064 (2003), addressed the contention that incorporating multiple "legal formalities" led to a biased arbitration procedure.

13

Specifically, plaintiff's amicus asserted objections to the arbitration requirement "that the rules of pleading and evidence be observed, that the arbitrator shall only rely on governing law and not informal principles of 'just cause,' and that traditional judicial motions such as demurrer and summary judgment be available to the parties." *Id*. at 1075 n.1. The court rejected these arguments, concluding that the procedures are equivalent to what would be available in a judicial proceeding:

> [W]e cannot say that these provisions, which make arbitration more closely follow judicial procedures, are unconscionably one-sided. It is not at all obvious that such provisions would inordinately benefit [defendant] rather than [plaintiff]. To the extent that the availability of dispositive pre-arbitration motions favor Auto Stiegler as defendant, they confer no more of an advantage than would be the case had the action been brought in court.

*Id*.

Similarly, in *Cruise v. Kroger Co.*, 233 Cal. App. 4th 390 (2015), the court of appeal recognized that an arbitration agreement governed by the California Arbitration Act ("CAA"), set forth in the California Code of Civil Procedure, is not unconscionable:

> [T]he instant arbitration proceeding is to be governed by the procedures set forth in the CAA. Because this arbitration is controlled by statutory and case law, [plaintiff's] arguments that [the employer's] Arbitration Policy is unconscionable, both procedurally and substantively, are meritless.

14

*Id.* at 399-400.

In short, courts routinely find that arbitration agreements that borrow procedures from the judiciary are enforceable, and by no means unconscionable. The same is true here: Appellants have borrowed from the judiciary a court-tested and court-approved process for efficiently managing and resolving mass claims handled by the same or coordinated counsel. Importing that process is entirely lawful, not unconscionable.

## III. BELLWETHER PROCEDURES PROTECT AGAINST "IN TERROREM" SETTLEMENTS IN MASS ARBITRATIONS

The surge in mass arbitration filings is a relatively recent phenomenon. *See* Cheryl Wilson, *Mass Arbitration: How The Newest Frontier Of Mandatory Arbitration Jurisprudence Has Created A Brand New Private Enforcement Regime In The Gig Economy Era*, 69 UCLA L. Rev. 372 (March 2022) (Abstract) ("This Comment tracks an emerging innovation in the otherwise stagnant area of mandatory arbitration jurisprudence: the development of a new breed of aggregate litigation—"Mass Arbitration"—in which large inventories of nearly identical claims are brought simultaneously in an arbitral forum.").

In order to create the "mass" for a mass arbitration, plaintiffs' law firms often create and implement specifically targeted social media campaigns to locate and retain claimants:

15

> The "mass" in a mass arbitration is the sum of hundreds or thousands of individual claimants, all of whom the [plaintiffs'] firm must identify, notify, contact, and ultimately retain. Creating the "mass" requires firms to develop (internally) or hire (externally) an advertising and marketing team capable of designing and implementing an expansive, but also targeted, multimedia campaign. That campaign must not only identify and reach a diffuse set of potential claimants; it must also persuade those individuals to reach out to the firm so that the firm can file claims on their behalf.

J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283, 1330 (June 2022)

The ultimate goal of this "new breed of aggregate litigation" is not a secret: by imposing administrative fees on defendants that "could spell financial catastrophe for a potential defendant . . . the fee-leveraging mechanism of the mass-arbitration model could impose settlement pressure for more dubious claims—that is to say, it could impose illegitimate, *in terrorem* settlement pressure." Glover, *Mass Arbitration*, 74 Stan. L. Rev. at 1349–50 (footnotes omitted).

The Supreme Court has recognized this very risk as inherent when large numbers of claims are brought in class actions, and it explained that that risk would also be present in class arbitrations:

> Faced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims. Other courts have noted the risk of "in terrorem" settlements that class actions entail, *see, e.g., Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*, 571 F.3d 672,

677-678 (CA7 2009), and class arbitration would be no different.

*AT&T Mobility LLC v. Concepcion*, 563 U.S. at 350.

