No. 22-16020

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

TERESA MACCLELLAND, *et al.*,
*Plaintiffs-Appellees*,

v.

CELLCO PARTNERSHIP, DBA VERIZON WIRELESS, *et al.*,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California, No. 3:21-cv-8592
Hon. Edward M. Chen, United States District Judge

## BRIEF OF AMICUS CURIAE PUBLIC CITIZEN IN SUPPORT OF
## PLAINTIFFS-APPELLEES AND AFFIRMANCE

Nicolas A. Sansone
Scott L. Nelson
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Amicus Curiae*

March 24, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae Public Citizen states that it is a non-stock, nonprofit corporation. It has no parent corporation, and no publicly held corporation owns 10% or more of Public Citizen.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES.................................................... iii

INTEREST OF AMICUS CURIAE ........................................ 1

SUMMARY OF ARGUMENT .................................................. 1

ARGUMENT ........................................................................ 3

    I.    The "mass-arbitration" provision is unconscionable under California's general contract principles because it impedes consumers from pursuing their claims. ...................................3

    II.    The Supreme Court's recent decision in *Viking River* contradicts Verizon's argument that the FAA preempts California's *McGill* Rule. ..........................................22

CONCLUSION ...................................................................... 33

CERTIFICATE OF COMPLIANCE....................................... 34

CERTIFICATE OF SERVICE................................................ 35

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*America Online, Inc. v. Superior Court*,
   108 Cal. Rptr. 2d 699 (Ct. App. 2001) .................................................. 7

*American Express Co. v. Italian Colors Restaurant*,
   570 U.S. 228 (2013) ............................................................................. 12

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) ..................................................................... passim

*Beynon v. Garden Grove Medical Group*,
   161 Cal. Rptr. 146 (Ct. App. 1980) ....................................................... 7

*Blair v. Rent-A-Center, Inc.*,
   928 F.3d 819 (9th Cir. 2019) .................................................. 25, 26, 31

*Briggs v. Merck Sharp & Dohme*,
   796 F.3d 1038 (9th Cir. 2015) ............................................................ 13

*Carmona v. Lincoln Millennium Car Wash, Inc.*,
   171 Cal. Rptr. 3d 42 (Ct. App. 2014) ................................................. 11

*Cisneros Alvarez v. Altamed Health Services Corp.*,
   274 Cal. Rptr. 3d 802 (Ct. App. 2021) ................................................. 6

*Comb v. PayPal, Inc.*,
   218 F. Supp. 2d 1165 (N.D. Cal. 2002) ............................................... 7

*Epic Systems Corp. v. Lewis*,
   138 S. Ct. 1612 (2018) ........................................................................ 21

*In re Lipitor*,
   2018 WL 2150942 (C.D. Cal. May 10, 2018) ................................ 14, 17

*In re: 3M Combat Arms Earplug Products Liability Litigation*,
   2022 WL 3345969 (N.D. Fla. Aug. 14, 2022) ..................................... 17

iii

*Iskanian v. CLS Transportation Los Angeles, LLC*,
  327 P.3d 129 (Cal. 2014) .................................................................... 27

*Lamps Plus, Inc. v. Varela*,
  139 S. Ct. 1407 (2019) ................................................................... 3, 9

*Lim v. TForce Logistics, LLC*,
  8 F.4th 992 (9th Cir. 2021) ..................................................... 10, 11, 12

*Little v. Auto Stiegler, Inc.*,
  63 P.3d 979 (Cal. 2003) ................................................................. 6, 7

*Lyle v. Superior Court*,
  175 Cal. Rptr. 918 (Ct. App. 1981) ........................................................ 9

*McArdle v. AT&T Mobility LLC*,
  772 F. App'x 575 (9th Cir. 2019) ....................................................... 26

*McGill v. Citibank, N.A.*,
  393 P.3d 85 (Cal. 2017) .......................................................... passim

*McGrath v. DoorDash, Inc.*,
  2020 WL 6526129 (N.D. Cal. Nov. 5, 2020) ....................................... 14

*Miller v. Gammie*,
  335 F.3d 889 (9th Cir. 2003) ............................................................ 32

*Mohamed v. Uber Technologies, Inc.*,
  848 F.3d 1201 (9th Cir. 2016) ......................................................... 12

*Nagrampa v. MailCoups, Inc.*,
  469 F.3d 1257 (9th Cir. 2006) ........................................................... 7

*Parada v. Superior Court*,
  98 Cal. Rptr. 3d 743 (Ct. App. 2009) ................................................ 11

*People ex rel. Dep't of Corps. v. SpeeDee Oil Change Systems, Inc.*,
  980 P.2d 371 (Cal. 1999) ................................................................... 9

iv

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ................................................................8

*ReliaStar Life Insurance Co. of New York v. EMC National Life Co.*,
    564 F.3d 81 (2d Cir. 2009) ...................................................19

*Saika v. Gold*,
    56 Cal. Rptr. 2d 922 (Ct. App. 1996) ....................................6

*Seagate Tech., LLC v. Western Digital Corp.*,
    854 N.W.2d 750 (Minn. 2014) ..............................................20

*Sonic-Calabasas A, Inc. v. Moreno*,
    311 P.3d 184 (Cal. 2013) ...............................................10, 21

*Tillage v. Comcast Corp,*,
    772 F. App'x 569 (9th Cir. 2019) .........................................26

