**Case No. 22-16020**

# In the United States Court of Appeals
# for the Ninth Circuit

TERESA MACCLELLAND; KAREN UMBERGER; SCOTT WILLITS; VALERIE REED; JOHN ST. JARRE; LOUISE MONSOUR; VANESSA WEST; TIM FRASCH; DARLEEN PEREZ; WILLIAM KAUPELIS; KERRY SHOWALTER; BRUCE SCHRAMM; PATRICIA GAGAN; WILLIAM ERIC LOUGH; MICHAEL CARNEY; ANNA GUTIERREZ; JANETTE LISNER; MARILYN KAYE; TERESA TOY; MICHAEL BRANOM; GLORIA STERN; DAVID MASSARO; AUGUSTUS JOHNSON; EDNA TOY; MOLLY BROWN; LINDA JENKINS; GABRIELLE POZZUOLI, for Themselves, as Private Attorneys General, and on Behalf of All Others Similarly Situated,,

*Plaintiffs-Appellees,*

v.

CELLCO PARTNERSHIP, dba VERIZON WIRELESS; and VERIZON COMMUNTICATIONS, INC.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Northern District of California
Hon. Edward M. Chen
No. 3:21-cv-08592

**BRIEF OF AMICUS CURIAE PUBLIC JUSTICE
IN SUPPORT OF PLAINTIFFS-APPELLEES**

Leah M. Nicholls
Matthew C. Clifford
Public Justice
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 797-8600
lnicholls@publicjustice.net
mclifford@publicjustice.net

*Counsel for Amicus Curiae Public Justice*

## CORPORATE DISCLOSURE STATEMENT

Amicus Curiae Public Justice does not issue stock and has no parent corporations.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................ i

TABLE OF CONTENTS....................................................... ii

STATEMENT OF INTEREST.................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

ARGUMENT .......................................................................5

I.    Reference to the AAA Rules Is Not Clear and Unmistakable Evidence Ordinary Consumers Agreed to Delegate Arbitrability. ..................................5

    A.    "Clear and Unmistakable" Means Explicit and Express......................7

    B.    Under Ordinary Contract Construction, the AAA Rules do Not Come into Play Until It Is Determined that the Dispute Is Going to Arbitration and the AAA Rules Will Govern the Proceedings.............9

    C.    The Language of the AAA Rule Does Not Unambiguously Delegate Arbitrability to the Arbitrator...........................................12

    D.    Ordinary Consumers and Other Unsophisticated Parties Are Particularly Ill-Equipped to Make the Non-Obvious Leaps Delegation-by-Rules Requires. ..........................................15

II.    Verizon's Mass Arbitration Provision Is Not a Provision to "Settle" Disputes by Arbitration Within the Meaning of the FAA............................................19

III.    The Effective Vindication Doctrine Bars Enforcement of Verizon's Arbitration Agreement....................................................24

CONCLUSION .....................................................................29

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Adir Int'l, LLC v. Starr Indem. & Liab. Co.*,
   994 F.3d 1032 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 861 (2022) .................23

*Am. Exp. Co. v. Italian Colors Rest.*,
   570 U.S. 228 (2013)...............................................................................25, 26, 27

*Arrow Sheet Metal Works v. Bryant & Detwiler Co.*,
   61 N.W.2d 125 (Mich. 1953).............................................................................11

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011).............................................................................................20

*Bloom v. ACT, Inc.*,
   No. CV 18-6749-GW(SSx), 2018 WL 6163128 (C.D. Cal. Oct. 24,
   2018) ....................................................................................................................18

*Bouman v. Block*,
   940 F.2d 1211 (9th Cir. 1991) ...........................................................................13

*Brennan v. Opus Bank*,
   796 F.3d 1125 (2015).............................................................................................6

*In re Checking Account Overdraft Litig.*,
   856 Fed. App'x 238 (11th Cir. 2021) ...................................................................9

*Cir. City Stores, Inc. v. Adams*,
   279 F.3d 889 (9th Cir. 2002), *cert. denied*, 535 U.S. 1112 (2002) ....................25

*Cole v. Burns Int'l Sec. Servs.*,
   105 F.3d 1465 (D.C. Cir. 1997).........................................................................25

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*,
   6 F.4th 308 (2d Cir. 2021) .................................................................................10

*Doctor's Assocs., Inc. v. Casarotto*,
   517 U.S. 681 (1996)............................................................................................20

*E.E.O.C. v. Waffle House, Inc.*,
534 U.S. 279 (2002) ................................................................................ 29

*Edwards v. Carter*,
580 F.2d 1055 (D.C. Cir. 1978) ............................................................. 14

*Edwards v. Macy's Inc.*,
No. 14CV-8616-CM-JLC, 2015 WL 4104718 (S.D.N.Y. June 30,
2015) ...................................................................................................... 18

*Eiess v. USAA Fed. Sav. Bank*,
404 F. Supp. 3d 1240 (N.D. Cal. 2019) ................................................. 18

*Ferguson v. Corinthian Colleges, Inc.*,
733 F.3d 928 (9th Cir. 2013) ............................................................. 24-25

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) ....................................................................... 5, 8, 20

*Gibbs v. Haynes Invs., LLC*,
967 F.3d 332 (4th Cir. 2020) ................................................................ 27

*Gilmer v. Interstate/Johnson Lane Corp.*,
500 U.S. 20 (1991) ........................................................................... 24, 25

*Gingras v. Think Fin., Inc.*,
922 F.3d 112 (2d Cir. 2019) .................................................................. 27

*Gostev v. Skillz Platform, Inc.*,
__ Cal. Rptr. 3d __, No. A164407, 2023 WL 2252693 (Cal. Ct.
App. Feb. 28, 2023) ................................................................................. 6

*Guerini Stone Co. v. P.J. Carlin Constr. Co.*,
240 U.S. 264 (1916) .............................................................................. 11

*Gulf Offshore Co. v. Mobil Oil Corp.*,
453 U.S. 473 (1981) .............................................................................. 13

*Hengle v. Treppa*,
19 F.4th 324 (4th Cir. 2021), *cert. dismissed*, 142 S. Ct. 2093
(2022) ..................................................................................................... 27

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
 139 S. Ct. 524 (2019) ............................................................................5

*Lambert v. Tesla, Inc.*,
 923 F.3d 1246 (9th Cir. 2019) ............................................................29

