No. 22-16020

# In the United States Court of Appeals for the Ninth Circuit

TERESA MACCLELLAND; KAREN UMBERGER; SCOTT WILLITS;
VALERIE REED; JOHN ST. JARRE; LOUISE MONSOUR; VANESSA WEST;
TIM FRASCH; DARLEEN PEREZ; WILLIAM KAUPELIS; KERRY SHOWALTER;
BRUCE SCHRAMM; PATRICIA GAGAN; WILLIAM ERIC LOUGH;
MICHAEL CARNEY; ANNA GUTIERREZ; JANETTE LISNER; MARILYN KAYE;
TERESA TOY; MICHAEL BRANOM; GLORIA STERN; DAVID MASSARO;
AUGUSTUS JOHNSON; EDNA TOY; MOLLY BROWN; LINDA JENKINS;
GABRIELLE POZZUOLI, FOR THEMSELVES, AS PRIVATE ATTORNEYS
GENERAL, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,
PLAINTIFFS-APPELLEES

*v.*

CELLCO PARTNERSHIP, DBA VERIZON WIRELESS;
VERIZON COMMUNICATIONS, INC., DEFENDANTS-APPELLANTS

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (CIV. NO. 21-8592)
(THE HONORABLE EDWARD M. CHEN, J.)*

### REPLY BRIEF OF APPELLANTS

<table>
<tr>
<td>

CRYSTAL NIX-HINES
SHON MORGAN
MARINA LEV
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
  *865 South Figueroa Street,*
    *10th Floor*
  *Los Angeles, CA 90017*

CHRISTINA HENRIQUEZ
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
  *555 Twin Dolphin Drive,*
    *5th Floor*
  *Redwood Shores, CA 94065*

</td>
<td>

KANNON K. SHANMUGAM
WILLIAM T. MARKS
YISHAI SCHWARTZ
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

JING YAN
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*

</td>
</tr>
</table>

# TABLE OF CONTENTS

Page

I. The district court erred by declining to send the question of unconscionability to the arbitrator...........................................3

    A. The arbitration agreement clearly and unmistakably delegates questions of arbitrability to the arbitrator by incorporating the rules of the American Arbitration Association ...................................................3

    B. The delegation provision is not unconscionable or illusory..........10

II. Even absent the delegation, the district court should not have addressed the unconscionability of contractual provisions outside the arbitration agreement.........................................15

III. The district court's unconscionability analysis was erroneous ..............16

    A. The mass-arbitration provision is not substantively unconscionable....................................................................17

    B. The Federal Arbitration Act preempts the district court's application of state law to the collective-arbitration waiver ........25

    C. The six-month notice provision is not substantively unconscionable....................................................................26

    D. The integration clause is not substantively unconscionable ........28

IV. The decision below should be reversed or, in the alternative, vacated ........................................................29

# TABLE OF AUTHORITIES

## CASES

*Achey* v. *Cellco Partnership*, No. A-3639-21, 2023 WL 3160849 (N.J. Super. Ct. App. Div. May 1, 2023) ..........................16

*AT&T Mobility LLC* v. *Concepcion*, 563 U.S. 333 (2011)..................................23

*Attix* v. *Carrington Mortgage Services, LLC*, 35 F.4th 1284 (11th Cir. 2022) ........................................................11

Page

Cases—continued:

*Awuah* v. *Coverall North America, Inc.*, 554 F.3d 7 (1st Cir. 2009) ...............13

*Becker* v. *Delek US Energy, Inc.*, 39 F.4th 351 (6th Cir. 2022) ........................12

*Blanton* v. *Domino's Pizza Franchising, LLC,*
    962 F.3d 842 (6th Cir. 2020) ................................................................4

*Brennan* v. *Opus Bank*, 796 F.3d 1125 (9th Cir. 2015) ...........................*passim*

*Brice* v. *Haynes Investments, LLC*, 13 F.4th 823 (9th Cir. 2021),
    *vacated*, 35 F.4th 1219 (9th Cir. 2022) ...........................................12

*Cape Flattery Limited* v. *Titan Maritime, LLC,*
    647 F.3d 914 (9th Cir. 2011) .................................................................7

*Caremark, LLC* v. *Chickasaw Nation*, 43 F.4th 1021 (9th Cir. 2022).......10, 13

*Casa del Caffe Vergnano S.P.A.* v. *ItalFlavors, LLC,*
    816 F.3d 1208 (9th Cir. 2016) ...............................................................5

*Cunningham* v. *Universal Underwriters,*
    120 Cal. Rptr. 2d 162 (Ct. App. 2002) ................................................29

*Depuy Orthopaedics, Inc.*, *In re*, 870 F.3d 345 (5th Cir. 2017) ......................22

*First Options of Chicago, Inc.* v. *Kaplan*, 514 U.S. 938 (1995) ..................5, 6, 8

*Freeman* v. *Wal-Mart Stores, Inc.*, 3 Cal. Rptr. 3d 860 (Ct. App. 2003).........24

*Gibbs* v. *Sequoia Capital Operations, LLC*, 966 F.3d 286 (4th Cir. 2020) ......11

*Gingras* v. *Think Finance, Inc.*, 922 F.3d 112 (2d Cir. 2019)..........................11

*Gostev* v. *Skillz Platform, Inc.*, 305 Cal. Rptr. 3d 248 (Ct. App. 2023)..........6, 7

*Helfand* v. *Gerson*, 105 F.3d 530 (9th Cir. 1997) ..............................................10

*Killgore* v. *SpecPro Professional Services, LLC,*
    51 F.4th 973 (9th Cir. 2022) ..................................................................6

Page

Cases—continued:

*Kindred Nursing Centers Limited Partnership* v. *Clark*,
581 U.S. 246 (2017)................................................................30

*Kum Tat Limited* v. *Linden Ox Pasture, LLC*,
845 F.3d 979 (9th Cir. 2017).................................................13

*Lim* v. *TForce Logistics, LLC*, 8 F.4th 992 (9th Cir. 2021) ..............11

*MacDonald* v. *CashCall, Inc.*, 883 F.3d 220 (3d Cir. 2018)...............11

*McGill* v. *Citibank, N.A.*, 393 P.3d 85 (Cal. 2017).....................25, 26

*Musicians* v. *Paramount Pictures Corp.*, 903 F.3d 968 (9th Cir. 2018) ..........9

*OTO, L.L.C.* v. *Kho*, 447 P.3d 680 (Cal. 2019) .......................................24

*Poublon* v. *C.H. Robinson Co.*, 846 F.3d 1251 (9th Cir. 2017)..............16, 19, 30