The same risk would be inherent in the mass-arbitration context. *Cf. Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1924 (2022) ("[S]uits featuring a vast number of claims entail the same 'risk of "in terrorem" settlements that class actions entail.'"). Two high-profile examples demonstrate that companies can feel pressured to settle—regardless of the merits of the underlying claims—when faced with a mass-arbitration proceeding. *See* Wilson, *Mass Arbitration*, 69 UCLA L. Rev. at 388-401 (describing settlements reached with Uber, which faced over $18 million in initial administrative fees, and DoorDash, which faced over $11 million in initial administrative fees).

To address this new approach to arbitration, arbitration providers have begun to develop new rules that mirror the courts' bellwether approach. Thus, for example, the American Arbitration Association has "announced a new protocol for instances in which twenty-five or more demands are simultaneously filed against the same party by plaintiffs represented by the same counsel." Wilson, *Mass Arbitration*, 69 UCLA L. Rev. at 429–30.[4] These new rules are an effort by

---

[4] *See*
https://www.adr.org/sites/default/files/Supplementary_Rules_MultipleCase_Filings.pdf.

arbitration providers to provide arbitration participants with similar procedures that are available in court, which, as shown above, cannot be unconscionable. *See OTO, L.L.C.* v. *Kho*, 8 Cal. 5th 111, 133 (2019) (the use of "litigation-like procedures, on their own, are not necessarily so one-sided as to make an arbitration agreement unconscionable"; indeed, "an arbitration process closely resembling civil litigation can be as advantageous for the [plaintiff] as for the [defendant]").[5]

The use of court-tested and court-approved bellwether procedures, therefore, does not suggest "that the party in the superior bargaining position was trying to impose arbitration . . . as an inferior forum." *See MacClelland*, 2022 WL 2390997, at *15. Rather, it is an attempt by arbitration providers to match arbitration procedures with the procedures that are available in court. *See Armendariz*, 24 Cal. 4th at 109 ("[T]he court was required to consider whether arbitration served as a reasonable substitute for a judicial forum."). That effort is entirely lawful and beneficial, not unconscionable.

---

[5] The District Court's conclusion that Appellants' mass-arbitration provision "stands in stark contrast" with AAA's rules (*MacClelland v. Cellco P'ship*, No. 21-CV-08592-EMC, 2022 WL 2390997, at *14 (N.D. Cal. July 1, 2022) is inaccurate. Section MC-1(g) gives AAA "sole authority" in its "sole discretion" to "make initial determinations with respect to administrative issues." *Supplementary Rules for Multiple Case Filings*, American Arbitration Association (Aug. 1, 2021). Thus, AAA could decide that proceeding in tranches, as Appellants' bellwether process does, also is in the best interests of the parties.

IV. **APPELLANTS' USE OF A BELLWETHER PROCESS HERE PROVIDES THE SAME (OR BETTER) DUE PROCESS THAN A COURT PROVIDES AND THUS CANNOT BE UNCONSCIONABLE**

Appellants persuasively explain why each of the District Court's rationales for finding the mass-arbitration provision to be unconscionable does not withstand scrutiny (Appellants' Opening Brief, at pp. 36–46), but CELC offers three additional thoughts.

First, with regard to the court's concern about the purported delay stemming from the grouping of claims into tranches, Appellants are correct that the prospect of a quick resolution of all claims—the expressly stated goal of the mass-arbitration provision—likely eliminates the prospect of any significant delay. But it also is true that any delay experienced in arbitration also would be experienced in a mass filing asserted in court. Indeed, the relief available in arbitration is in all likelihood superior to what courts could provide in the context of similar mass claims. When mass claims are filed in courts that use well-established and accepted bellwether trial procedures for managing them, some claims necessarily are heard before others. Some litigants will have to wait for their claim to be heard, which could frustrate or even deter that litigant from participating. An arbitration agreement that uses a bellwether procedure imposes no greater delay than exists in a court; in fact, the delay in arbitration likely is less, since multiple assigned arbitrators can make more time available to address the multiple claims

than a single judge could. It follows, then, that an arbitration agreement with a bellwether procedure—like that before the Court in this case—does not deter claimants any more than the current court system already does. Thus, it cannot be unconscionable.