*Viking River Cruises, Inc. v. Moriana*,
    142 S. Ct. 1906 (2022) ...............................................passim

## Statutes

9 U.S.C. § 2 ................................................................................23

28 U.S.C. § 1407 .......................................................................17

## Other Authorities

American Arbitration Ass'n, *Supplementary Rules for Multiple Case Filings* (Aug. 1, 2021) ...........................................................18

Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*,
    82 Tul. L. Rev. 2323 (2008) .................................................13

J. Maria Glover, *Mass Arbitration*,
    74 Stan. L. Rev. 1283 (2022) ...........................................8, 20

## INTEREST OF AMICUS CURIAE[1]

Public Citizen, a nonprofit consumer advocacy organization with members in all fifty states, appears before Congress, administrative agencies, and courts to advocate for the enactment and enforcement of laws protecting consumers, workers, and the public. Public Citizen has a longstanding interest in issues concerning the enforcement of mandatory pre-dispute arbitration agreements, and it has appeared as amicus curiae in many cases involving such issues in state and federal courts. *See, e.g.*, *New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019); *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017).

## SUMMARY OF ARGUMENT

I.    As the district court correctly held, the contractual provision drafted by Appellants Cellco Partnership and Verizon Communications, Inc. (together, Verizon) that requires groups of jointly represented consumers to arbitrate claims against Verizon in consecutive, ten-case tranches is unconscionable under California law. While Verizon and its

---

[1] This brief was not authored in whole or part by counsel for a party, and no one other than amicus curiae or its counsel made a monetary contribution to the preparation or submission of the brief. Counsel for all parties have consented to its filing.

amici attempt to paint the provision as an efficiency-enhancing measure that promotes expeditious claim resolution, the provision by its terms operates to *delay* resolution of claims—and potentially to chill consumers with meritorious but low-value claims from filing claims in the first place. California law does not permit the drafter of an adhesion contract to enforce a provision, like this one, that creates unreasonable procedural obstacles for non-drafting parties who wish to vindicate their rights.

**II.** The district court also correctly held that the provision purporting to waive consumers' right to seek public injunctive relief in any forum was unconscionable under California law. Verizon does not dispute the provision's invalidity and unenforceability under the California Supreme Court's holding in *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017), but it argues that the Federal Arbitration Act (FAA) preempts that state-law holding. This Court, though, has already held that the FAA does no such thing. And contrary to Verizon's arguments, the Supreme Court's subsequent decision in *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022), *reinforces*—rather than undermines— this Court's binding determination that the FAA does not preempt *McGill*. As *Viking River* held, the FAA does not authorize courts to

2

enforce an arbitration provision that requires plaintiffs to sacrifice *substantive* rights that they enjoy under state law. Because the ability to seek public injunctive relief is such a right, *Viking River* squarely forecloses any argument that the FAA preempts *McGill*'s state-law holding that waivers of the right to seek public injunctive relief—like the waiver Verizon included in its user agreement here—are unenforceable.

## ARGUMENT

### I. The "mass-arbitration" provision is unconscionable under California's general contract principles because it impedes consumers from pursuing their claims.

**A.** Despite the shorthand title that Verizon gives its so-called "mass-arbitration" provision, the provision does not target the sort of collective proceedings that the Supreme Court has deemed incompatible with "fundamental attributes of arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). The provision instead restricts exactly the sort of individual proceedings that advocates of arbitration purport to champion. *See Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019) (describing "the individualized form of arbitration envisioned by the FAA"). Verizon claims that the provision promotes "efficient resolution" when large numbers of consumers assert their individual

arbitration rights, Verizon Br. 40, but as the district court correctly held, the provision's effect is exactly the opposite.

The "mass-arbitration" provision—better described as an "arbitration-metering" provision—imposes a rigid framework that largely bars more than ten similarly aggrieved, jointly represented consumers from proceeding simultaneously in individual arbitrations. Specifically, the provision directs that if twenty-five or more Verizon customers with the same or coordinated counsel "initiate notices of dispute with Verizon … raising similar claims," only ten cases can proceed directly to arbitration. ER-20. The other cases "shall not be filed in arbitration" until all ten initial cases have reached final resolution. *Id.* Once each of the ten first-filed cases has concluded, another ten consumers may then file their claims. *Id.* After every case in the second tranche is resolved, another ten consumers may file, with the remainder left to wait. *Id.* This sequence of ten-case tranches continues "until the parties are able to resolve all of the claims, either through settlement or arbitration." *Id.* Instead of providing an expeditious means for individualized dispute resolution, the provision penalizes consumers who want to assert the same claims as many others by rationing dispute

4

resolution and forcing most aggrieved consumers to wait indefinitely for their individual day in arbitration.

The district court thus properly recognized that the arbitration-metering provision requires "consumers who retain counsel willing to represent them" in cases challenging practices that have inflicted relatively low levels of individual injury on large numbers of people "to wait months, more likely years[,] before they can even submit a demand for arbitration." ER-23. Verizon never disputes the district court's factual determination that the average arbitration proceeding lasts roughly seven months. *See* ER-21. And Verizon acknowledges that consumer cases like this one, where many consumers want to invoke their right to pursue similar claims through individual arbitration, can involve "hundreds or thousands of claims." Verizon Br. 40. Even on the unrealistic assumption that no arbitration in any tranche runs longer than average, then, it would take nearly six years for a group of one hundred plaintiffs to have all their claims resolved in arbitration pursuant to Verizon's arbitration-metering provision. For a group of one thousand, which is hardly an unrealistic number given the size of Verizon's customer base, it would take closer to *sixty* years. *See* Verizon

5

Comms. Inc., Fact Sheet (updated Jan. 24, 2023) (noting Verizon's 91.9 million postpaid connections), https://www.verizon.com/about/sites/default/files/Verizon_Fact_Sheet.pdf; *see also* ER-20 (observing that plaintiffs' counsel in this case "currently represent 2,712 Verizon customers"). Moreover, a single outlier case that takes longer than average to resolve could delay this timeline considerably, because the arbitration-metering provision purports to bar plaintiffs from filing a new ten-case tranche until *every* case in the preceding tranche has concluded.