*Larry's United Super, Inc. v. Werries*,
 253 F.3d 1083 (8th Cir. 2001) ............................................................28

*Litgo N.J. Inc. v. Comm'r N.J. Dep't of Env't Prot.*,
 725 F.3d 369 (3d Cir. 2013) ...............................................................13

*Loc. Joint Exec. Bd. of Las Vegas v. NLRB*,
 540 F.3d 1072 (9th Cir. 2008) ..............................................................7

*Merrion v. Jicarilla Apache Tribe*,
 455 U.S. 130 (1982)...............................................................................7

*Metro. Edison Co. v. NLRB*,
 460 U.S. 693 (1983)...............................................................................7

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
 473 U.S. 614 (1985).......................................................................19, 24

*Mohamed v. Uber Techs., Inc.*,
 848 F.3d 1201 (9th Cir. 2016) ............................................................27

*Nat'l Fed'n of the Blind v. The Container Store, Inc.*,
 904 F.3d 70 (1st Cir. 2018)..................................................................18

*Preston v. Ferrer*,
 552 U.S. 346 (2008).......................................................................20, 21

*Rent-A-Center, West, Inc. v. Jackson Preston v. Ferrer*,
 561 U.S. 63 (2010)......................................................................5, 8, 24

*Retfalvi v. United States*,
 930 F.3d 600 (4th Cir. 2019) ..............................................................14

*Scherk v. Alberto-Culver Co.*,
 417 U.S. 506 (1974)..............................................................................19

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
　464 U.S. 417 (1984) ...................................................................... 14

*Starr v. Union Pac. R.R. Co.*,
　75 P.3d 266 (Kan. Ct. App. 2003) ................................................ 11

*St. Louis v. United Ry. Co.*,
　210 U.S. 266 (1908) ........................................................................ 7

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
　559 U.S. 662 (2010) ...................................................................... 26

*United States v. Winstar Corp.*,
　518 U.S. 839 (1996) ........................................................................ 7

*Veliz v. Cintas Corp.*,
　No. C 03-1180, 2004 WL 2452851 (N.D. Cal. Apr. 5, 2004),
　*modified on reconsideration*, No. 03-01180(SBA), 2005 WL
　1048699 (N.D. Cal. May 4, 2005) ................................................ 25

*Viking River Cruises, Inc. v. Moriana*,
　142 S. Ct. 1906 (2022) .............................................. 19, 24, 28, 29

*Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*,
　489 U.S. 468 (1989) ...................................................................... 16

*Williams v. Medley Opportunity Fund II, LP*,
　965 F.3d 229 (3d Cir. 2020) ........................................................ 27

*Yellow Freight Sys., Inc. v. Donnelly*,
　494 U.S. 820 (1990) ...................................................................... 13

## STATUTES

9 U.S.C. § 2 ........................................................................... 19, 22

28 U.S.C. § 1654 ......................................................................... 23

42 U.S.C. § 2000e-5(f)(3) ........................................................... 13

# OTHER AUTHORITIES

Am. Arbitration Ass'n, Consumer Arbitration Rules (Sept. 1, 2014),
*available at*
https://adr.org/sites/default/files/Consumer%20Rules.pdf................................12

*Bloom v. ACT, Inc.*,
No. 19-55628, 2019 WL 5296670 (9th Cir.)........................................................1

Cal. Rules of Prof'l Conduct r. 1.7 .........................................................................22

Cal. Rules of Prof'l Conduct r. 1.7(a)-(b)...............................................................22

Cal. Rules of Prof'l Conduct r. 1.7(d)(1)................................................................23

CFPB, Arbitration Study: Report to Congress (2015)......................................15, 16

Fed. R. App. P. 29(a)(4)............................................................................................2

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
No. 19-963, 2020 WL 6291310 (U.S.) .................................................................1

Model Rules of Prof'l Conduct r. 1.7 .....................................................................22

My Verizon Wireless Customer Agreement (Feb. 22, 2023), *available*
*at* https://www.verizon.com/legal/notices/customer-agreement/ .........................8

Petition for Certiorari, *Piersing v. Domino's Pizza Franchising LLC*,
142 S. Ct. 1268 (2021) (No. 20-695), 2020 WL 6826371 .............................1, 17

Restatement (Third) U.S. Law of Int'l Comm. Arb. § 2.8 cmt. b (2019)...............12

11 Williston on Contracts § 30:25 (4th ed. May 2022 update) ..............................11

## STATEMENT OF INTEREST

Public Justice is a national public interest advocacy organization that specializes in precedent-setting, socially significant civil litigation, with a focus on fighting to preserve access to justice for victims of corporate and governmental misconduct and preserving the civil justice system as an effective tool for holding the powerful accountable. To further its goal of defending access to justice for workers, consumers, and others harmed by corporate wrongdoing, Public Justice has long conducted a special project devoted to fighting abuses of mandatory arbitration.

As part of that project, Public Justice works to ensure that consumers and workers are not blindsided by the so-called delegation provision in the American Arbitration Association's rules—one of the questions at issue in this case. Public Justice has argued that reference to the AAA rules is not clear and unmistakable delegation of arbitrability to the arbitrator in a number of cases, including in this Court. *See, e.g.*, *Piersing v. Domino's Pizza Franchising LLC*, No. 20-695, 2020 WL 6826371 (U.S.) (petition for certiorari); *Henry Schein, Inc. v. Archer & White Sales, Inc.*, No. 19-963, 2020 WL 6291310 (U.S.) (amicus brief in support of respondent); *Bloom v. ACT, Inc.*, No. 19-55628, 2019 WL 5296670 (9th Cir.) (brief for plaintiffs-appellants). Public Justice has interest and expertise not only in ensuring mandatory arbitration is not abused generally, but specifically in ensuring

that agreements to delegate arbitrability to the arbitrator truly are clear and

unmistakable, as Supreme Court precent requires.[1]

---

[1] No party's counsel authored this brief in whole or in part nor did a party, its counsel, or any other person contribute money to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4). All parties have consented to the filing of this amicus brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Cellco Partnership (Verizon) has misled millions of consumers about the cost of its wireless plans. If Verizon's arbitration agreement is enforced, as a practical matter, consumers like Plaintiffs-Appellees can never hold Verizon accountable for those actions. This Court should decline to grant Verizon immunity for its illegal actions.