*Rent-A-Center, West, Inc.* v. *Jackson*, 561 U.S. 63 (2010) ...............6, 10, 11, 12

*T.P. ex rel. S.P.* v. *Walt Disney Parks & Resorts U.S., Inc.*,
445 F. Supp. 3d 665 (C.D. Cal. 2020) ...............................22

*Soltani* v. *Western & Southern Life Insurance Co.*,
258 F.3d 1038 (9th Cir. 2001)...............................................27

*Sonic-Calabasas A, Inc.* v. *Moreno*, 311 P.3d 184 (Cal. 2013).........................23

*St. Paul Fire & Marine Insurance Co.* v. *AmerisourceBergen Corp.*,
295 Cal. Rptr. 3d 400 (Ct. App. 2022) ..............................22

*StockX Customer Data Security Breach Litigation, In re*,
19 F.4th 873 (6th Cir. 2021) ...........................................11, 12

*Tompkins* v. *23andMe, Inc.*, 840 F.3d 1016 (9th Cir. 2016)...............11

*Vaughn* v. *Tesla, Inc.*, 303 Cal. Rptr. 3d 457 (Ct. App. 2023)...........................25

*Viking River Cruises, Inc.* v. *Moriana*, 142 S. Ct. 1906 (2022)..............2, 25, 26

Page

Cases—continued:

*Weatherly* v. *Universal Music Publishing Group*,
 23 Cal. Rptr. 3d 157 (Ct. App. 2004) ...............................................28

*Zimmer M/L Taper Hip Prosthesis Products
 Liability Litigation*, *In re*, Civ. No. 18-10393,
 2021 WL 5963392 (S.D.N.Y. Dec. 16, 2021) .................................22

## STATUTES

Federal Arbitration Act, 9 U.S.C. §§ 1-16 ...............................*passim*

California Private Attorney General Act,
 Cal. Labor Code §§ 2698-2699.8.....................................................25

## MISCELLANEOUS

AAA Consumer Arbitration Rules
 <tinyurl.com/aaaconsumer> ...............................................*passim*

AAA Consumer Due Process Protocol
 <tinyurl.com/consumerdueprocess> ........................................14

AAA Supplementary Rules for Mutliple Case Filings
 <tinyurl.com/aaamultiplecaserules> .......................................18

Eldon E. Fallon, *Bellwether Trials*,
 89 U. Mo. Kan. City L. Rev. 951 (2021).........................................18

Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigations*,
 82 Tul. L. Rev. 2323 (2008) ......................................................22, 24

J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283 (2022) ...................23

Abbe R. Gluck, *Unorthodox Civil Procedure: Modern Multidistrict
 Litigation's Place in the Textbook Understandings of Procedure*,
 165 U. Pa. L. Rev. 1669 (2017).................................................21, 22

Page

Miscellaneous—continued:

Martin H. Redish & Julie M. Karaba, *One Size Doesn't Fit All:*
*Multidistrict Litigation, Due Process, and the Dangers of*
*Procedural Collectivism*, 95 B.U. L. Rev. 109 (2015).............................18, 22

*Webster's Third New International Dictionary* (2002)....................................29

The district court erred by refusing to compel arbitration in this case. Both the arbitration agreement's delegation of questions of arbitrability to the arbitrator and the Federal Arbitration Act's rule of severability prohibited the court from adjudicating plaintiffs' challenge to the arbitration agreement. The district court proceeded not only to address those challenges, but to decide them incorrectly. The arbitration agreement is valid and enforceable.

Plaintiffs throw out a slew of contrary arguments—some old, some new. But those arguments reflect a fundamental misunderstanding of federal arbitration and contort the provisions of the customer agreement beyond recognition.

With respect to the delegation of arbitrability: plaintiffs continue to advocate for an exception for unsophisticated consumers to the settled rule that incorporation of the rules of the American Arbitration Association (AAA) constitutes a clear and unmistakable delegation of arbitrability. Every court of appeals to have considered the issue has refused to create such an exception, and it is obvious why. That exception has no foothold in the text of the Federal Arbitration Act; it has no basis in the Supreme Court's precedents on arbitrability; and it conflicts with the objective theory of contract formation. Plaintiffs' new arguments on appeal that the delegation provision is unconscionable and illusory fare no better.

With respect to plaintiffs' challenge to the broader arbitration agreement: plaintiffs can barely muster a response to the argument that the federal rule of severability prohibits a court from invalidating an arbitration agreement based on contract provisions outside the arbitration agreement. And even if the Court were to consider all of plaintiffs' challenges, each falls short. The mass-arbitration provision fairly and efficiently ameliorates the central problems associated with mass filings and will not create unreasonable delay in the adjudication of coordinated claims. Plaintiffs cannot reconcile the district court's invalidation of the collective-arbitration waiver with the Supreme Court's recent decision in *Viking River Cruises, Inc.* v. *Moriana*, 142 S. Ct. 1906 (2022). And even assuming the provisions were not severable from the arbitration agreement, plaintiffs cannot explain how their challenge to the six-month notice provision is consistent with California precedent, or why their unduly harsh interpretation of the integration clause should lead to its invalidation.

In sum, the district court never should have addressed plaintiffs' enforceability challenge, and once it did, it compounded that error with several more. This Court should reverse the decision below and direct the district court to compel arbitration.

## I.  THE DISTRICT COURT ERRED BY DECLINING TO SEND THE QUESTION OF UNCONSCIONABILITY TO THE ARBITRATOR

Under the plain terms of the customer agreement, the parties agreed to arbitrate threshold questions of arbitrability, including the question of whether the arbitration agreement is enforceable.  *See* Br. of Appellants 20-31.  Plaintiffs' attempts to avoid that delegation are unsuccessful.

### A.  The Arbitration Agreement Clearly And Unmistakably Delegates Questions of Arbitrability To The Arbitrator By Incorporating The Rules Of The American Arbitration Association

As appellants have explained (Br. 21-24), this Court and the ten other courts of appeals to have considered the question have all held that an arbitration agreement's incorporation of the AAA rules provides the necessary "clear and unmistakable" evidence to delegate questions of arbitrability to the arbitrator.  The arbitration agreement here incorporates those rules and thus unambiguously delegated objections to the validity of the agreement to the arbitrator.  *See* Br. of Appellants 20-31.  Plaintiffs' various responses are unavailing.