Second, with regard to the court's fear that the statute of limitations would run on those claimants who were not among the first groups of claims to be filed, Appellants are correct that the agreement is best understood as tolling the statute of limitations for those Claimants who provide notice of a dispute. (Opening Brief, at p. 44.) Courts routinely conclude that ambiguities in arbitration agreements should be construed in favor of arbitration. *See, e.g., Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418 (2019) ("[W]e have repeatedly held that ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration." (*citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 626 (1985); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U. S. 1, 24-25 (1983))).

In addition, *Armendariz* supports that conclusion that tolling is implied. In that case, the plaintiff sought to establish that the arbitration agreement failed to meet the minimum requirements for a valid arbitration agreement by asserting, among other things, that "adequate discovery is not guaranteed under the arbitration agreement." *Armendariz,* 24 Cal. 4th at 105. The court rejected that

20

argument, concluding that "the employer, by agreeing to arbitrate the FEHA claim, has impliedly consented to such discovery." *Id.* at 106. A similar analysis applies here. By agreeing that the coordinated claims of all who provide notice "shall proceed in arbitration," Appellants "impliedly consented" to the tolling of any statutes of limitations.

Finally, regarding the court's concern with mutuality, Appellants are again correct, and *Armendariz* again supplies the dispositive rationale. The court in *Armendariz* refused to hold that "all lack of mutuality in a contract of adhesion was invalid." *Armendariz*, 24 Cal. 4th at 117. Provided that there was "at least some reasonable justification for such one-sidedness based on 'business realities,'" a non-mutual arbitration agreement still could be enforced. *Id*. at 117. The business reality here is that only Appellants—not Appellees—are faced with millions of dollars in up-front administrative fees that must be paid before any consideration is given to the merits of any case. Such a one-sided fee structure justifies any lack of mutuality in Appellants' mass-arbitration provision.

In addition to these points, application of the mass-arbitration provision does not compel plaintiffs to forfeit any substantive rights. *See Armendariz*, 24 Cal 4th at 99-100. Rather, the arbitration agreement simply places the resolution of their claims "in an arbitral, rather than a judicial, forum." *Id*. at 99. Because the requirements for lawful arbitration are met—including "all of the types of relief

21

that would otherwise be available in court" (*id*. at 102)—the arbitration agreement

is not unconscionable.

## V.   THE FAA REQUIRES COURTS TO HONOR REASONABLE PROCEDURES IN ARBITRATION AGREED TO BY THE PARTIES, SUCH AS A BELLWETHER PROCESS

Finally, the Federal Arbitration Act, 9 U.S.C. § 1 et seq., "places arbitration

agreements on an equal footing with other contracts, requiring courts to enforce

them according to their terms." *In re Grice*, 974 F.3d 950, 953 (9th Cir. 2020).

Because the bellwether process agreed to by the parties is not unconscionable,

courts are obligated to honor that agreement.  As the U.S. Supreme Court

succinctly stated:

> Arbitration is a matter of contract, and *the FAA requires courts to honor parties' expectations*.

*AT&T Mobility LLC v. Concepcion*, 563 U.S. at 351 (emphasis added).

The Court here should reverse the District Couyrt, so that the parties'

expectations are honored.

## CONCLUSION

The filing of mass arbitrations is an effort to extract settlements from

defendants faced with exorbitant administrative fees that have no relation to the

merits of any case.  Use of a court-tested and court-approved bellwether process—

which has demonstrated benefits for everyone involved—generates an opportunity

for global resolution focused on the actual merits of the cases.  For this reason and

the reasons set forth above, this Court should reverse the finding of the

District Court and conclude that it is not unconscionable for arbitration agreements

to provide for bellwether procedures in mass arbitrations.

DATED:  November 28, 2022          PAUL HASTINGS LLP

By:                /s/ George W. Abele
                       George W. Abele

Attorneys for *Amicus Curiae*
California Employment Law Council

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Circuit R. 32-1 because this brief contains 5,023 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

DATED: November 28, 2022     PAUL HASTINGS LLP

By: _____ /s/ George W. Abele _____
             George W. Abele

Attorneys for *Amicus Curiae*
California Employment Law Council

24

# CERTIFICATE OF SERVICE

I hereby certify that my firm electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 28, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED:  November 28, 2022      PAUL HASTINGS LLP

By:                    /s/ George W. Abele
                       George W. Abele

Attorneys for *Amicus Curiae*
California Employment Law Council