The extended delays built into the arbitration-metering provision's procedural framework withhold the promise of timely resolution and render the provision substantively unconscionable. *See, e.g.*, *Cisneros Alvarez v. Altamed Health Servs. Corp.*, 274 Cal. Rptr. 3d 802, 820 (Ct. App. 2021) (citing the "delay associated with procedures which potentially stood between a plaintiff … and the confirmation of his or her award" as contributing to unconscionability); *Saika v. Gold*, 56 Cal. Rptr. 2d 922, 925 (Ct. App. 1996) (explaining that the imposition of time-consuming procedures can be unconscionable even where they only "*incrementally* increase[] expense and delay"), *cited in Little v. Auto Stiegler, Inc.*, 63 P.3d 979, 984 (Cal. 2003). Indeed, where large numbers

of customers seek to assert claims, Verizon's provision, if enforceable, would discourage, if not "effectively preclud[e]," many aggrieved consumers "from asserting any claims against [Verizon]" in the first place by pushing off any hope of recovery for years or decades. *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1288 (9th Cir. 2006) (en banc); *see Beynon v. Garden Grove Med. Grp.*, 161 Cal. Rptr. 146, 150 (Ct. App. 1980) (declining to enforce an adhesive contract term that could "render arbitration an expensive and protracted proceeding"), *cited in Little*, 63 P.3d at 984. That result is impermissible under California law. *See Comb v. PayPal, Inc.*, 218 F. Supp. 2d 1165, 1177 (N.D. Cal. 2002) (holding an arbitration agreement unconscionable where its features aimed at "shield[ing]" the drafting party "from liability instead of providing a neutral forum in which to arbitrate disputes"); *cf. Am. Online, Inc. v. Superior Ct.*, 108 Cal. Rptr. 2d 699, 708 (Ct. App. 2001) (noting that "California courts will refuse" to enforce a contractual forum-selection clause that "would substantially diminish" a party's substantive rights).

**B.** The fact that coordinated representation is the trigger for the arbitration-metering provision and its corresponding delays underscores the risk that the provision will deter consumers from asserting their

rights. Where, as here, a lawsuit targets practices that have inflicted widespread but relatively small financial injuries, it is often economically impractical for attorneys to offer representation unless they can take on enough individual claims to benefit from economies of scale so that the total expected recovery outweighs the litigation costs. *Cf. Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 809 (1985) (recognizing the economic logic behind "pool[ing] claims which would be uneconomical to litigate individually"); J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283, 1307 (2022) (explaining that "[t]he types of claims that tend to arise from [adhesion] contracts," including consumer-fraud claims, "are those that tend to gain viability from aggregation").

To be sure, the Supreme Court has held that these economic considerations cannot justify requiring arbitration to allow *class-action* procedures like those described in Federal Rule of Civil Procedure 23. *Concepcion*, 563 U.S. at 347–52. As the Court explained, "[c]lasswide arbitration includes absent parties, necessitating additional and different procedures and involving higher stakes" than does bilateral arbitration of individual claims, and "arbitrators are not generally knowledgeable in the often-dominant procedural aspects of certification."

*Id.* at 348. Verizon's arbitration-metering provision, however, does not address the sort of collective proceeding that "interferes with fundamental attributes of arbitration." *Id.* at 344. Rather, the provision inhibits even those consumers who pursue "the individualized form of arbitration envisioned by the FAA," *Lamps Plus*, 139 S. Ct. at 1416, from taking the economically rational course of retaining counsel who are handling other, similar claims and who therefore may be able to manage individual cases more expertly and efficiently, and at lower cost. This interference with civil litigants' "important right to counsel of [their] choice" heightens the arbitration-metering provision's substantive unconscionability. *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 980 P.2d 371, 378 (Cal. 1999); *see Lyle v. Superior Ct.*, 175 Cal. Rptr. 918, 925 (Ct. App. 1981) (noting a civil litigant's interest in "avoiding inconvenience and duplicative expense" by retaining counsel "already thoroughly familiar with the case"). And a consumer, put to the choice of either seeking prompt recovery through an attorney who is incapable of providing cost-effective representation or engaging an attorney who can vindicate a claim efficiently but who may be barred from doing so for years, may well choose not to pursue the claim at all.

9

**C.** The arbitration-metering provision's role in insulating Verizon from consumers' claims, especially low-value claims arising from a common business practice that injures large numbers of consumers, becomes still clearer when that provision is "viewed collectively" with others. *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1003 (9th Cir. 2021); *see Sonic-Calabasas A, Inc. v. Moreno*, 311 P.3d 184, 203 (Cal. 2013) (stating that "the unconscionability inquiry requires a court to examine the totality of the agreement's substantive terms"). Immediately after laying out Verizon's arbitration-metering process, the arbitration agreement provides express authority for a court, "if necessary, to enjoin the mass filing of arbitration demands against Verizon," without explaining when or why such a measure may be "necessary" or how many individual arbitration demands make up a "mass filing." ER-20. This vague provision goes beyond the arbitration-metering provision's threat of protracted delay by creating the risk that Verizon could attempt to foreclose customers from filing their claims at all, whenever Verizon perceives some undefined necessity for doing so.