First, the question whether Verizon's arbitration agreement is enforceable is a question for the court, not the arbitrator. Verizon's agreement contains no clause expressly delegating arbitrability to the arbitrator—which it could have easily included if its intent truly was to do so. Instead, Verizon relies on the agreement's statement that the American Arbitration Association (AAA) rules *might* govern an arbitration between the parties, and the rules include a provision that supposedly delegates arbitrability to the arbitrator. But saying the AAA rules *might* govern arbitration proceedings is not the "clear and unmistakable" evidence the Supreme Court requires to demonstrate the parties intended to have the arbitrator decide whether arbitration is appropriate. Even putting aside that the agreement offers a choice of rules, so the AAA "delegation" rule will not even apply to some portion of disputes, reference to arbitral rules is not sufficiently clear and unmistakable to constitute a delegation clause. That's because delegation-by-rules is not explicit, is contrary to the most straightforward reading of the contract, and relies on a AAA

3

provision that itself does not unambiguously remove arbitrability questions from the purview of the court. These issues with delegation-by-rules are amplified where, as here, the terms are imposed on unsophisticated parties who are ill-equipped to navigate the non-obvious leaps that delegation-by-rules requires.

Second, Verizon's mass arbitration provision (MAP) cannot be enforced under the Federal Arbitration Act (FAA) because it is not an agreement to "settle" disputes by arbitration under the Act. The MAP's system of having only ten "bellwether" proceedings go forward at a time means that it would take more than 150 years for the potential claimants to be able to even *file* their claims in arbitration. That delay—which itself amount to a bar, especially when coupled with the agreement's statute of limitations—is inconsistent with the FAA's purpose of streamlining the *resolution* of disputes in arbitration. Further, it appears that *none* of the potential claimants could actually have their claims arbitrated *at all*. That's because forcing claimants' counsel to choose which cases to move forward creates an inherent conflict of interest that cannot be overcome.

Third, the effective vindication doctrine bars enforcement of Verizon's arbitration agreement. While Verizon's agreement has numerous problematic provisions, the Court need look no further than the MAP. Because the MAP prevents potential claimants from having their claims heard in arbitration *at all*, Verizon's terms, if enforced, prevent its customers from being able to pursue their statutory

4

rights, full stop. Courts must perform effective vindication review before compelling arbitration regardless of whether there is an enforceable delegation clause, both because effective vindication derives from FAA text pertaining to what *courts* must do and because here, claimants would never get to an arbitrator to decide even threshold arbitrability issues.

The Court should affirm the decision below.

## ARGUMENT

### I. Reference to the AAA Rules Is Not Clear and Unmistakable Evidence Ordinary Consumers Agreed to Delegate Arbitrability.

In *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995), the Supreme Court held that, for a court to find that parties intended to upend the default presumption that courts decide threshold questions of arbitrability, it must do so only on the basis of "clear and unmistakable evidence" that the parties intended that result. *Id.* at 944 (cleaned up). In the delegation context, silence and ambiguity cut *against* arbitration and in favor of courts determining arbitrability. That framework was reiterated in *Rent-A-Center, West, Inc. v. Jackson*—which characterized the standard as a "heightened" one, 561 U.S. 63, 69 n.1 (2010)—and again in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, where the Supreme Court made clear that it has "express[ed] no view about whether" providing that the AAA rules govern arbitration delegates arbitrability to the arbitrator, 139 S. Ct. 524, 531 (2019).

Providing that the AAA or similar rules will govern arbitration is not "clear and unmistakable evidence" the parties intended to delegate threshold questions to the arbitrator: It is not explicit, it is contrary to plain and commonsense construction of contracts—particularly because Verizon's contract provides a choice between two sets of rules—and the AAA rule that is supposedly the delegation clause does not unambiguously delegate arbitrability to the arbitrator.

While this Court has interpreted reference to the AAA rules as "clear and unmistakable" evidence of sophisticated business parties' intent to delegate arbitrability, it expressly left open the question whether the same logic applies when an ordinary consumer or employee is faced with a take-it-or-leave-it contract. *Brennan v. Opus Bank*, 796 F.3d 1125, 1131 (2015). Though a sophisticated party may understand that reference to the AAA rules has sometimes been equated with delegating arbitrability, ordinary consumers like the plaintiffs in this case—or the fast-food workers or children in other cases—do not have the legal know-how to reach that same conclusion. Therefore, at the very least, this Court should hold that reference to the AAA rules is insufficient evidence that the parties intended to change the default rule that courts decide arbitrability where one party is unsophisticated—just as the California Court of Appeals did last month. *Gostev v. Skillz Platform, Inc.*, __ Cal. Rptr. 3d __, No. A164407, 2023 WL 2252693, at *7 (Cal. Ct. App. Feb. 28, 2023).

### A. "Clear and Unmistakable" Means Explicit and Express.

"Clear and unmistakable" means explicit and express, and referencing a set of arbitral rules—whether or not they are "incorporated"—is not an explicit statement that the parties agree to have the arbitrator decide questions of arbitrability.

"Clear and unmistakable" is a high standard. The Supreme Court has repeatedly held that contractual or statutory terms are only "clear and unmistakable" if they are explicit or express, and "admit of no other reasonable interpretation." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982) (quoting *St. Louis v. United Ry. Co.*, 210 U.S. 266, 280 (1908)); *see also, e.g.*, *United States v. Winstar Corp.*, 518 U.S. 839, 888 (1996) (plurality opinion) (waivers of sovereign authority are only "unmistakable" if they include an "express delegation"); *id.* at 920-21 (Scalia, J., concurring in the judgment); *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983) (waiver must be "explicitly stated" to be "clear and unmistakable"); *Loc. Joint Exec. Bd. of Las Vegas v. NLRB*, 540 F.3d 1072, 1079 (9th Cir. 2008) (same).

Providing generally that a set of arbitral rules will govern arbitration proceedings—particularly without pinpointing the specific rule that supposedly delegates arbitrability to the arbitrator—fails the "clear and unmistakable" standard at every turn. At best, it is ambiguous, which means that it is not clear or unmistakable. As *First Options* explained, ambiguities mean that the court determines arbitrability because any other rule "might too often force unwilling

parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." 514 U.S. at 945. That is of particular concern here, where it is entirely reasonable—as explained below—for parties to conclude that the referenced body of rules only applies, if it applies, to the question of *how* arbitration is to be conducted, not *whether* it is to be conducted.