1.  Plaintiffs begin by arguing (Br. 24-25) that the customer agreement is silent as to who will decide questions of arbitrability, notwithstanding the agreement's incorporation of the AAA rules.  This Court's decision in *Brennan* v. *Opus Bank*, 796 F.3d 1125 (2015), forecloses that argument.  In *Brennan*, the Court expressly held—in line with the decisions of "[v]irtually every circuit"—that the "incorporation of the AAA rules constitutes clear and

unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Id.* at 1130. Plaintiffs do not dispute that "the AAA rule at issue here is identical to the one in *Brennan*." Br. of Appellants 29. *Brennan* thus precludes any argument that the body of the arbitration agreement must contain the specific language delegating questions of arbitrability to the arbitrator, *see* Br. of Appellees 24-25, or that the AAA rules do not otherwise provide the arbitrator with exclusive power to determine questions of arbitrability.

2.      Plaintiffs also argue, as the district court concluded, that the incorporation rule recognized in *Brennan* must have an exception "[w]here at least one party is unsophisticated." Br. 28. But plaintiffs admit (Br. 31 n.16) that neither this Court nor any other federal court of appeals recognizes such an exception. In fact, at least five different courts of appeals, including this Court in an unpublished decision, have declined to recognize such an exception. *See* Br. of Appellants 24.

That uniformity is unsurprising. "[N]othing in the [Arbitration Act] purports to distinguish between 'sophisticated' and 'unsophisticated' parties." *Blanton* v. *Domino's Pizza Franchising, LLC*, 962 F.3d 842, 851 (6th Cir. 2020). And the unsophisticated-party exception conflicts with the objective theory of contracts, under which parties are bound by the "reasonable meaning of [their] words," not "their unexpressed intentions or

understanding." *Casa del Caffe Vergnano S.P.A.* v. *ItalFlavors, LLC*, 816 F.3d 1208, 1212 (9th Cir. 2016) (citation omitted).

Plaintiffs do not dispute any of those points. Instead, they double down on the argument that sophisticated and unsophisticated parties may understand the same words differently. They contend that, where the body of an agreement does not include the specific delegation language, an unsophisticated party could make the "reasonable inference" that "the *enforceability* of the arbitration [agreement] remains a matter for determination by a court." Br. 29-30 (citation omitted). Under undisputed principles of contract law, however, a contract's meaning is determined by the objective import of the parties' words and actions, not a party's different, unexpressed intention. *See* Br. of Appellants 26-27. And even if the parties' subjective characteristics were relevant, it is hard to see how plaintiffs' suggested inference could be considered "reasonable" after this Court held that incorporation of the AAA rules *clearly and unmistakably* delegates questions of arbitrability to the arbitrator. *See Brennan*, 796 F.3d at 1130.

To the extent that plaintiffs suggest (Br. 28-29) that the clear-and-unmistakable rule itself becomes more demanding where one party is unsophisticated, that argument fails. Such a rule would amount to a presumption that an unsophisticated party does not understand what the words in a contract mean. But as the Supreme Court explained in *First Options of Chicago, Inc.*

v. *Kaplan*, 514 U.S. 938 (1995), the clear-and-unmistakable rule merely "reverses the presumption" that "silence or ambiguity" in an arbitration agreement should be interpreted in favor of arbitration. *Id.* at 944-945. The unsophisticated-party exception would do something entirely different: it would measure the degree of clarity required to create an enforceable delegation based on the subjective characteristics of the parties.

Nothing in the Supreme Court's precedents supports the grafting of such an analysis on top of the reverse presumption that the clear-and-unmistakable rule embodies. To the contrary, the Court has referred to the rule as focused on the parties "*manifestation of intent.*" *Rent-A-Center, West, Inc.* v. *Jackson*, 561 U.S. 63, 70 n.1 (2010).

3. In *Gostev* v. *Skillz Platform, Inc.*, 305 Cal. Rptr. 3d 248 (2023), an intermediate California appellate court recently rejected the phalanx of "contrary federal authority" and adopted the unsophisticated-party exception. *Id.* at 258 n.7, 260. Plaintiffs argue that, because a "California appellate court has spoken" on the issue, this Court is now "obligated" to apply the unsophisticated-consumer exception here. Br. 30, 31.

Setting aside that this Court is not bound by the decision of an intermediate state appellate court, *see, e.g.*, *Killgore* v. *SpecPro Professional Services, LLC*, 51 F.4th 973, 982 (9th Cir. 2022), the Court already rejected the application of state law in this context. In *Brennan*, the plaintiff similarly contended

that California law should apply to the determination of whether the clear-and-unmistakable standard was satisfied. *See* 796 F.3d at 1129. The Court disagreed, explaining that, for any agreement covered by the Arbitration Act, "federal law governs the arbitrability question" absent "clear and unmistakable evidence that the parties agreed to apply non-federal arbitrability law." *Id.* (citation omitted). Accordingly, *Gostev* would apply here only if the agreement "expressly state[d] that California law governs the question of *arbitrability*." *Brennan*, 796 F.3d at 1129.

It does not. Plaintiffs cite the agreement's choice-of-law provision (Br. 12, 30), but the mere existence of a "general" choice-of-law provision selecting another source of law does not suffice. *See Cape Flattery Limited* v. *Titan Maritime, LLC*, 647 F.3d 914, 921 (9th Cir. 2011). The choice-of-law provision also states that "*federal law* and [state] laws" govern disputes covered by the agreement. ER-39 (emphasis added). And the arbitration agreement elsewhere provides that the Federal Arbitration Act applies under the agreement. *See* ER-37. The agreement thus leaves no doubt that the federal law of arbitrability applies here.

Plaintiffs contend that, even if the federal law of arbitrability supplies the clear-and-unmistakable rule, "state contract law determines whether that standard has been met." Br. 30 n.15. That was the very argument this Court rejected in *Brennan* when it held that the federal law of arbitrability

governed: the plaintiff there was attempting to resist arbitration by invoking "the opposition of the California appellate courts to the use of the reference to AAA rules as a sufficiently clear and unmistakable delegation." Br. of Appellant at 33, *Brennan, supra* (Nos. 13-35580 & 13-35598). Plaintiffs suggest that, in *First Options*, the Supreme Court treated the application of the clear-and-unmistakable rule to the facts as a question of state law. *See* Br. 30-31 n.15. But the Court did not refer to state law when determining that the heightened federal standard was not satisfied. *See First Options*, 514 U.S. at 946-947.

Federal law governs the question of whether there is an unsophisticated-consumer exception to the general rule that the incorporation of the AAA rules constitutes a clear and unmistakable delegation of questions of arbitrability to the arbitrator. Consistent with the numerous other federal courts of appeals to have addressed the issue, this Court should hold that no such exception exists.