Furthermore, as the district court noted, the arbitration agreement "expressly reserves Verizon's right to raise a statute of limitations

defense," creating "the risk that claims will be effectively barred" for consumers proceeding in later tranches, ER-23, because the agreement provides that those consumers' cases "shall not be filed in arbitration" until potentially thousands of other cases have been resolved, ER-20. Verizon never disputes that the agreement can reasonably be read to present that risk. Instead, it says the agreement is "*best* understood" as implicitly "tolling the limitations period" for claims governed by the arbitration-metering provision, and it emphasizes that it has agreed to accept tolling in certain cases. Verizon Br. 44 (emphasis added). But under California law, the unconscionability analysis asks whether a contract provision, "as drafted, would deter potential litigants." *Parada v. Superior Ct.*, 98 Cal. Rptr. 3d 743, 768 (Ct. App. 2009) (quoting *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 677 (6th Cir. 2003) (en banc)), *cited in Lim*, 8 F.4th at 1004–05. Regardless of whether a court might later read an unwritten tolling provision into the contract, the risk that it might *not* do so heightens the arbitration-metering provision's chilling effect. *Cf. Carmona v. Lincoln Millennium Car Wash, Inc.*, 171 Cal. Rptr. 3d 42, 53 (Ct. App. 2014) (holding that a unilateral fee-shifting provision in a consumer contract exerted an unconscionable chilling

effect despite the existence of a state statute that would have rendered the provision bilateral). Verizon's after-the-fact willingness not to raise a statute of limitations defense does not alter that risk, nor does "waiving [a contract's] unconscionable elements … change the analysis of whether the [contract], as drafted, is unconscionable." *Lim*, 8 F.4th at 1004.[2]

**D.** Verizon's principal defense of the arbitration-metering provision rests on a mischaracterization of how it functions. Verizon and its amici contend that the "coordinated process" that the provision sets out cannot be unconscionable because it supposedly "resembles bellwether proceedings regularly employed in mass litigation" to facilitate efficient claim resolution. Verizon Br. 37; *see* Chamber Amicus Br. 4. In a sleight-of-hand, they then largely defend the provision, not on

---

[2] Despite the Chamber of Commerce's suggestion, Chamber Amicus Br. 6, *Mohamed v. Uber Technologies, Inc.*, 848 F.3d 1201 (9th Cir. 2016), is not to the contrary. In *Mohamed*, this Court declined to consider whether an arbitration agreement's fee-splitting provision was invalid under the effective-vindication doctrine because the defendant had agreed not to enforce the provision. 848 F.3d at 1212. That doctrine, however, is "a judge-made exception to the FAA" designed to "harmonize competing federal policies by allowing courts to invalidate agreements that prevent the 'effective vindication' of a federal statutory right." *Am. Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 235 (2013). This Court's application of an equitable doctrine rooted in federal common law casts no light on California contract law.

its own terms, but by explaining the benefits of the judicial bellwether process it supposedly replicates. Verizon Br. 37–40; Chamber Amicus Br. 18–21; CELC Amicus Br. 4–11. But whatever the merits of a true bellwether system, in which some representative cases go to trial before others to give the parties predictive insight into the value of the remaining plaintiffs' claims and to facilitate settlement, Verizon's arbitration-metering provision is not such a system. Instead, Verizon's system forces substantial delays that Verizon can leverage to avoid ever having to resolve large numbers of claims at all.

In a true bellwether system, the parties try one or more "test case[s]" to conclusion, after which plaintiffs who do not settle their claims can proceed to trial. *Briggs v. Merck Sharp & Dohme*, 796 F.3d 1038, 1051 (9th Cir. 2015); *see* Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2339 (2008) (explaining that bellwether trials enable attorneys to compile evidentiary materials for use by "litigants and local counsel" when "individual cases" go to trial following the bellwether process). As a judge presiding over a coordinated proceeding in California state court has explained, "[i]f bellwether trials … are unsuccessful in guiding the parties to … settlements, it has always

13

been clear … that the coordination trial judge will have to remand cases for trial" in their originating courts so as not to "deprive plaintiffs of timely adjudication of their claims." *In re Lipitor*, 2018 WL 2150942, at *2 (C.D. Cal. May 10, 2018) (quoting California Superior Court Judge Carolyn Kuhl). Unlike in Verizon's arbitration-metering process, nothing in the typical bellwether procedure compels plaintiffs who choose not to settle to await resolution of potentially vast numbers of other claims before filing, much less proceeding with, their own.