If it truly intended to impose delegation on its customers, Verizon could have easily included an explicit delegation clause. It has known about the standard articulated in *First Options* for decades. And *Rent-A-Center* has told Verizon exactly what it needs to do to meet that standard. 561 U.S. at 66 (explaining the following explicit language constituted a delegation clause: "[T]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable").[2]

---

[2] Verizon knows how to write an express delegation clause. After the time period at issue in this case, it amended its wireless agreement to include an express delegation clause. *See* My Verizon Wireless Customer Agreement (Feb. 22, 2023), *available at* https://www.verizon.com/legal/notices/customer-agreement/ ("ANY DISPUTE THAT IN ANY WAY RELATES TO OR ARISES OUT OF THIS AGREEMENT, INCLUDING THE VALIDITY, ENFORCEABILITY, OR SCOPE OF ANY PORTION OF THIS AGREEMENT (INCLUDING THE AGREEMENT TO ARBITRATE)," is to be resolved by arbitration (emphasis in original)).

But Verizon chose to do otherwise. Where it is very easy for contract drafters to impose explicit delegation clauses instead of relying on convoluted references to the AAA or similar rules, it is odd and unnecessary to make this stretch: If Verizon wants a delegation clause, it can and should put it in the contract.[3]

### B.   Under Ordinary Contract Construction, the AAA Rules do Not Come into Play Until It Is Determined that the Dispute Is Going to Arbitration and the AAA Rules Will Govern the Proceedings.

Under an ordinary reading of Verizon's contract, the AAA rules are irrelevant until it becomes clear that the dispute is going to be arbitrated, and the party bringing the claim selects the AAA rules as the governing rules. In other words, nothing about indicating that the AAA rules *might* govern how arbitration is to be conducted makes it "clear and unmistakable" that those rules will govern whether any arbitration will occur in the first place.

Like most consumer contracts, Verizon's contract begins by explaining which disputes are subject to arbitration. ER37. While Verizon's language is broad, it is not limitless—for example, there could be a dispute as to whether an employment-related dispute brought by a Verizon employee who is also a Verizon customer is

---

[3] Some courts embracing delegation-by-rules have taken the extreme view that *all* issues of arbitrability are delegated to the arbitrator even if the plain language of the contract only provides that certain types of arbitrability questions are for the arbitrator. *See, e.g.*, *In re Checking Account Overdraft Litig.*, 856 Fed. App'x 238, 244-45 (11th Cir. 2021). That fails to honor the contractual language as the FAA requires—and is contrary to the obvious intent of the parties.

included. Only those disputes within the scope of the clause may be subject to arbitration. *Id.*[4]

Verizon's agreement includes other caveats to the general rule that disputes are subject to arbitration. Either party may bring any qualifying claims in small claims court instead of arbitration. *Id.* And disputes cannot be arbitrated if either party fails to provide the detailed notice required by the agreement. ER38. The agreement expressly provides that any dispute over whether the notice is sufficient must be decided by a court prior to the parties going to arbitration. *Id.*

But even if all these requirements for arbitration are met, it is *still* not clear that the AAA rules will govern. Verizon's agreement provides that, for claims under $10,000, the party bringing the claim may choose either the AAA rules or the Better Business Bureau rules. ER37. The latter do not contain any provision that arguably delegates questions of arbitrability to the arbitrator. It cannot be the case that the AAA rules govern the question of whether the dispute is to be arbitrated when the AAA rules may not be the relevant set of arbitral rules even if the dispute goes to

---

[4] The Second Circuit has sensibly recognized that where an arbitration agreement does not include a broad scope provision, but rather sharply limits what types of disputes go to arbitration and provides that the AAA rules "apply to such arbitrations," the best interpretation of the contract is that the AAA rules do *not* apply until it has been determined that the dispute is appropriate for arbitration and do not govern arbitrability—or it is at least insufficiently clear that they should. *See DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 320-21 (2d Cir. 2021).

arbitration. At the very least, given the conflicting sets of rules, it is not clear and unmistakable that the AAA rules govern whether arbitration is appropriate.

Even if the AAA rules were to be considered incorporated into Verizon's contract, the most sensible reading of the contract's text is that the AAA rules would, at most, govern the arbitration itself, not whether to arbitrate. A reference by contracting parties "to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified." *Guerini Stone Co. v. P.J. Carlin Constr. Co.*, 240 U.S. 264, 277 (1916); 11 Williston on Contracts § 30:25 (4th ed. May 2022 update); *see also, e.g.*, *Arrow Sheet Metal Works v. Bryant & Detwiler Co.*, 61 N.W.2d 125, 129-30 (Mich. 1953); *Starr v. Union Pac. R.R. Co.*, 75 P.3d 266, 269 (Kan. Ct. App. 2003). Here—and as with these types of contracts in general—the particular purpose that is evident from the contract is that the AAA rules will govern arbitral proceedings, not decide whether the claims are arbitrable. At a minimum, referencing the AAA rules in an arbitration agreement without saying more muddies the waters as to whether those rules apply before arbitration commences. That is not "clear and unmistakable" evidence that the parties intended the AAA rules to govern the question whether the claims should be arbitrated in the first place.

### C. The Language of the AAA Rule Does Not Unambiguously Delegate Arbitrability to the Arbitrator.

Further, the language of the relevant AAA rule does not itself unambiguously delegate questions of arbitrability to the arbitrator. Rule 14(a) of the AAA consumer rules, at issue here, provides that "the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *See* Am. Arb. Ass'n, Consumer Arbitration Rules (Sept. 1, 2014), *available at* https://adr.org/sites/default/files/Consumer%20Rules.pdf. Many, but not all, of the other sets of AAA rules—including the AAA employment rules—contain identical provisions, and some other arbitration providers' rules contain identical or similarly-worded provisions. Nothing in this language makes clear that arbitrability disputes are to be exclusively decided by the arbitrator; nothing in the rule purports to remove arbitrability questions from the court's purview. At most, it is ambiguous as to whether it does so—and *First Options* requires ambiguities to break in favor of the court deciding arbitrability.