4. Plaintiffs additionally argue (Br. 25) that the arbitration agreement is ambiguous with respect to the delegation because it allows a party bringing a claim for less than $10,000 to choose either the AAA rules or the rules of the Better Business Bureau (BBB), which do not delegate all questions of arbitrability to the arbitrator. Plaintiffs contend that, at the time they signed the agreement, they did not know which rules would govern, which in their view "results in a failed delegation." Br. 26-27.

8

Plaintiffs confuse choice with ambiguity. A contractual provision is ambiguous only if it is subject to "multiple reasonable interpretations." *Musicians* v. *Paramount Pictures Corp.*, 903 F.3d 968, 977 (9th Cir. 2018) (citation omitted). But the portion of the arbitration agreement incorporating the AAA and BBB rules is not. It unambiguously states that, for certain claims, the AAA rules apply, and that, for other claims, the customer can choose between the AAA or BBB rules. Read together, the two clauses merely provide alternative paths that do not conflict. Plaintiffs need not have chosen between AAA or BBB arbitration at the time they signed the agreement. But the agreement unambiguously provides that, if plaintiffs bring claims for more than $10,000, or if they later choose AAA arbitration, then the AAA rules apply—including the rule delegating questions of arbitrability to the arbitrator.

Plaintiffs chose the AAA path, arguing to the district court that the "[t]he [c]ustomer [a]greement specifies arbitration before the American Arbitration Association" and that they would "opt for AAA arbitration" if they had a choice. D. Ct. Dkt. 29, at 3 & n.3; *see* Br. of Appellants 31. Plaintiffs now attempt to change that position, contending that they still "have the ability to choose either the AAA or the BBB rules" and that they "never contended that their claims are worth more than $10,000." Br. 26 (emphasis omitted). But plaintiffs cannot "gain[] an advantage by taking one position" below and then gain "a second advantage by taking an incompatible position" on appeal.

9

*Helfand* v. *Gerson*, 105 F.3d 530, 534 (9th Cir. 1997). Plaintiffs represented to the district court that the AAA rules would apply and even cited data from the AAA to support their argument that the mass-arbitration provision creates delay. *See* D. Ct. Dkt. 29, at 3, 18. The district court then referred to that AAA data in ruling that the mass-arbitration provision is unconscionable. *See* ER-21. This Court should not indulge plaintiffs' new position on appeal.

**B.    The Delegation Provision Is Not Unconscionable Or Illusory**

For the first time on appeal, plaintiffs assert (Br. 32-38) that the delegation provision itself is invalid. In particular, plaintiffs contend that the delegation is unconscionable and provides an "illusory remedy." Those arguments are unpersuasive.

1.    Plaintiffs' unconscionability challenge to the delegation provision falters at the outset because their argument is not specific to the delegation provision. Under the Arbitration Act's federal rule of severability, a court may resolve only "challenges directed specifically to the validity of the arbitration provision itself." *Caremark, LLC* v. *Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022). That rule also applies to agreements that delegate questions of arbitrability to the arbitrator. *See Rent-A-Center*, 561 U.S. at 71-72. Accordingly, when an arbitration agreement contains a delegation provision, the court must send the entire dispute to arbitration unless the plaintiff "challenge[s] the delegation provision specifically." *Id*. at 72.

10

A party may mount a specific challenge to a delegation provision by arguing that "common procedures *as applied* to the delegation provision rendered *that provision* unconscionable." *Rent-A-Center*, 561 U.S. at 74; *accord Lim* v. *TForce Logistics, LLC*, 8 F.4th 992, 1003 (9th Cir. 2021); *Tompkins* v. *23andMe, Inc.*, 840 F.3d 1016, 1032 (9th Cir. 2016). But even then, the plaintiff must make "arguments specific to the delegation provision." *Rent-A-Center*, 561 U.S. at 75; *accord Brennan*, 796 F.3d at 1133.

There is some disagreement among the courts of appeals concerning the proper analysis for determining whether a challenge to a delegation provision is sufficiently specific. Some courts have suggested that a party need only say that it is challenging the delegation provision, including by merely stating that the "delegation clause suffers from the same defect as the arbitration provision." *Gibbs* v. *Sequoia Capital Operations, LLC*, 966 F.3d 286, 291 (4th Cir. 2020) (citation omitted); *see Gingras* v. *Think Finance, Inc.*, 922 F.3d 112, 126 (2d Cir. 2019); *MacDonald* v. *CashCall, Inc.*, 883 F.3d 220, 226-227 (3d Cir. 2018). The better view, however, is that "it is not sufficient for a party to merely say the words, 'I am challenging the delegation agreement.'" *Attix* v. *Carrington Mortgage Services, LLC*, 35 F.4th 1284, 1304 (11th Cir. 2022). Because "[c]hallenging a delegation agreement is a matter of substance, not form," a proper challenge must "meaningfully go[] to the parties' precise agreement to delegate threshold arbitrability issues." *Id.*; *accord In re StockX*

*Customer Data Security Breach Litigation*, 19 F.4th 873, 885-886 (6th Cir. 2021); *Brice* v. *Haynes Investments, LLC*, 13 F.4th 823, 827, 829-830 (9th Cir. 2021), *vacated*, 35 F.4th 1219 (9th Cir. 2022).

This Court should thus look to the "substance" of plaintiffs' challenge and determine whether it "rest[s], in part, on different factual or legal grounds than the ones supporting [their] challenge to the arbitration agreement as a whole." *Becker* v. *Delek US Energy, Inc.*, 39 F.4th 351, 356 (6th Cir. 2022). It is not enough for plaintiffs "simply [to] recycle[] the same arguments that pertain to the enforceability of the agreement as a whole." *StockX*, 19 F.4th at 886.

That, however, is exactly what plaintiffs do. Plaintiffs' nominal challenge to the delegation provision is premised on the alleged delays "built into Verizon's arbitration system." Br. 37. But that is the same argument that plaintiffs raise to challenge the arbitration agreement as a whole. *See* Br. 53-63. While plaintiffs recite that they are challenging "the mass arbitration provision *as applied to* the delegation clause," Br. 34, 37 (emphasis added), plaintiffs do not meaningfully explain how the mass-arbitration provision affects their ability to arbitrate questions of arbitrability. They simply assume that the provision has the same effect on the delegation clause as on the broader arbitration agreement as a whole. That is not an "argument[] specific to the delegation provision." *Rent-A-Center*, 561 U.S. at 74.