The district court contrasted the arbitration-metering provision here with a provision that better resembled a bellwether process. ER-24–25. In *McGrath v. DoorDash, Inc.*, 2020 WL 6526129 (N.D. Cal. Nov. 5, 2020), the district court opined that a provision for managing large numbers of similar bilateral arbitration claims "appear[ed] fair" where, among other things, claimants could "choose to opt out of the arbitration process and go back to court" after a roughly 210-day process that entailed resolution of a single set of initial test cases and subsequent efforts to mediate the remaining cases, *id.* at *10 & n.7. The plaintiffs' ability to pursue their claims promptly after a time-limited bellwether

process meant the provision at issue there lacked "the possibility of significant delay that is facially present here." ER-25.[3]

The absence of any mechanism by which plaintiffs can proceed promptly with individual claims following a discrete bellwether period belies Verizon's claim that "the whole purpose" of its arbitration-metering provision is, like that of a bellwether system, "to facilitate a *quicker* resolution of the claims" by "provid[ing] the parties with the information necessary to reach a global settlement." Verizon Br. 41–42. A defendant may have incentive to engage in settlement negotiations when faced with the imminent alternative of litigating a host of individual claims that a bellwether process has shown to be potentially meritorious. But where, as here, a defendant has structured the dispute so that it will face only a trickle of low-value arbitration demands each year, it has scant incentive to pursue a fairly valued global settlement resolving large quantities of claims that it knows *cannot* be arbitrated for

---

[3] The Chamber of Commerce suggests that the district court's discussion of *McGrath* below was inconsistent with the FAA because it supposedly favored allowing plaintiffs to proceed "in court" after a bellwether process. Chamber Amicus Br. 23–24. The critical distinction between *McGrath* and this case, though, is the *McGrath* plaintiffs' ability to proceed *at all*—whether in court *or* arbitration—immediately following initial bellwether proceedings.

years or even decades to come, no matter what an initial tranche of cases reveals about their probable eventual success. While Verizon disclaims any intent to "deliberately prolong the bellwether proceedings" and maintains that such delay would breach the implied covenant of good faith and fair dealing, *id.* at 43, it is the straightforward operation of the arbitration-metering provision itself—not any particular action Verizon might take in arbitration beyond demanding adherence to the provision's terms—that ensures delay.

Verizon is thus wrong to claim that the prospect of prohibitive delays is "surpassingly unlikely" or that it rests on a "chain of multiple hypothetical contingencies." *Id.* at 42. Verizon maintains that it is speculative that "large numbers of customers would … raise similar claims" and "choose to be represented by the same or coordinated counsel," *id.*, but that is exactly what happened here and what *usually* happens when a single widespread business practice causes small-value injuries to a large group of people. *See supra* at 8. And given the distorted settlement incentives just discussed, it is hardly fanciful to think that "[m]ultiple rounds of bellwether arbitrations would … fail to produce a global resolution." Verizon Br. 42. Moreover, even if a global settlement

materialized, its terms would likely be artificially advantageous to Verizon because plaintiffs, in valuing their claims, would have to factor in the years or decades of delay the arbitration-metering provision would inevitably impose absent a settlement.

Verizon observes that delays are inherent in any resolution of large numbers of cases that must work their way through an adjudicatory system. *Id.* Established procedural mechanisms, however, have long offered courts the necessary flexibility to manage high-volume litigation efficiently. *See, e.g.*, 28 U.S.C. § 1407(a) (allowing "civil actions involving one or more common questions of fact" to be consolidated for joint pretrial proceedings before being remanded to the originating courts for individual trials); *In re Lipitor*, 2018 WL 2150942, at *2 (describing a similar system for mass actions in California state court); *see also, e.g.*, *In re: 3M Combat Arms Earplug Prods. Liab. Litig.*, 2022 WL 3345969, at *1 (N.D. Fla. Aug. 14, 2022) (describing a process by which nearly 300,000 individual cases were organized into 500-case waves in preparation for trial). Bilateral arbitral proceedings, meanwhile, present similar opportunities for adaptation, characterized as they are by "informality" that "allow[s] for efficient, streamlined procedures tailored

to the type of dispute." *Concepcion*, 563 U.S. at 344–45. Arbitral bodies have recognized those opportunities, recommending case-management measures parties can adopt to facilitate efficient resolution of large numbers of similar claims. *See, e.g.*, Am. Arbitration Ass'n, *Supplementary Rules for Multiple Case Filings* (Aug. 1, 2021), https://tinyurl.com/3uas9hwj. Far from embracing such flexible case-management procedures, Verizon's arbitration-metering provision *forecloses* them by setting up a system that requires potentially huge numbers of plaintiffs to wait years before so much as initiating the arbitral equivalent of pretrial proceedings.

**E.** Finally, Verizon contends that the arbitration-metering provision is necessary to spare it from arbitration expenses that it has contractually undertaken to pay. Verizon Br. 40–41. Verizon, though, cannot dispute that its customers have a right to pursue legal claims against it and that the expenses it fears are a function of the forum *it* has selected. Rather than allowing customers to file their claims as a class action or class arbitration—where challenges to an allegedly unlawful practice affecting many consumers could likely be resolved in a single proceeding—Verizon has chosen to require that each customer's claims

18

be resolved in bilateral arbitration. Verizon's fears about the economic implications of its chosen method of resolving claims cannot justify a contractual provision that leaves potentially large numbers of aggrieved consumers without any realistic avenue to pursue their claims at all.