The view that this language fails to give the arbitrator the exclusive authority to decide arbitrability was adopted by the ALI Restatement of the U.S. Law of International Commercial and Investor-State Arbitration. *See* Restatement (Third) U.S. Law of Int'l Comm. Arb. § 2.8 cmt. b (2019) (proposed final draft) ("Many institutional arbitration rules give the arbitral tribunal the authority to rule on such

12

defenses to enforcement …. These rules, however, do not expressly give the tribunal exclusive authority over these issues.").

Moreover, interpreting the AAA rule to provide concurrent jurisdiction of the court and arbitrator over arbitrability is consistent with the way the Supreme Court has interpreted similarly-worded statutes. In the context of statutes granting federal-court jurisdiction over particular claims, the Supreme Court has made clear that language stating a federal forum "shall have" power to decide a particular question does not "oust" a state forum of concurrent authority. *Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 823 (1990). In *Donnelly*, the Court considered statutory language stating that "United States district court[s] … shall have jurisdiction of actions brought [under Title VII]." *Id.* (quoting 42 U.S.C. § 2000e-5(f)(3)). It read this to "contain[] no language that expressly confines jurisdiction to federal courts" and affirmed state courts' concurrent jurisdiction over Title VII claims. *Id.*; *see also Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 479 & n.5 (1981) (finding jurisdictional grant to federal courts in the Outer Continental Shelf Lands Act not to preclude state-court jurisdiction); *Litgo N.J. Inc. v. Comm'r N.J. Dep't of Env't Prot.*, 725 F.3d 369, 396 (3d Cir. 2013) (finding that "shall have jurisdiction" language is "merely a grant of authority" not inconsistent with state-court jurisdiction); *see also Bouman v. Block*, 940 F.2d 1211, 1230 (9th Cir. 1991) (concluding that a California statute providing that state superior courts "shall have

13

jurisdiction" over claims under the act did not preclude federal courts from exercising their own jurisdiction).

Moreover, constitutional grants of authority framed in "shall-have-power" terms are treated as permissive and non-exclusive. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 456 (1984) (holding that the constitutional phrase "Congress shall have the power" is permissive). For example, "[t]he grant of authority to Congress under the [P]roperty [C]lause states that 'the Congress shall have power … ,' not that only the Congress shall have power, or that the Congress shall have exclusive power." *Edwards v. Carter*, 580 F.2d 1055, 1057 (D.C. Cir. 1978). Identical language in the Taxing Clause leads to an identical result. While "[t]he Congress shall have Power To lay and collect Taxes," that "grant of power is not exclusive to Congress alone." *Retfalvi v. United States*, 930 F.3d 600, 608-09 (4th Cir. 2019).

Interpreted as a concurrent jurisdictional provision, the AAA rule sensibly empowers the arbitrator to decide questions of arbitrability when they arise in the course of arbitration, giving the parties the option to avoid having to run to court every time such a dispute arises. In other words, it offers the parties a more streamlined and efficient proceeding—just as arbitration is intended to do.

**D.    Ordinary Consumers and Other Unsophisticated Parties Are Particularly Ill-Equipped to Make the Non-Obvious Leaps Delegation-by-Rules Requires.**

Numerous district courts in this Circuit have held reliance on references to AAA or similar rules to find delegation is particularly problematic in the context of adhesion contracts with unsophisticated low-wage employees and ordinary consumers. An increasing number of companies are asking courts to find that referencing these rules is enough to send arbitrability questions to the arbitrator in contexts where ordinary individuals are particularly ill-equipped to appreciate and understand the obscure, non-obvious implications of referencing a set of arbitral rules. But this Court should find that, at least in the context of unsophisticated parties, delegation clauses must be explicit.

First, empirical evidence indicates that reference to the AAA rules is ubiquitous in take-it-or-leave-it form contracts that include arbitration clauses. The Consumer Financial Protection Bureau's 2015 study found that, of the 850 consumer financial services contracts it reviewed, about half (between 39 and 63 percent of each industry) contained express delegation clauses similar to the one in *Rent-A-Center*. CFPB, Arbitration Study: Report to Congress § 2, at 43 tbl.6 (2015); *see id.* § 1.3 at 7. But, "almost all of the arbitration clauses without delegation clauses in the sample … selected one or more [arbitration] administrators." *Id.* § 2, at 42. Indeed, *every* payday loan contract and mobile wireless contract that contained

15

an arbitration clause, but not an explicit delegation clause, specified that arbitration would be governed by a particular set of arbitral rules, almost always the AAA rules. *Id.* § 2, at 42 n.109.

Concluding that referencing the AAA rules constitutes a delegation clause amounts to adding judicially-imposed delegation clauses to consumer arbitration agreements that do not contain such a clause—regardless of whether the parties actually intended such delegation or merely intended to invoke the most prevalent set of consumer arbitration procedures to govern the arbitration itself. Such a sweeping conclusion stands in significant tension with the principle that arbitration is a matter of contract and that intent to delegate arbitrability questions to the arbitrator must be "clear and unmistakable." *See Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 472 (1989).

Unsurprisingly, because some courts have held that reference to the AAA rules constitutes an agreement to delegate arbitrability, even in the context of unsophisticated consumers, an increasing number of delegation determinations rest solely on the designation of a set of arbitral rules. A Westlaw search of delegation decisions indicates that in approximately thirty percent of cases in which arbitration of arbitrability was compelled in a one-year period, that decision was based solely on the parties' selection of a set of arbitral rules, and not on any express delegation

clause. *See* Petition for Certiorari at 32, *Piersing v. Domino's Pizza Franchising LLC*, 142 S. Ct. 1268 (2021) (No. 20-695), 2020 WL 6826371, at \*32.

But ordinary consumers like the Plaintiffs here are ill-equipped to appreciate the not-so-obvious meaning of a reference to a rule. Especially in the employee and consumer context, "clear and unmistakable" loses all meaning if one needs to be an expert in arbitration law to understand that merely referencing the AAA rules will send to arbitration issues that are not within the scope of the arbitration agreement itself.