12

2.     Plaintiffs' illusory-remedy argument is substantively indistinguishable from their unconscionability argument.  It too is based entirely on the delay allegedly caused by the mass-arbitration provision, and so it fails for the same reason:  it is a general attack on the arbitration agreement as a whole rather than a specific attack on the delegation clause.

Plaintiffs suggest that the illusory-remedy argument is unique because it presents a "question of contract formation" that "must be decided by a court and not by an arbitrator."  Br. 33.  But that is of no significance with respect to the delegation provision; the court must always dispose of challenges to the delegation provision before compelling arbitration, whether the issue is one of contract formation or contract validity.  *See, e.g.*, *Caremark*, 43 F.4th at 1030.  For that reason, the Court should treat plaintiffs' illusory-remedy and unconscionability arguments as identical.[1]

---

[1] Plaintiffs do not directly argue that the arbitration agreement as a whole is unenforceable because it provides an illusory remedy.  If plaintiffs were raising that argument, it *would* matter whether the argument presented a question of contract formation, because "a court must resolve any challenge that an agreement to arbitrate was never formed, even in the presence of a delegation clause."  *Caremark*, 43 F.4th at 1030.  Yet even if the Court were to consider plaintiffs' novel illusory-remedy argument as applied to the arbitration agreement as a whole, that argument clearly concerns contract validity and not formation.  After all, the argument does not dispute the "very existence" of an arbitration agreement, *Kum Tat Limited* v. *Linden Ox Pasture, LLC*, 845 F.3d 979, 983 (9th Cir. 2017); rather, it challenges the arbitration agreement based on the "public policy concern[]" that arbitration is not serving as a valid alternative to litigation.  *Awuah* v. *Coverall North America, Inc.*, 554 F.3d 7, 12 (1st Cir. 2009).

13

3.      Even if plaintiffs had properly challenged the enforceability of the delegation provision, they are incorrect that the mass-arbitration provision would require them to wait "decades or longer" for "access to an arbitrator" in order to determine threshold questions of arbitrability.  Br. 32.

As an initial matter, the same AAA rules that delegate arbitrability make clear that AAA will administer disputes in a manner that permits proceedings to "occur within reasonable time, without undue delay."  AAA Due Process Protocol Principle 8 <tinyurl.com/consumerdueprocess>; *see* AAA R-1(d).  In any event, in order to challenge the mass-arbitration provision, one of the first selected plaintiffs would simply file a demand for arbitration, and upon appointment of an arbitrator, ask the arbitrator to determine the validity of the mass-arbitration provision.

It is true that, if the arbitrator were to *uphold* the mass-arbitration provision, other plaintiffs may be unable to obtain immediate decisions on other questions of arbitrability, such as whether the plaintiffs' claims fall within the scope of the arbitration agreement.  At that point, the mass-arbitration provision may require the plaintiffs to wait before proceeding.  But precisely because the arbitrator would already have upheld the mass-arbitration provision, any such delay would be permissible.  And if the arbitrator were to *invalidate* the mass-arbitration provision, the plaintiffs raising the challenge could proceed to adjudicate any threshold questions of arbitrability apace.

Plaintiffs are thus incorrect that the mass-arbitration provision, as applied to the delegation provision, renders the delegation provision unenforceable. Because the parties' agreement contains a clear and enforceable delegation of questions of arbitrability to the arbitrator, the district court was incorrect to proceed to decide those questions. For that reason alone, the district court's order denying the motion to compel arbitration should be reversed.

## II. EVEN ABSENT THE DELEGATION, THE DISTRICT COURT SHOULD NOT HAVE ADDRESSED THE UNCONSCIONABILITY OF CONTRACTUAL PROVISIONS OUTSIDE THE ARBITRATION AGREEMENT

Even setting aside the arbitration agreement's delegation of questions of arbitrability to the arbitrator, the district court violated the federal rule of severability by assessing the unconscionability of three contractual provisions outside the arbitration agreement: namely, the six-month notice provision, the punitive-damages waiver, and the integration clause. *See* Br. of Appellants 31-32. Plaintiffs devote only a single footnote to that issue, arguing that those provisions are "procedural rules that are intended to be applied in arbitration and, once applied, could limit the claims alleged, the evidence presented, and the damages awarded." Br. of Appellees 39-40 n.20 (citations omitted).

Plaintiffs merely parrot the district court's statement that the three provisions at issue are "functionally intertwined with the arbitration clause." ER-9. But as defendants have explained (Br. 31-34), the mere fact that a provision

15

is "procedural" or might have some effect on the arbitration does not make that provision part of the arbitration agreement for purposes of the federal severability principle. All three of the relevant provisions physically appear outside the arbitration agreement; they apply equally in small-claims court; and they are perfectly coherent without reference to the arbitration agreement. *Id.* Plaintiffs offer no response to any of those points.

## III. THE DISTRICT COURT'S UNCONSCIONABILITY ANALYSIS WAS ERRONEOUS

While the Court need not address plaintiffs' challenges to the broader arbitration agreement or consumer contract in light of the valid delegation, the district court erred in crediting those challenges. *See also Achey* v. *Cellco Partnership*, No. A-3639-21, 2023 WL 3160849, at *4-*6 (N.J. Super. Ct. App. Div. May 1, 2023) (following the district court's decision as matter of New Jersey law). Plaintiffs do not dispute that the contract at issue here contained only "a low degree of procedural unconscionability at most," and that the contract is thus enforceable "unless the degree of substantive unconscionability is high." *Poublon* v. *C.H. Robinson Co.*, 846 F.3d 1251, 1261, 1262-1263 (9th Cir. 2017) (citation omitted). Attempting to meet that heavy burden, plaintiffs severely distort several of the contract's clauses, ignoring their plain meaning and defying multiple rules of contract construction. This Court should reject plaintiffs' attempt to manufacture unconscionability by misreading the contract.

### A.    The Mass-Arbitration Provision Is Not Substantively Unconscionable

The mass-arbitration provision establishes a bellwether mechanism for resolving multiple similar claims filed by the same counsel. *See* Br. of Appellants 36-39. Plaintiffs do not dispute that bellwether proceedings are a fair, well-established, and efficient mechanism for resolving mass claims. *See* Br. of Appellees 58. Nor do they contest that the mass-arbitration provision reduces the *in terrorem* settlement pressure created when a plaintiffs' firm files hundreds or thousands of claims for the purpose of triggering a company's fee-paying obligations. *See* Br. of Appellants 40-41. Instead, plaintiffs argue that several features of the mass-arbitration provision create impermissible delay or otherwise render it problematic. Those arguments are unpersuasive.