The Chamber of Commerce's suggestion that the arbitration-metering provision is necessary to guard against supposedly "abusive" litigation practices aimed at extorting "blackmail settlements" is likewise without merit. Chamber Amicus Br. 2; *see* CELC Amicus Br. 15–16. Despite acknowledging that "rules of professional conduct" require attorneys to "vet[] their clients to ensure that they have a basis for presenting an arbitral claim," and without suggesting that plaintiffs' attorneys here have failed to take this mandatory step, the Chamber asks this Court to assume based on a handful of anecdotal examples that attorneys will regularly fail to comply with their professional obligations. Chamber Amicus Br. 10–11. The Chamber does not explain why existing disciplinary mechanisms are insufficient to police attorneys who engage in bad-faith conduct in arbitration. *See, e.g.*, *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co.*, 564 F.3d 81, 86–87 (2d Cir. 2009) (noting widespread judicial recognition that arbitrators have broad authority to

fashion remedies and impose sanctions, provided that such authority is consistent with the terms of the parties' underlying arbitration agreement); *Seagate Tech., LLC v. W. Digital Corp.*, 854 N.W.2d 750, 753–54 (Minn. 2014) (affirming an arbitrator's imposition of sanctions that contributed to an award of more than $500 million against the sanctioned party).

This Court should decline to assume that attorneys will court financial risk and professional opprobrium by pursuing meritless claims en masse. *See* Glover, *Mass Arbitration*, 74 Stan. L. Rev. at 1328–38 (describing the "substantial startup costs" that make arbitrating a sizeable group of similar cases "an expensive and therefore risky proposition" for plaintiffs' lawyers, even if the defendant reimburses filing fees). Rather, large numbers of similar arbitration demands are the inevitable consequence when large numbers of consumers who have been injured by a common business practice are contractually required to pursue a remedy in individual bilateral arbitral proceedings and have succeeded in the difficult task of finding attorneys willing to represent them in those proceedings. If companies like Verizon are dissatisfied with the forum into which the adhesion contracts of their own creation have

directed their customers' claims, the companies' solution cannot permissibly be to impose inflexible procedural hurdles that hold those claims in extended limbo, unable for years to advance in *any* forum.

By requiring its customers to agree to a contractual provision that sacrifices precisely "the virtues Congress originally saw in arbitration, its speed and simplicity and inexpensiveness," *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1623 (2018), Verizon has made clear that capturing those benefits—as opposed to making it economically disadvantageous for customers to challenge unlawful practices that inflict relatively small amounts of harm on large numbers of people—was never its aim in requiring its customers to forgo the efficiencies of aggregate litigation in favor of individual bilateral arbitration. It is therefore no surprise that Verizon does not even attempt to argue that the FAA preempts application of the state-law unconscionability principles upon which the district court relied. After all, it is *Verizon* that has attempted to "interfere[] with fundamental attributes of arbitration" by deterring and delaying consumer claims. *Concepcion*, 563 U.S. at 344; *see also Sonic-Calabasas*, 311 P.3d at 199 (observing that procedures that "cause[] arbitration to be substantially delayed ... interfere[] with a fundamental

21

attribute of arbitration"). In contrast, the district court's holding *effectuates* the FAA's purposes by prohibiting an arbitration agreement from imposing procedural obstacles that impede the prompt and efficient resolution of consumer claims in individual bilateral arbitration.

## II. The Supreme Court's recent decision in *Viking River* contradicts Verizon's argument that the FAA preempts California's *McGill* Rule.

In *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017), the California Supreme Court held that provisions in agreements (including arbitration agreements) purporting to waive a plaintiff's right to seek "public injunctive relief" are unenforceable, *id.* at 87. Relying chiefly on *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022), Verizon contends that the FAA preempts that holding. *See* Verizon Br. 47–54; *see also* Chamber Amicus Br. 24–30. Yet *Viking River*, in which the Supreme Court held that the FAA does not authorize enforcement of agreements that waive an individual plaintiff's state-law right to seek relief that benefits other individuals, strongly supports *McGill*'s validity.

A.    Under California law, a plaintiff who proves that a defendant has violated certain consumer statutes may be entitled to obtain public injunctive relief—that is, "relief that 'by and large' benefits the general

public and that benefits the plaintiff, 'if at all,' only 'incidental[ly]' and/or as 'a member of the general public.'" *McGill*, 393 P.3d at 89 (citations omitted). In *McGill*, the California Supreme Court considered an arbitration agreement that waived the plaintiff's "right to seek public injunctive relief *in any forum*," *id*. at 90, and held the provision "invalid and unenforceable under state law insofar as it purport[ed] to waive [the] statutory right to seek such relief," *id*. at 93. The court relied on the longstanding principle of California law that "a law established for a public reason cannot be contravened by a private agreement." *Id*. (quoting Cal. Civ. Code § 3513).

*McGill* further held that the FAA does not preempt California's prohibition on contractual waivers of the right to obtain public injunctive relief. The court held that the non-waiver principle fell within the saving clause of FAA section 2, which preserves "grounds … for the revocation of any contract," 9 U.S.C. § 2—that is, "generally applicable contract defense[s]." *McGill*, 393 P.3d at 94. The prohibition on contractual waivers of the right to seek public injunctive relief, *McGill* explained, is such a generally applicable defense because it does not "appl[y] only to arbitration or … derive[] its meaning from the fact that an agreement to

23

arbitrate is at issue." *Id*. Rather, "a provision in *any* contract—even a contract that has no arbitration provision—that purports to waive, in all fora, the statutory right to seek public injunctive relief … is invalid and unenforceable under California law." *Id*.