To have any appreciation of what is at stake, an employee or consumer would have to go through numerous steps to figure out the implications of delegation-by-rules. First, they would need to sort through what may be many pages of fine print to locate any arbitration clause, and then also identify the reference to the arbitral rules. Second, the individual would need to understand that—contrary to the most obvious reading of the contract—the rules will govern not only how the arbitration will be conducted, but also whether arbitration will take place. Third, they would need to locate and review a copy of the specific rules referenced in the agreement, assuming the agreement references a specific set of rules rather than invoking "AAA rules" generally, in which case they would have to figure out which set of the more than forty AAA rules would most likely apply. Fourth, the individual would need to pinpoint which rule sets forth the arbitrator's ability to hear disputes about its own

17

jurisdiction. And fifth, they would need to understand that, even when—as here—it doesn't say so, the rule *removes* arbitrability from the purview of the court. That a typical consumer is likely to successfully navigate this process is fantasy. *See Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1253 (N.D. Cal. 2019). If a company wants to impose a delegation clause, it should have to say so clearly and unmistakably, just as *First Options* requires.

Making this process especially difficult, many employees and consumers enter into arbitration agreements in which they may not have the ability, as a practical matter, to consult and understand the referenced rules, even if it had occurred to them to do so. For example, it is not uncommon for a consumer to be asked to enter into an agreement containing an arbitration clause on a point-of-sale device at a store. *E.g.*, *Nat'l Fed'n of the Blind v. The Container Store, Inc.*, 904 F.3d 70, 75-76 (1st Cir. 2018); *Edwards v. Macy's Inc.*, No. 14CV-8616-CM-JLC, 2015 WL 4104718, at *5 (S.D.N.Y. June 30, 2015). And companies have tried to enforce delegation-by-reference against minors with learning disabilities taking a college entrance exam. *See Bloom v. ACT, Inc.*, No. CV 18-6749-GW(SSx), 2018 WL 6163128, at *1 (C.D. Cal. Oct. 24, 2018). Under those circumstances, it is absurd to think that a reference to a set of arbitral rules is somehow "clear and unmistakable evidence" of the employee's, consumer's, or minor's intent to overturn the default presumption that courts decide questions of arbitrability.

18

**II.    Verizon's Mass Arbitration Provision Is Not a Provision to "Settle" Disputes by Arbitration Within the Meaning of the FAA.**

Verizon and amici wrongly contend that Verizon's MAP is enforceable under the FAA. The FAA authorizes courts to compel arbitration *only* based on written agreements "to settle by arbitration" certain types of controversies. 9 U.S.C. § 2. Because the proposed "bellwether" proceedings here would prevent plaintiffs from bringing claims in arbitration, it is not a provision to "settle" controversies—and this Court may not compel arbitration for Verizon under the FAA.

The FAA authorizes courts to compel the *resolution* of certain disputes in arbitration. Nearly five decades ago, the Court held that "[a]n agreement to arbitrate … is, in effect, a specialized kind of forum-selection clause that posits … the procedure to be used in *resolving* the dispute." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974) (emphasis added); *accord Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1919 (2022). By authorizing specific enforcement of arbitration agreements, the FAA provides "arbitration as an alternative means of dispute *resolution*." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627 (1985) (emphasis added). Thus, per the FAA, a party agreeing to arbitrate claims "only submits to their *resolution* in an arbitral, rather than a judicial, forum." *Id.* at 628 (emphasis added).

The explicit limitation in both the text of the FAA and the Supreme Court's cases that enforceable arbitration provisions are only those that "settle"[5] or "resolve" the underlying controversy derives from one of the overarching goals of the FAA: the "encouragement of efficient and speedy dispute *resolution*." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345 (2011) (emphasis added). The Supreme Court has found this purpose to have broad preemptive effect over law that would "hinder speedy resolution of the controversy." *Preston v. Ferrer*, 552 U.S. 346, 358 (2008) (invalidating statutory prerequisites to enforcement of an arbitration agreement); *see also AT&T*, 563 U.S. at 352 (invalidating judicial rule barring class action waiver); *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (invalidating statutory "special notice requirement not applicable to contracts generally"). The proposed "bellwether" proceedings similarly conflict with the FAA's purpose by making the dispute-resolution "process slower … and more likely to generate procedural morass than final judgment." *AT&T*, 563 U.S. at 348.

Verizon's "arbitration" provision does not "settle" the underlying controversies it has with its customers within the meaning of § 2; to the contrary, it

---

[5] Section 2 uses the term "settle" with regard to pre-dispute arbitration agreements, and "submit" with regard to post-dispute arbitration agreements. Verizon's contract includes a pre-dispute agreement, so "submit" is not germane here. And, even if it were, the term "submit" is equivalent to "settle" in this context. *See First Options*, 514 U.S. at 943 ("[A]rbitration is simply a matter of contract between the parties; it is a way to *resolve* those disputes . . . that the parties have agreed to *submit* to arbitration." (emphases added)).

actually *prevents* them from resolving their controversies in arbitration. Under the terms of the MAP, only ten plaintiffs would even nominally be able to file claims in arbitration; unless selected as part of that "bellwether" tranche of ten test cases, the 27 named Plaintiffs in this case, *and* the 2,685 other Verizon customers represented by Plaintiffs' counsel, would be forced to wait in limbo. ER38.

Assuming that at least *some* arbitration might be possible, the district court below explained that the effect of the MAP is to require consumer plaintiffs "to wait months, more likely years before they can even submit a demand for arbitration" because "consumers may not 'file' their claims in arbitration until all preceding tranches are adjudicated." ER23. Thus, the MAP conflicts with "Congress' intent 'to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible.'" *Preston*, 552 U.S. at 357. *Preston* observed that "[r]equiring initial reference of the parties' dispute to the [California] Labor Commissioner would, at the least, hinder speedy resolution of the controversy." *Id.* at 358. The Court ultimately held in line with the dissenting judge on the Circuit panel below, who "reasoned that the FAA called for immediate recognition and enforcement of the parties' agreement to arbitrate." *Id.* at 351. With a possible delay of *156 years* in adjudicating all claims by the 2,712 Verizon customers represented by Plaintiffs' counsel, ER20-21; ER23—assuming, that is, that any of them may

ever be adjudicated—the provision here cannot be squared with the purpose and statutory text of the FAA to "settle" controversies, 9 U.S.C. § 2.