1.    Plaintiffs first argue that the mass-arbitration provision would "destroy most claims" by preventing them from being filed before the applicable limitations period expires. Br. 16-19, 55. But the express provisions of the contract toll the limitations periods for all noticed claims. *See* Br. of Appellants 44-45. Plaintiffs do not address those provisions, nor do they dispute that standard principles of contract interpretation require ambiguities to be construed in favor of tolling. *See id.* at 45.

Plaintiffs also argue that, regardless of tolling, the mass-arbitration provision would require them to "wait decades" for their arbitrations to occur. Br. 15. To support that figure, plaintiffs point to a single study indicating that the

"average arbitration takes 6.9 months to administer." Br. 17. But that calculation makes little sense in the context of the coordinated, substantively similar claims at issue here. There are at least two reasons why.

*First*, as plaintiffs acknowledge (Br. 58), the primary goal of bellwether proceedings is to facilitate global resolution. And generally, bellwether proceedings have proven enormously successful at achieving that goal. *See*, *e.g.*, Martin H. Redish & Julie M. Karaba, *One Size Doesn't Fit All: Multidistrict Litigation, Due Process, and the Dangers of Procedural Collectivism*, 95 B.U. L. Rev. 109, 128 (2015). There is no reason to assume different results for the bellwether proceedings here.

*Second*, the efficiencies created by coordinating proceedings will allow the parties to proceed much more rapidly than in an average AAA arbitration. The same counsel will represent the parties each time, making "future [proceedings] more efficient" by allowing the reuse of materials across similar cases. Eldon E. Fallon, *Bellwether Trials*, 89 U. Mo. Kan. City L. Rev. 951, 952 (2021). The AAA's Supplementary Rules for Multiple Case Filings also streamline proceedings in several ways. Under those rules, a recurring group of arbitrators can conduct the arbitrations. *See* AAA Rule MC-7 <tinyurl.com/aaamultiplecaserules>. Parties can also file single communications across multiple cases. *See* AAA Rule MC-3(a), MC-4(b). The arbitrators could thus quickly master the applicable law and facts and work with counsel to

decide successive cases rapidly. In light of that streamlined process, individual arbitrations—even proceeding in batches of ten—should be completed in far less than seven months per arbitration.

Plaintiffs attempt to insulate their figures from scrutiny by suggesting that the district court accepted them as "factual findings" subject only to clear-error review. Br. 10-11. Not so. The district court simply noted that "[p]laintiffs calculate that it would take approximately 156 years to resolve the claims of all of [p]laintiffs' counsel's clients," ER-21; it did not affirmatively find that number to be accurate. Nor could it have made any such finding, in light of the absence of submissions of evidence or testimony.

2.     Plaintiffs next argue (Br. 18-19) that, even if the bellwether process could facilitate global resolution, defendants might intentionally refrain from settling cases in order to force plaintiffs into protracted proceedings. As defendants have explained, however, the implied covenant of good faith and fair dealing would bar such conduct. *See* Br. 43. Notably, plaintiffs do not dispute that a contract term is not substantively unconscionable where the covenant of good faith prohibits its use in an unreasonable way. *See Poublon*, 846 F.3d at 1269.

Plaintiffs' only response is to insist (against their own interest) that "the arbitration agreement expressly allows Verizon to slowly drag out the

arbitrations." Br. 57.  To the contrary, the two contractual provisions plaintiffs cite prevent the very abuse they claim to fear.

Plaintiffs first cite a sentence of the mass-arbitration provision stating that the bellwether process "may continue until the parties are able to resolve all of the claims, either through settlement or arbitration."  ER-38; *see* Br. of Appellees 57 n.38.  Yet that provision speaks explicitly of an ongoing "bell-wether" process—a process that plaintiffs acknowledge is designed to facilitate global settlement.  *See* ER-38; Br. of Appellees 58.  Were defendants to delay proceedings artificially in an effort to avoid settlement and fair resolution, the proceedings would cease to be "bellwethers" altogether.  The arbitrator would then be free to enforce the covenant of good faith—and the plain text of the agreement—as appropriate.

Plaintiffs next cite the paragraph of the arbitration provision stating that defendants "may, but are not obligated to, make a written settlement offer any time before the arbitration hearing."  ER-38; Br. 18, 57 n.39.  But that same paragraph penalizes defendants for failing to make a reasonable settlement offer in small-value cases where the consumer prevails.  Under that paragraph, if defendants fail to make a settlement offer and "the arbitrator awards [the consumer] any amount of money but less than $5,000, then [defendants] agree to pay $5,000 instead of the amount awarded," as well as "any reasonable attorneys' fees and expenses."  ER-38.  Defendants face a similar

penalty if the customer rejects the settlement offer and "the arbitrator awards [the consumer] an amount of money that's more than [the] offer but less than $5,000." ER-38.

Plaintiffs' reliance on that provision is bizarre. That provision provides an entirely one-sided benefit to plaintiffs, penalizing defendants—but not plaintiffs—for failing to negotiate seriously. And crucially, that provision clearly *reduces* the likelihood of abuse of the bellwether process. The penalties set forth in that provision incentivize defendants to make serious settlement offers and therefore reduce any economic benefit from undue delay. Plaintiffs are thus flat wrong when they assert that the agreement "contains nothing to foster settlement negotiations." Br. 61.

3. Plaintiffs further malign the bellwether process on the ground that it "lacks several of the characteristics vital to a true bellwether." Br. 58.

For example, plaintiffs argue that, unlike a "true" bellwether process, "claimants who do not want to settle" after the "initial phase is completed" cannot "go ahead and continue prosecuting their claims." Br. 58 (emphasis omitted). But it is inaccurate to say that plaintiffs proceeding in court can always proceed quickly with their individual case after an initial bellwether phase is complete. Only around 3% of cases consolidated in an MDL are re-manded to the original district court for individual proceedings. *See* Abbe R. Gluck, *Unorthodox Civil Procedure: Modern Multidistrict Litigation's Place*

21

*in the Textbook Understandings of Procedure*, 165 U. Pa. L. Rev. 1669, 1673 (2017). And judges overseeing mass litigation often order multiple rounds of bellwether trials, during which cases not selected remain stayed. *See, e.g.*, *In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 348-349 (5th Cir. 2017); *T.P. ex rel. S.P.* v. *Walt Disney Parks & Resorts U.S., Inc.*, 445 F. Supp. 3d 665, 667 (C.D. Cal. 2020); *In re Zimmer M/L Taper Hip Prosthesis Products Liability Litigation*, Civ. No. 18-10393, 2021 WL 5963392, at *6 (S.D.N.Y. Dec. 16, 2021).