*McGill* found additional support for its holding in the U.S. Supreme Court's repeated recognition that by "agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Id*. at 95 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). That principle, *McGill* explained, is as applicable to state-law substantive rights as it is to federal ones. *See id*. (citing *Preston v. Ferrer*, 552 U.S. 346, 359 (2008)). And because a public injunction is a "*substantive statutory remedy*" rather than a mere "*procedural* device" that is subject to waiver in an arbitration clause, *id*. at 97 (citation omitted), the FAA does not authorize enforcement of contracts waiving the right to pursue that relief.

Finally, *McGill* explained that its non-waiver rule does not "interfere with any of arbitration's attributes." *Id*. The court emphasized that parties remain free to decide for themselves whether to arbitrate

24

claims for public injunctive relief, or to exclude them from arbitration, as long as their contract does not bar the assertion of such claims completely by precluding both arbitral and judicial fora. "Thus, arbitration of claims the parties *have agreed* to arbitrate may proceed pursuant to whatever procedures the arbitration agreement specifies, unaffected by any subsequent proceedings made necessary by invalidation of the waiver regarding the public injunctive relief claims the parties *did not agree to arbitrate*." *Id*.

**B.** In *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819 (9th Cir. 2019), this Court likewise held that the FAA does not preempt the *McGill* rule. *Blair* agreed that the *McGill* rule is a generally applicable contract defense that neither discriminates against nor shows hostility to arbitration. *See id*. at 827. *Blair* further held that the *McGill* rule does not create an "obstacle to the accomplishment of the FAA's objectives," *id*. at 828 (quoting *Concepcion*, 563 U.S. at 343), by "interfer[ing] with fundamental attributes of arbitration," *id*. at 825 (quoting *Lamps Plus*, 139 S. Ct. at 1418). *Blair* stressed that even if parties respond to *McGill* by agreeing to arbitrate claims for public injunctive relief, such arbitration will remain consistent with arbitration's bilateral nature and,

25

unlike class proceedings, will not require the procedural formalities necessary when claims of specific absent parties are asserted. *See id*. at 829–30. Acknowledging that public injunctive relief may involve increased complexity, the Court noted that any such complexity would flow from the substance of the claims and that "[a] state-law rule that preserves the right to pursue a substantively complex claim in arbitration without mandating procedural complexity does not frustrate the FAA's objectives." *Id*. at 829. Likewise, the Court recognized that a claim for public injunctive relief may heighten the stakes of an arbitration, but held that the FAA does not preempt state statutory rights merely because their high stakes "arguably" make them "poorly suited to arbitration." *Id*. at 830 (citation omitted).

The defendant in *Blair* did not seek rehearing en banc, but defendants in two other cases decided by this Court together with *Blair* did, and this Court denied rehearing in both cases, with no judge requesting a vote. *See Tillage v. Comcast Corp,*, 772 F. App'x 569 (9th Cir. 2019); *McArdle v. AT&T Mobility LLC*, 772 F. App'x 575 (9th Cir. 2019). The Supreme Court denied certiorari in both cases, *see* 140 S. Ct. 2827 (2020), a few months before granting certiorari in *Viking River*.

26

**C.** The Supreme Court's decision in *Viking River* confirms that this Court in *Blair* was correct in holding that *McGill*'s no-waiver rule is consistent with the FAA. The question in *Viking River* was whether the FAA preempted the rule announced in *Iskanian v. CLS Transportation Los Angeles, LLC*, 327 P.3d 129 (Cal. 2014), that an individual's right under California's Private Attorneys General Act (PAGA) to seek penalties on behalf of the state for Labor Code violations affecting other employees could not be waived. *See Viking River*, 142 S. Ct. at 1916. The *Iskanian* rule was similar to the *McGill* rule in that it rested on the principle that private contracts cannot waive rights conferred for a public reason, *see Iskanian*, 327 P.3d at 148–149, and that it sought to preserve the availability of some forum in which an individual plaintiff could assert claims for recoveries that would ultimately benefit third parties rather than the plaintiff himself, *see id.* at 149. The Supreme Court in *Viking River* held that those aspects of *Iskanian*, which it termed *Iskanian*'s "principal rule," 142 S. Ct. at 1916, were "*not preempted* by the FAA," *id.* at 1925 (emphasis added). That is, the FAA does not preempt a state-law rule that forbids waiver of an individual's substantive state-law entitlement to seek relief benefiting third parties, as long as that

27

relief is not sought through procedural mechanisms, such as class actions, that are incompatible with the nature of arbitration under the FAA. *See id*. at 1919–23.

In holding that *Iskanian*'s principal non-waiver rule was not preempted, *Viking River* echoed key aspects of *McGill*'s and *Blair*'s reasoning. *Viking River*, like *McGill* and *Blair*, began by recognizing that a rule prohibiting waiver of the right to pursue a statutorily prescribed remedy is a generally applicable contract defense that neither applies only to arbitration nor derives its meaning from the fact that an agreement to arbitrate is at issue. *See id*. at 1917. The Court then considered whether the rule nonetheless conflicted with the nature of arbitration. *See id*. at 1918. In addressing that issue, the Court emphasized, as did *McGill*, that waivers of substantive rights are not attributes of arbitration under the FAA: "[T]he FAA does not require courts to enforce contractual waivers of substantive rights and remedies. The FAA's mandate is to enforce '*arbitration agreements*.' … An arbitration agreement … does not alter or abridge substantive rights; it merely changes how those rights will be processed." *Id*. at 1919 (citation omitted). Like *McGill*, *Viking River* held that this principle applies fully

28

to state-law rights because "the FAA requires only the enforcement of 'provision[s]' to settle a controversy 'by arbitration,' and not any provision that happens to appear in a contract that features an arbitration clause." *Id.* at 1919 n.5 (citation omitted). Because an agreement that waives a party's ability to pursue a right to relief in any forum is not an agreement to arbitrate a controversy over the party's entitlement to that relief, the FAA does not require its enforcement, regardless of the source of the right.