If anything, the district court understated the effect of the MAP and its conflict with federal arbitration law. Under the MAP's terms, not even *one* of the thousands of Plaintiffs and potential plaintiffs represented by counsel here will *ever* be able to arbitrate their claim against Verizon. The MAP bars those plaintiffs from filing any of their individual cases in arbitration until a tranche of ten "bellwether" cases "proceed[s] first in arbitration." ER38. In determining which individual cases will be arbitrated as part that first tranche, the MAP requires that plaintiffs' counsel "shall … select five cases." ER38. But forcing plaintiffs' counsel to decide which individual clients' claims may proceed and which may be forever forestalled presents an unavoidable conflict of interest that prevents counsel from making such a selection. *See* Model Rules of Prof'l Conduct r. 1.7 (Am. Bar Ass'n 2020); Cal. Rules of Prof'l Conduct r. 1.7 (State Bar of Cal. 2018).

Here, each named Plaintiff has already instructed counsel to file their individual claims in arbitration immediately if their claims are compelled into arbitration. SER38. Counsel cannot unilaterally select only five of those cases. *See* Cal. Rules of Prof'l Conduct r. 1.7(a)-(b) (requiring informed written consent by clients to overcome conflicts due to "directly adverse" representation or where "there is a significant risk the lawyer's representation of the client will be materially

22

limited by the lawyer's responsibilities to or relationships with another client"). Even if the 2,712 clients were to give counsel informed consent to this conflict, counsel would still not be able to overcome it; a reasonable lawyer could not believe that they could provide "competent and diligent representation to each affected client" due to the inherent conflict between them as to which clients may proceed with their claims, and which clients may never have the opportunity to proceed in court or arbitration. Cal. Rules of Prof'l Conduct r. 1.7(d)(1).[6]

The effect of the MAP provision on plaintiffs' ability to resolve their claims in arbitration is clear. At its *hypothetical* best, it delays the filing of claims in arbitration for more than a century—claims which, notwithstanding Verizon's contract, could be filed *immediately* in court. Here, the real-world effect of the MAP is even more severe: Not a single plaintiff will be able to proceed in arbitration. At

---

[6] One might be excused for thinking that an implicit purpose of Verizon's requirement that plaintiffs' counsel—a definition which encompasses multiple "coordinated" attorneys from different firms, ER38—select a "bellwether" subset of their own clients to proceed in arbitration is to prevent counsel willing to litigate these low-dollar claims from representing more than a handful of plaintiffs. It is contrary to the interests of justice to prevent counsel from representing similarly-situated plaintiffs where counsel's expertise enables them to more effectively litigate similar claims.

The proposed proceedings also prevent potential plaintiffs from retaining counsel of their own choosing without waiving their right to proceed in arbitration. This restriction implicates potential, and serious, violations of federal constitutional and statutory law. *See Adir Int'l, LLC v. Starr Indem. & Liab. Co.*, 994 F.3d 1032, 1039 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 861 (2022) ("[C]ourts have generally acknowledged a civil litigant's Fifth Amendment due process right to retain and fund the counsel of their choice."); 28 U.S.C. § 1654.

the end of the day, Verizon's contract contains not an "arbitration agreement," but rather an agreement to *not* settle disputes at all.[7]

### III.  The Effective Vindication Doctrine Bars Enforcement of Verizon's Arbitration Agreement.

This Court is also unauthorized to compel arbitration of Plaintiffs' claims because Plaintiffs would not be able to effectively vindicate those claims in the proposed proceedings. *See Mitsubishi*, 473 U.S. at 637 (1985) (permitting specific enforcement of agreements to arbitrate "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum"). The Supreme Court clarified just last term in *Viking River* that the effective vindication doctrine derives from the same "settle by arbitration" text in § 2 discussed above: "The basis of this principle … is that the FAA requires only the enforcement of 'provision[s]' to settle a controversy 'by arbitration,' § 2, and not any provision that happens to appear in a contract that features an arbitration clause." 142 S. Ct. at 1919 n.5. The Court also clarified, based on the same text of § 2, that the doctrine applies equally to federal *and* state statutes, *id.*, abrogating this Court's decision in *Ferguson*

---

[7] Verizon and amici suggest that the proposed bellwether proceedings may help encourage private settlement between the parties based on the results of the test cases. But this is not what the FAA means by "settle." *See, e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991) (citing *adjudicated* cases as examples of how "[s]uch disputes can be settled"). Although "parties generally have substantial leeway to define the terms and scope of their agreement," that leeway is limited to agreements "to settle disputes *in an arbitral forum*." *Rent-A-Ctr.*, 561 U.S. at 77 (2010) (Ginsburg, J., dissenting) (emphasis added).

*v. Corinthian Colleges, Inc.*, 733 F.3d 928, 936 (9th Cir. 2013) (holding that the effective vindication doctrine "does not extend to state statutes"). Applying the effective vindication doctrine to Plaintiffs' state-law claims, the question is whether the arbitration agreement "operat[es] … as a prospective waiver of a party's right to pursue statutory remedies." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013) (emphasis omitted).

Verizon's contract operates as a waiver of Plaintiffs' right to pursue statutory remedies under California law in several regards.[8] But this Court need look no further than the MAP—which prevents Plaintiffs from effectively vindicating *any* of their claims by permanently relegating them to pre-filing purgatory—to decide this question. Plaintiffs cannot even *begin* to pursue statutory remedies when they are unable to even *file* claims in arbitration. As explained above in Part II, neither named Plaintiffs nor any of the other 2,685 clients represented by counsel will ever

---

[8] The contract bars punitive damages and public injunctive relief. *See Cir. City Stores, Inc. v. Adams*, 279 F.3d 889, 895 (9th Cir. 2002), *cert. denied*, 535 U.S. 1112 (2002). The 180-day contractual statute-of-limitations reduces the amount of overall recovery. *See Veliz v. Cintas Corp.*, No. C 03-1180 SBA, 2004 WL 2452851, at *15, *20 (N.D. Cal. Apr. 5, 2004) (limitation "limits the amount" of recovery), *modified on reconsideration*, No. 03-01180(SBA), 2005 WL 1048699 (N.D. Cal. May 4, 2005). And the bar on "*all* extrinsic evidence," ER19, deprives plaintiffs of a "fair opportunity to present their claims," *Gilmer*, 500 U.S. at 31 (1991); *see also Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1482 (D.C. Cir. 1997) (*Gilmer* requires that the "arbitration arrangement … provides for more than minimal discovery.").

be able to proceed in arbitration. That result categorically bars plaintiffs from "pursu[ing] statutory remedies." *Id.*

But even if plaintiffs *were* able to proceed, they would still be unable to effectively vindicate their claims because the contract "expressly reserves Verizon's right to raise a statute of limitations defense in arbitration," ensuring that claims in later tranches will never reach the merits. ER23. And, even if Verizon could retroactively rewrite the terms of its contract to disallow that possibility, which it cannot, *see Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682-83 (2010), "[d]elaying the ability of one to vindicate a legal claim by years, possibly *156 years*, 'conflict[s] with one of the basic principles of our legal system—justice delayed is justice denied.'" ER23.