In any event, all of plaintiffs' arguments on this score boil down to a concern about delayed adjudication. But extended delays in mass proceedings are the inevitable result of mass filings themselves, not the bellwether process used to resolve those cases. Individual adjudications in MDLs, for example, are usually delayed by "several years, at a minimum." Redish & Karaba 145. That delay, however, represents the more-efficient alternative to "thousands of similar cases clogging the courts." Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigations*, 82 Tul. L. Rev. 2323, 2330 (2008) (Fallon). Precisely the same is true of arbitration. Far from causing delay, it is the bellwether process that produces efficiencies in "every aspect of the litigation process—to the benefit of the parties, the court, and the public alike." *St. Paul Fire & Marine Insurance Co.* v. *AmerisourceBergen Corp.*, 295 Cal. Rptr. 3d 400, 412 (Ct. App. 2022).

In addition, as defendants have explained (Br. 40-41), the mass-arbitration provision reduces the "illegitimate, *in terrorem* settlement pressure" created by the need to pay all administrative and arbitrator fees in hundreds or thousands of cases simultaneously. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283, 1350 (2022). Plaintiffs do not dispute that the provision provides those benefits. Instead, they chastise defendants as having "breathtaking" "chutzpah" for seeking those benefits after opting for arbitration over class litigation in their consumer contracts. Br. 62. Selecting arbitration, however, is defendants' statutory right; indeed, it is a choice that federal policy affirmatively favors. *See*, *e.g.*, *AT&T Mobility LLC* v. *Concepcion*, 563 U.S. 333, 346 (2011).

It also matters not whether the mass-arbitration procedures in the arbitration agreement here differ from the procedures adopted by a third-party arbitration provider. *See* Br. of Appellees 59-60. Plaintiffs' policy preferences for other models of arbitration agreements hardly render the agreement here unconscionable. *See Sonic-Calabasas A, Inc.* v. *Moreno*, 311 P.3d 184, 204 (Cal. 2013). And plaintiffs cite no authority for the proposition that the procedures here are problematic because defendants drafted them. *See* Br. 61.

Plaintiffs also assert that the process for selecting bellwether arbitrations—with each side's counsel selecting five cases—amounts to "the worst option" for case selection. Br. 60. But plaintiffs do not argue that such a

process is unfair, much less that it is "so one-sided as to shock the conscience." *OTO, L.L.C.* v. *Kho*, 447 P.3d 680, 693 (Cal. 2019) (internal quotation marks and citation omitted). In any event, as one experienced federal judge has explained, that method of selecting the bellwether candidates "is probably the most useful approach," because it "institutes fairness and attorney participation, while maintaining efficiency and placing the burden of ensuring representative cases on those with the most at stake." Fallon 2364.

4. Plaintiffs separately contend that the mass-arbitration provision improperly "interferes with a claimant's ability to retain the counsel of their choice." Br. 20. In plaintiffs' view, the provision does so by "creating a strong disincentive (long delays) to hir[ing] experienced counsel." *Id.* It may be true that a plaintiff has a right under California law to be "represented by retained counsel in civil proceedings." *Id.* But plaintiffs cite no authority for the further proposition that such a right extends to a plaintiff's choice to be free of any disincentives to hiring a particular attorney. If anything, the fact that a consumer "ha[s] the option" to avoid coordinated proceedings by hiring independent representation militates against, not in favor of, a finding of unconscionability. *Freeman* v. *Wal-Mart Stores, Inc.*, 3 Cal. Rptr. 3d 860, 867 (Ct. App. 2003). The mass-arbitration provision is not substantively unconscionable for any reason.

**B.     The Federal Arbitration Act Preempts The District Court's Application Of State Law To The Collective-Arbitration Waiver**

In *Viking River Cruises, Inc.* v. *Moriana*, 142 S. Ct. 1906 (2022), the Supreme Court held that the Arbitration Act preempts state-law rules invalidating a traditional, bilateral arbitration agreement on the ground that the right to seek relief on behalf of others is a nonwaivable substantive right. *See* Br. of Appellants 50-51.  That is precisely what the district court did here, however, by holding the collective-arbitration waiver unenforceable under the rule of *McGill* v. *Citibank, N.A.*, 393 P.3d 85 (Cal. 2017), which prohibits waivers of a party's right to seek public injunctive relief.  Plaintiffs contend that the district court's decision is consistent with *Viking River*.  It is not.

Plaintiffs first point to the fact that *Viking River* upheld the aspect of the California rule prohibiting waivers of individual claims under California's Private Attorney General Act (PAGA). *See* Br. 45-46.  That is true but irrelevant.  Individual PAGA claims do not seek damages for harms to absent third parties. *See Viking River*, 142 S. Ct. at 1915.  By contrast, the kind of public injunctive relief at issue here seeks to "prohibit[] unlawful acts that threaten future injury to the general public"—in other words, to prevent injuries to third parties. *McGill*, 393 P.3d at 87.  Contrary to the decision in *Vaughn* v. *Tesla, Inc.*, 303 Cal. Rptr. 3d 457 (Ct. App. 2023), that is precisely the sort of

third-party claim that *Viking River* held parties could not be forced to arbitrate against their will. *See* Br. of Appellants 52-54.

Plaintiffs are also incorrect that the *McGill* rule merely acts to prevent a waiver of a "substantive right and a substantive remedy." Br. 48. As applied by the district court here, the rule creates the very same problem of mandatory "claim joinder" as in *Viking River*. By its plain terms, the collective-arbitration waiver does not purport to waive a customer's substantive right to pursue public injunctive relief; it merely bars the customer from pursuing such relief *in arbitration*. *See* ER-37. And while the agreement generally requires arbitration of all disputes, it permits judicial resolution of claims for classwide or general relief where state law prohibits the waiver of such claims. *See* ER-38. Plaintiffs are therefore free to seek public injunctive relief separately in court. The district court's decision, however, requires defendants either to arbitrate claims for public injunctive relief alongside a customer's individual claims, or to forgo arbitration altogether. That is precisely the "unacceptable choice" that *Viking River* bars. 142 S. Ct. at 1918.