*Viking River* further considered whether *Iskanian*'s principal non-waiver rule effectively required procedures inconsistent with arbitration, as did the rule prohibiting class-action waivers that the Court had held preempted in *Concepcion*. Like *McGill* and *Blair*, *Viking River* concluded that a rule prohibiting waivers of the right to pursue relief benefiting third parties in otherwise bilateral proceedings was distinguishable from a rule prohibiting waivers of class-action procedures and was not preempted by the FAA. *See id.* at 1920–23. *Viking River* stressed that actions under PAGA "exhibit virtually none of the procedural characteristics of class actions," *id.* at 1920, and "do not present the problems of notice, due process, and adequacy of representation that

render class arbitration inconsistent with arbitration's traditionally individualized form," because they "do not adjudicate the individual claims of multiple absent third parties," *id*. at 1921. This Court in *Blair* made exactly the same points about actions for public injunctive relief. *See* 928 F.3d at 828–30.

Similarly, *Viking River* rejected the argument that the complexity and heightened risk posed by claims seeking penalties for violations involving other employees made the non-waiver rule inconsistent with arbitration: "[O]ur precedents," the Supreme Court stated, "do not hold that the FAA allows parties to contract out of *anything* that might amplify defense risks," but only that "States cannot coerce individuals into forgoing arbitration by taking the individualized and informal *procedures* characteristic of traditional arbitration off the table." 142 S. Ct. at 1921. Again, this Court's opinion in *Blair* applied identical reasoning to claims for public injunctive relief. *See* 928 F.3d at 830.

In short, *Viking River* held that *Iskanian*'s principal rule is not preempted by the FAA because it is not a rule that declares a contract "unenforceable *just because it requires bilateral arbitration*." 142 S. Ct. at 1922 (quoting *Epic Sys.*, 138 S. Ct. at 1623). The same is true of the

*McGill* rule. *See Blair*, 928 F.3d at 829 (quoting *Epic Sys.*, 138 S. Ct. at 1623). *Viking River*'s holding that the FAA does not preempt a rule prohibiting waiver of a plaintiff's right to seek penalties on behalf of the state for violations affecting third parties thus dictates the same result here: The FAA does not preempt *McGill*'s rule prohibiting waiver of the right to seek injunctive relief on behalf of the general public.

**D.**     The *Iskanian* rule at issue in *Viking River* differed from the *McGill* rule in one key respect: *Iskanian* included a "secondary rule" that prohibited enforcement of agreements requiring an employee to pursue PAGA penalty claims for violations affecting her individually in separate proceedings from penalties for violations affecting other employees. *See Viking River*, 142 S. Ct. at 1916–17. This "compulsory … joinder rule," the Supreme Court ruled, conflicted with the FAA by "defeat[ing] the ability of parties to control which claims are subject to arbitration." *Id.* at 1924. Thus, the FAA preempted the *Iskanian* rule only "insofar as it precludes division of PAGA actions into individual and non-individual claims through an agreement to arbitrate," *id.*, while leaving intact *Iskanian*'s principal rule against "wholesale waiver" of claims, *id.* at 1924–25.

31

The *McGill* rule has no such flaw. It allows parties to agree to require arbitration of a plaintiff's individual entitlement to any form of relief, including injunctive relief, for any claim, while excluding only claims for public injunctive relief, as long as public injunctive relief remains available in court. *See McGill*, 393 P.3d at 97. Thus, while the *Iskanian* rule had a "built-in" procedural joinder mechanism that *Viking River* found incompatible with the FAA, *see* 142 S. Ct. at 1923, the *McGill* rule builds in parties' freedom to structure their arbitration agreements as they like, prohibiting only the outright waiver of the substantive right to pursue a particular form of relief. *McGill* is fully consistent with the fundamental principle that drove the Supreme Court's limited preemption holding in *Viking River*: "[A]rbitration is a matter of consent." *Id.*; *accord McGill*, 393 P.3d at 97.

Far from suggesting that *Blair* was wrong to hold that the FAA does not preempt the *McGill* rule, *Viking River* demonstrates that *Blair* was correct. *Viking River* could only excuse this Court from following its binding precedent in *Blair* if it were "clearly irreconcilable" with *Blair*'s holding. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). That *Viking River* is not only clearly *reconcilable* with *Blair* but in fact

32

strongly supportive of *Blair*'s analysis leaves no doubt of the proper outcome here: As in *Blair*, the Court should reject the argument that the FAA preempts the *McGill* rule.

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

/s/ Nicolas A. Sansone
Nicolas A. Sansone
Scott L. Nelson
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Amicus Curiae*

March 24, 2023

33

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and the Rules of this Court, it contains 6,489 words.

This brief also complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 29(a)(4), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

<u>/s/ Nicolas A. Sansone</u>
Nicolas A. Sansone
*Attorney for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Brief of Amicus Curiae with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit on March 24, 2023, using the Appellate Electronic Filing system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Nicolas A. Sansone
Nicolas A. Sansone
*Attorney for Amicus Curiae*