Even if there *were* a delegation clause in Verizon's contract, this Court would still need to assess whether Plaintiffs will be able to effectively vindicate their rights in the proposed proceedings. First, the effective vindication doctrine applies directly to the purported delegation clause in Verizon's contract. The combined effect of a delegation clause and the MAP would be to prevent Plaintiffs from resolving even *threshold* arbitrability issues that might be delegated to an arbitrator. Unless a plaintiff's case is selected as part of a "bellwether" tranche of test cases, even arbitrability issues will never be considered by the arbitrator. Because plaintiffs must resolve the arbitrability controversy before reaching the merits controversy, the

26

delegation clause and MAP force a "prospective waiver of … right[s] … to pursue statutory remedies" upon Plaintiffs no less than the MAP foils their efforts to pursue such remedies at the merits stage. *American Express*, 570 U.S. at 235; *see also Hengle v. Treppa*, 19 F.4th 324, 338 (4th Cir. 2021) (choice-of-law clause barring arbitrator from considering federal law prevented arbitrator from resolving arbitrability or merits disputes), *cert. dismissed*, 142 S. Ct. 2093 (2022).

Second, just as parties may not immunize themselves from liability through imposing arbitration, *see American Express*, 570 U.S. at 244 (Kagan, J., dissenting), so, too, may they not evade courts' effective vindication review prior to compelling arbitration by relying on a delegation clause. All but one of the circuits to have considered this issue have concluded that courts must still assess plaintiffs' abilities to pursue statutory remedies before compelling arbitration based on an agreement with a delegation clause. *See Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 238, 241 (3d Cir. 2020); *Gibbs v. Haynes Invs., LLC*, 967 F.3d 332, 341 (4th Cir. 2020); *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 127 (2d Cir. 2019); *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1212 (9th Cir. 2016); *but see Larry's United Super, Inc. v. Werries*, 253 F.3d 1083, 1086 (8th Cir. 2001).[9]

---

[9] There is also good reason to believe that the Eighth Circuit would decide *Larry's United* differently today, with the benefit of *Viking River*. The Eighth Circuit misunderstood the effective vindication question to be "[w]hether a prospective waiver of punitive damages violates the public policy underlying" plaintiffs' statutory claims. 253 F.3d at 1086. But *Viking River* clarified that the doctrine

The majority position is well founded. As the Supreme Court explained in *Viking River*, the effective vindication doctrine derives from the "settle by arbitration" language in § 2. 142 S. Ct. at 1919 n.5. Courts must rigorously police that boundary to ensure that the FAA does not sweep beyond its textual bounds established by Congress; otherwise, parties—especially powerful contracting entities like Verizon—may seek to use arbitration agreements to force waivers of statutory rights upon their contractual counterparties. That a court might compel an entire court case—threshold arbitrability questions and merits disputes, alike—into arbitration does not alter a court's duty under the FAA to ensure that it is not forcing parties to waive their statutory causes of action.

If courts do not police the boundary between FAA-authorized arbitration and illegal waivers, nobody will. Although arbitrators *may* consider whether there is an "inherent conflict" between a statutory claim and an arbitration agreement when adjudicating arbitrability, *Lambert v. Tesla, Inc.*, 923 F.3d 1246, 1249 (9th Cir. 2019) (describing conditions for finding statutes nonarbitrable), the effective vindication doctrine does not apply *in* arbitration because the FAA— including the textual basis for the doctrine in § 2—has no role in the arbitral forum. Congress enacted the FAA to "reverse the longstanding *judicial* hostility to arbitration

---

derives from the text, *not* public policy concerns. 142 S. Ct. at 1919 n.5. The Eighth Circuit also erroneously assumed that effective vindication review was delegable; but, as explained below, *Viking River* makes clear that it is not.

agreements that had existed at English common law and had been adopted by American *courts*." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (emphases added). But an arbitrator is not a court, and the judicial doctrines which Congress abrogated in the FAA, *see Viking River*, 142 S. Ct. at 1917 n.3, never applied to arbitrators in the first place. Thus, parties who object to arbitration because it will waive their statutory claims are not safeguarded by § 2 *in* arbitration—only *before* arbitration. If parties may evade the effective vindication doctrine through a delegation clause, then the FAA's textual limitations on courts' authority to compel arbitration become ephemeral.

## CONCLUSION

For the reasons stated above and those given in Appellees' brief, the Court should affirm the district court's denial of Verizon's motion to compel arbitration.

March 24, 2023                    Respectfully submitted,

                             /s/ Leah M. Nicholls
                             Leah M. Nicholls
                             Matthew C. Clifford
                             Public Justice
                             1620 L St. NW, Suite 630
                             Washington, DC 20036
                             (202) 797-8600
                             lnicholls@publicjustice.net
                             mclifford@publicjustice.net

                             *Counsel for Amicus Curiae Public Justice*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), Fed. R. App. P. 29(a)(5), and Ninth Circuit Rule 32-1(a) because this brief contains 6,986 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as calculated by Microsoft Word 2016. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a) because this brief has been prepared in proportionally spaced typeface using 14-point Times New Roman font.

March 24, 2023

/s/ Leah M. Nicholls
Leah M. Nicholls
Public Justice
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 797-8600
lnicholls@publicjustice.net

*Counsel for Amicus Curiae Public Justice*

**CERTIFICATE OF SERVICE**

I certify that on March 24, 2023, the foregoing document was served on all parties or their counsel of record through CM/ECF system.

March 24, 2023

/s/ Leah M. Nicholls
Leah M. Nicholls
Public Justice
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 797-8600
lnicholls@publicjustice.net

*Counsel for Amicus Curiae Public Justice*