## C. The Six-Month Notice Provision Is Not Substantively Unconscionable

The six-month notice provision is not a limitation provision, and plaintiffs are wrong (Br. 40) that Verizon conceded that it "functions" as one. The provision merely requires claimants to notify Verizon about a dispute within six months but does not require them to commence an action during that

period. *See* Br. of Appellants 55-56. Because such a requirement is easier to comply with than a six-month limitation provision, it is even more reasonable than such a provision. *Id.*

In any event, "the weight of California case law strongly indicates that [a] six-month limitation provision is not substantively unconscionable." *Soltani* v. *Western & Southern Life Insurance Co.*, 258 F.3d 1038, 1043 (9th Cir. 2001). Plaintiffs cite two exceptions to that weight of authority (Br. 40-41), but both cases involved employment agreements—which California law views as "different" from other agreements when considering the "import of [a limitation] clause." Br. of Appellants 55-56 (citation omitted).

Plaintiffs also contend that the Court in *Soltani* upheld a six-month limitations provision "because the two analogous statutes had six-month limitations periods, resulting in a net reduction of 0%." Br. 41. That is incorrect: the *Soltani* court made no finding on the applicable statutes of limitations and analyzed the question as if the contractual provision "shortened" the limitations period. *See* 258 F.3d at 1041, 1043-1044. It is also beside the point: the court surveyed a range of cases involving different types of claims to make its point about "the weight of California case law." *Id.* at 1043-1044.

According to plaintiffs (Br. 42), six months was not sufficient for them to provide notice to defendants of their claims because defendants intentionally prevented them from learning of their claims. But that risk is inherent in any

limitations period, not simply one that is six months long.  To the extent plaintiffs contend they would need the benefit of a discovery rule, California applies such a rule to contractual limitations periods in appropriate cases.  *See Weatherly* v. *Universal Music Publishing Group*, 23 Cal. Rptr. 3d 157, 161-162 (Ct. App. 2004).

> **D.    The Integration Clause Is Not Substantively Unconscionable**

The customer agreement includes an ordinary integration clause stating, in consumer-friendly language, that the contract is the parties' entire agreement and supersedes all prior agreements.  *See* ER-39.  Plaintiffs concede that the first sentence of the integration clause "is a traditional integration clause." Br. 49.  But they argue that the second sentence—which provides that the customer "can't rely on any other documents, or on what's said by any Sales or Customer Services Representatives," ER-39—prohibits "extrinsic evidence to be considered under any circumstances, including to show fraud." Br. 50 (citation omitted).

As defendants have explained (Br. 57-59), that is not the fairest reading of the second sentence.  In context, the sentence refers to the subject of the previous sentence—the documents that "form the entire agreement between us"—and provides that any "other documents," or verbal representations by sales representatives, are not part of that agreement.  ER-39.

Even if the language were ambiguous, plaintiffs admit (Br. 51-52) that multiple rules of construction would require the integration clause to be interpreted as lawful. And here, the second sentence cannot unambiguously prohibit all extrinsic evidence because it says nothing about evidence, fraud, or discovery. Plaintiffs do not address defendants' interpretation, much less explain why it is unreasonable. *See Cunningham* v. *Universal Underwriters*, 120 Cal. Rptr. 2d 162, 168 (Ct. App. 2002).

Plaintiffs contend that "the word 'rely' is broad," and that "rely[ing] on other documents and [statements]" unambiguously means "*seeking* evidence through discovery" and "*submitting* evidence to the arbitrator." Br. 48-49. But none of those things is within the common definition of the verb "to rely," which means "to have confidence" or "to find support" or "depend." *Webster's Third New International Dictionary* 1919 (2002). The integration clause could thus reasonably be interpreted as "you can't count on other documents to create a binding agreement," or "you can't trust verbal statements as promises." Because those are reasonable interpretations of the integration clause, the Court should interpret the clause as valid.

## IV. THE DECISION BELOW SHOULD BE REVERSED OR, IN THE ALTERNATIVE, VACATED

Plaintiffs do not dispute that the punitive-damages waiver can be severed from the rest of the agreement. Nor do they dispute that the district court premised its severability analysis on the conclusion that all five of the

challenged provisions were unconscionable under California law. If this Court were to conclude that some, but not all, of those provisions are unconscionable, the district court's severability decision would be predicated on an error of law, and remand on the new question of severability would thus be appropriate.

Plaintiffs respond that defendants have conceded in other litigation that the mass-arbitration provision is not severable. *See* Br. 65. But in that very same filing, defendants also argued that all remaining challenged provisions *are* severable, because they address distinct issues and are separate from, or not central to, the arbitration agreement. *See id.* Finally, to the extent that plaintiffs suggest that an agreement to arbitrate is *automatically* considered to be permeated by unconscionability whenever it "contains more than one unenforceable provision" (Br. 66), this Court has declined to hold that California law creates such a "per se rule." *Poublon*, 846 F.3d at 1273. And even if there were such a rule, the Arbitration Act would bar it, because it would "discriminat[e] on its face against arbitration." *Kindred Nursing Centers Limited Partnership* v. *Clark*, 581 U.S. 246, 251 (2017).

Of course, the easiest way to dispose of this appeal is to hold that the district court erred by deciding questions of arbitrability despite the agreement's clear and enforceable delegation of those questions to the arbitrator. If this Court agrees that the district court erred in that respect, it would pretermit any need to get into any questions of severability.

\*      \*      \*      \*      \*

The order of the district court denying the motion to compel arbitration should be reversed.  In the alternative, the order should be vacated and the case remanded for further proceedings.

Respectfully submitted,

/s/ Kannon K. Shanmugam

| | |
|---|---|
| CRYSTAL NIX-HINES | KANNON K. SHANMUGAM |
| SHON MORGAN | WILLIAM T. MARKS |
| MARINA LEV | YISHAI SCHWARTZ |
| QUINN EMANUEL URQUHART | PAUL, WEISS, RIFKIND, |
| & SULLIVAN, LLP | WHARTON & GARRISON LLP |
| *865 South Figueroa Street,* | *2001 K Street, N.W.* |
| *10th Floor* | *Washington, DC 20006* |
| *Los Angeles, CA 90017* | *(202) 223-7300* |
| | |
| CHRISTINA HENRIQUEZ | JING YAN |
| QUINN EMANUEL URQUHART | PAUL, WEISS, RIFKIND, |
| & SULLIVAN, LLP | WHARTON & GARRISON LLP |
| *555 Twin Dolphin Drive,* | *1285 Avenue of the Americas* |
| *5th Floor* | *New York, NY 10019* |
| *Redwood Shores, CA 94065* | |

MAY 8, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-16020

I am the attorney or self-represented party.

**This brief contains** | 6,951 | **words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [                    ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Kannon K. Shanmugam | **Date** | May 8, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/2018*